UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:   S-Tek 1, LLC,                                    No. 20-12241-j11

        Debtor.

S-Tek 1, LLC

        Plaintiff and Counter-Defendant,

v.                                                       Adv. Proc. No. 20-01074-j

Surv-Tek, Inc. *et al.*,

        Defendants and Counter-Plaintiffs

**MEMORANDUM OPINION REGARDING SURV-TEK PARTIES'
MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT**

THIS MATTER is before the Court on a motion for summary judgment and partial

summary judgment (the "Summary Judgment Motion"), AP Doc. 72,[1] filed by defendants and

counter-plaintiffs Surv-Tek, Inc. ("Surv-Tek"), STIF, LLC ("STIF"), Russ Hugg, and Robbie

Hugg (collectively, the "Surv-Tek Parties"). Debtor plaintiff and counter-defendant S-Tek 1, LLC

("Debtor") filed a response in opposition (the "Response"), AP Doc. 82. Third-party defendants

Christopher Castillo, Kymberlee Castillo, and Randy P. Asselin (collectively, the "Individuals")

filed joinders to Debtor's Response (AP Docs. 80 & 81). The Surv-Tek Parties filed a reply to the

Response (AP Doc. 84). After consideration of the Summary Judgment Motion, Response,

joinders to the Response, and Reply, and the evidence presented by the parties, the Court will grant

in part and deny in part the Summary Judgment Motion for the reasons set forth below.

The Surv-Tek Parties seek partial summary judgment: (i) holding that Debtor is liable for

---

[1] References to "Doc. __" are to the docket in the bankruptcy case, Case No. 20-12241.
References to "AP Doc. __" are to the docket in the adversary proceeding, Adv. Proc. No. 20-01074 (the
"Adversary Proceeding").

breaches of a promissory note, security agreement, and commercial lease and that the Individuals are liable for breaches of guarantees thereof and (ii) determining the amounts owed, pending resolution of defenses and offsetting claims at trial. The Court will deny partial summary judgment on all of these counts (the "Surv-Tek Counts") because there can be no determination that parties are liable when there are defenses to liability that have not been determined.

The Surv-Tek Parties also seek full summary judgment on six of Debtor's claims (the "Debtor Counts"), denying the requested relief. The Court will grant or deny summary judgment on the Debtor Counts, as follows:

(1) Debtor's claim for intentional violation of the automatic stay. The Court will grant summary judgment in the Surv-Tek Parties' favor on this claim, because even in the light most favorable to Debtor, the facts do not demonstrate a stay violation.

(2) Debtor's claims for tortious interference with business relationships and prima facie tort. The Court will deny summary judgment on these claims because there are genuine issues of material fact.

(3) Debtor's claims for violations of the Unfair Trade Practices Act and conversion of personal property. The Court will grant in part and deny in part summary judgment on these claims.

(4) Debtor's claim for subordination of Surv-Tek's claim pursuant to 11 U.S.C. § 510(b). The request for summary judgment on this claim is moot because Debtor has withdrawn the claim.

## I.    SUMMARY JUDGMENT STANDARDS

Summary judgment will be granted when the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), made applicable to adversary proceedings by Fed. R. Bankr. P. 7056. "[A] party seeking summary judgment always bears the initial responsibility of informing the . . . court of the basis for its motion, and . . . [must] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Bacchus Indus., Inc.*

*v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir. 1991) ("The moving party has the initial burden to show that there is an absence of evidence to support the nonmoving party's case.") (internal quotation marks omitted). Only if the properly supported material facts entitle the requesting party to judgment as a matter of law is it appropriate for the court to grant summary judgment. *Celotex*, 477 U.S. at 323. The court evaluates a request for summary judgment by drawing "all reasonable factual inferences in favor of the non-moving party." *Genberg v. Porter*, 882 F.3d 1249, 1253 (10th Cir. 2018). Thus, summary judgment is appropriate "if the evidence points only one way and no reasonable inferences could support the non-moving party's position." *Id.*

In opposing a motion for summary judgment, a party may establish the existence of a genuinely disputed material fact by: 1) citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers or other materials" in the record; or 2) showing that "the materials cited [by the moving party] do not establish the absence . . . of a genuine dispute," or that the moving party "cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B). A dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Id.* Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

In considering a motion for summary judgment, the court must resolve all reasonable inferences and doubts in favor of the non-moving party and construe all evidence in the light

most favorable to the non-moving party. *See Hunt v. Cromartie,* 526 U.S. 541, 552 (1999). Further, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. *See Anderson*, 477 U.S. at 249.

## II.     FACTUAL BACKGROUND[2]

After review of the documentary evidence presented by the parties and affidavit testimony, the Court finds that certain facts are not in genuine dispute. Lists of the undisputed facts are attached to this Opinion as <u>Exhibit A</u> and <u>Exhibit C</u>, and a list of contested facts, with the Court's ruling on each fact as to whether it is in genuine dispute, is attached as <u>Exhibit B</u>.[3] Taking the facts in the light most favorable to Debtor and the Individuals, the non-moving parties, the Court summarizes the relevant facts as follows:

In January 2019, Debtor purchased Surv-Tek's surveying business. Pursuant to the closing agreement (the "Closing Agreement"), Debtor purchased substantially all of the assets and properties of Surv-Tek, including its name and the majority of its tangible and intangible assets. [Ex. A ¶ 4]. The purchase price was $1.8 million, with $250,000 paid at closing and the remaining $1.55 million to be paid pursuant to a promissory note (the "Promissory Note") issued by Debtor in favor of Surv-Tek. [Ex. A ¶ 11]. The Closing Agreement, the Promissory Note, and all other documents signed as part of the closing are collectively the "Loan Documents."

The Promissory Note provides that Debtor would make payments commencing on April 1,

---

[2] The Court takes judicial notice of the docket and claims register, and the documents therein, in this bankruptcy case and the Adversary Proceeding. See Fed. R. Evid. 201(b)(2) and (c); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may sua sponte take judicial notice of its own docket), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) ("[T]he bankruptcy court appropriately took judicial notice of its own docket . . .").

[3] The Surv-Tek Parties' undisputed facts are attached as <u>Exhibit A</u>, and Debtor's undisputed additional facts are attached as <u>Exhibit C</u>. Debtor also proposed additional facts that were contested by the Surv-Tek Parties. Such facts are not material to the outcome of the Summary Judgment Motion, and therefore they are not included here.

-4-

2019, and continuing on the first day of each month thereafter, in the amount of $16,440.15 per month. [Ex. A ¶ 12]. The unpaid principal balance of the Promissory Note accrued interest at the rate of 5.00% per annum, with a default interest rate of 12.00%. [Ex. A ¶ 13]. Pursuant to the Closing Agreement, the parties entered into an escrow agreement, which required all payments on the Promissory Note to be made to the escrow agent, Weststar Escrow, Inc. ("Weststar") [Ex. A ¶ 17].

In connection with the closing, Debtor also granted Surv-Tek a security interest in collateral pursuant to a security agreement (the "Security Agreement"), in order to secure Debtor's obligations to Surv-Tek under the Promissory Note. [Ex. A ¶ 23]. Surv-Tek's security interest was perfected on January 2, 2019, by the filing of a UCC-1 financing statement. [Ex. A ¶ 24]. Debtor further signed a lease agreement with STIF (the "Lease"), under which Debtor was to lease commercial space from STIF (the "Leased Premises"), commencing on January 1, 2019. [Ex. B ¶ 31].

Also in connection with the closing, guarantees of the Promissory Note and the Lease were executed. The three Individuals all executed the guarantee of the Promissory Note (the "Commercial Guarantee"). [Ex. B ¶ 42]. Mr. Asselin and Mr. Castillo executed the guarantee of the Lease (the "Lease Guarantee"). [Ex. B ¶ 42].

After January 2020, Debtor made no further payments on the Promissory Note [Ex. B ¶ 16] or the Lease. [Ex. A ¶ 33]. In a letter dated March 16, 2020, demand was made on Debtor for payment of all amounts owed under the Promissory Note and Lease. [Ex. A ¶ 45].

On April 4, 2020, Surv-Tek and STIF regained possession of the Leased Premises and took steps to secure and protect the collateral. [Ex. B ¶ 48].

Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on

December 2, 2020. [Ex. A ¶ 1].

## III.  PROCEDURAL BACKGROUND

The Surv-Tek Parties filed their Summary Judgment Motion in order to seek (1) partial summary in their favor on four counts against Debtor and the Individuals and (2) full summary judgment in their favor on six counts that Debtor brought against them. Regarding partial summary judgment, the Surv-Tek Parties have requested the Court to find partial summary judgment on Surv-Tek Counts I, II, and III,[4] with findings of liability and damages but pending resolution of any defenses or offsetting claims at trial. The Surv-Tek Parties request partial summary judgment determining that:

(1) On Surv-Tek Count I – Breach of Promissory Note and Security Agreement, Debtor is in breach of the Promissory Note and the Security Agreement, and the amount owed as of the Petition Date is $1,768,941.83.

(2) On Surv-Tek Count II – Breach of Lease, Debtor is in breach of the Lease, and the amount owed as of the Petition Date is $82,998.30.

(3) On Surv-Tek Count III – Breach of Commercial and Lease Guarantees, the Individuals are jointly and severally liable for all amounts: (a) owed by Debtor to Surv-Tek, under the Commercial Guarantee, and (b) owed by Debtor to STIF, under the Lease Guarantee, and the amounts owed are $1,768,941.83 and $82,998.30, respectively.

Regarding full summary judgment, the Surv-Tek Parties are seeking that the Court deny the requested relief for six of Debtor's claims:

(4) Debtor Count IX – Violations of the Unfair Trade Practices Act,

(5) Debtor Count X – Tortious Interference with Business Relationships,

---

[4] The "Surv-Tek Counts" describes claims brought by one or more of the Surv-Tek Parties.

(6) Debtor Count XI – Conversion,

(7) Debtor Count XII – Intentional Violations of Automatic Stay,

(8) Debtor Count XIV – Prima Facie Tort, and

(9) Debtor Count XVI – Subordination Claim Pursuant to § 510(b).

## IV.    DISCUSSION

(A) *Treating Facts as Established in This Adversary Proceeding Pursuant to FRCP 56(g)*

In connection with the Summary Judgment Motion, the Surv-Tek Parties filed a supplement requesting relief pursuant to Fed. R. Civ. P. 56(g), made applicable to adversary proceedings by Fed. R. Bankr. P. 7056. AP Doc. 73. Rule 56(g) provides:

> If the court does not grant all the relief requested by the [summary judgment] motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case.

The Surv-Tek Parties alleged sixty-three (63) facts in the Summary Judgment Motion are not in genuine dispute. Of those facts, Debtor and the Individuals contested thirty-four (34) of them. The Surv-Tek Parties' uncontested facts are set forth in Exhibit A, and the Court finds it appropriate to treat these uncontested facts as established for purposes of trial.[5] With regard to the contested facts, the Court reviewed each contested fact and determined whether it is in genuine dispute, not in genuine dispute to a certain extent, or not in genuine dispute at all. The list of contested facts and the Court's rulings are attached as Exhibit B. The Court finds it appropriate to treat the contested facts as established for purposes of trial for those facts the Court has determined are not in genuine dispute.

---

[5] Debtor proposed additional facts, many of which were not contested by the Surv-Tek Parties. However, Debtor did not make a request pursuant to Fed. R. Civ. P. 56(g) to treat facts as established for trial, and therefore Debtor's uncontested additional facts, while established for purposes of this Summary Judgment Motion, are not established for trial.

(B)  *Partial Summary Judgment is Denied for Surv-Tek Counts I, II, and III*

(1)  *Surv-Tek Count I – Breach of Promissory Note and Security Agreement*

The Surv-Tek Parties request partial summary judgment on Count I of their counterclaims.[6] They ask the Court to hold that Debtor is in breach of the Promissory Note and the Security Agreement and that the amount owed as of the Petition Date due to such breaches is $1,768,941.83. The Surv-Tek Parties have failed to meet their burden to establish liability and the amount owed on this claim.

With respect to the Promissory Note, the undisputed facts show that Debtor did not make payments for February 2020 through and including December 2020. However, establishing Debtor's nonpayment on the Promissory Note is insufficient to show that Surv-Tek is entitled to judgment as a matter of law. Debtor has asserted defenses to liability, including that Surv-Tek's prior breach of the Closing Agreement excused Debtor from further performance under the Loan Documents. Surv-Tek has requested partial summary judgment on liability and damages "pending the resolution of any offsetting claims or defenses at trial." Summary Judgment Motion at 16. The Court cannot make a determination on liability if defenses exist that could render Debtor not liable.

>  A claimant is entitled to summary judgment only when no genuine dispute as to material fact exists, the papers on the motion demonstrate the right to relief, and every one of the defenses asserted legally are insufficient. Since a single valid defense may defeat recovery, however, a claimant's motion for summary judgment should be denied when any defense presents significant fact issues that should be tried.

§ 2734 Defenses, 10B Fed. Prac. & Proc. Civ. § 2734 (4th ed.) (citing cases). When a plaintiff (or here counter-plaintiff) seeks summary judgment "as to the ultimate question of liability, it need not also move for the court to reject all defenses—that is implied by the motion." *TAS*

---

[6] *See* AP Doc. 31-1.

*Distrib. Co. v. Cummins, Inc.*, No. 07-1141, 2013 WL 12241129, at *3 (C.D. Ill. Feb. 1, 2013).

"Whether a defense counters directly the elements of a claim or otherwise excuses liability (i.e. an affirmative defense), it must be presented and supported when the embracing issue of 'liability' is considered for judgment." *Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 796 F. Supp. 1164, 1167 (S.D. Ind. 1992). However, the initial burden to show that defenses do not apply still rests with the moving party. "This initial burden remains with the moving party, even when the issue involved is one on which the non-movant will bear the burden of proof at trial, such as the Defendant's affirmative defenses in the present case." *Cytec Indus., Inc. v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821, 829 (S.D. Ohio 2002) (quoting *Books–A–Million, Inc. v. H & N Enters., Inc.*, 140 F. Supp. 2d 846, 851 (S.D. Ohio 2001)). While it may be possible to render partial summary judgment on liability and still preserve other issues for trial, such as damages or offsetting claims, it is not possible to hold that a party bears liability on a claim where there are defenses to liability.

With respect to the Security Agreement, Surv-Tek failed to meet its burden to establish breach of the Security Agreement because there are genuine issues of material fact. First, Surv-Tek asserted that Debtor's removal of collateral from the Leased Premises constituted a breach of the Security Agreement. However, there is a genuine issue of material fact whether Debtor's removal of collateral from the Leased Premises occurred in the ordinary course of business or was otherwise permitted under the Security Agreement. *See* Ex. B at ¶¶ 47 & 49. Additionally, there are also genuine issues of material fact regarding whether Debtor breached the Security Agreement by granting a security interest in Surv-Tek's collateral to First Corporate Solutions, Inc. and whether Debtor is in substantial compliance with the reporting requirements pursuant to state court order. *See* Ex. B at ¶¶ 27 & 43.

-9-

Finally, with respect to the amount owed, even if the Debtor were liable for breach of the Promissory Note and the Security Agreement, Surv-Tek failed to demonstrate how much it would be owed. Surv-Tek contradicted itself regarding what interest rate should apply; it alleged that an amount was due on the Petition Date based on a calculation by Weststar, asserted that Weststar used the incorrect interest rate based on the Promissory Note, and then proceeded to ask for an amount of damages that is based on the Weststar calculation. *See* Summary Judgment Motion ¶¶ 19 & 20 and p. 16. Surv-Tek also failed to properly support the amount of fees and costs for collection efforts pursuant to the Promissory Note that it seeks to have reimbursed. *See* Ex. B ¶ 22.

(2) *Surv-Tek Count II – Breach of Lease*

The Surv-Tek Parties request partial summary judgment on Count II of their counterclaims.[7] They ask the Court to hold that Debtor is in breach of the Lease and that the amount owed as of the Petition Date due to such breach is $82,998.30. The undisputed facts show that Debtor did not make payments for February 2020 through and including December 2020. However, establishing Debtor's nonpayment on the Lease is insufficient to show that STIF is entitled to judgment as a matter of law. Debtor has asserted defenses to liability, including that STIF's prior breach of the Closing Agreement and the Lease excused Debtor from further performance under the Loan Documents. Just as with the Promissory Note, STIF has requested partial summary judgment on liability and damages "pending the resolution of any offsetting claims or defenses at trial." Summary Judgment Motion at 17. The Court cannot make a determination on liability if defenses exist that could render Debtor not liable—see the

---

[7] *See* AP Doc. 31-1.

discussion in section (IV)(B)(1) above.

Further, with respect to the amount owed, even if the Debtor were liable for breach of the Lease, STIF failed to demonstrate how much it would be owed. There is a genuine issue of material fact regarding the "Estimated Payment" amount that STIF seeks. *See* Ex. B ¶ 31 ("The Surv-Tek Parties seek the Estimated Payment amount of $1,386.00 for each month, but the Lease requires STIF to provide a reconciliation based on Debtor's actual cost allocation for the prior year. Whether STIF provided required reconciliations, and the legal effect of not providing required reconciliations (if applicable), is in genuine dispute.")

(3) *Surv-Tek Count III – Breach of Commercial and Lease Guarantees*

The Surv-Tek Parties request partial summary judgment on Count III of their counterclaims.[8] They ask the Court to hold that the Individuals are jointly and severally liable for all amounts owed by Debtor to Surv-Tek and STIF, that the amount owed to Surv-Tek is $1,768,941.83 as of the Petition Date, and that the amount owed to STIF is $82,998.30 as of the Petition Date.

Since the Court held above that partial summary judgment on Debtor's liability and damages is denied, partial summary judgment on the Individuals' liability and damages under the guarantees must also be denied for the same reasons.

Further, the Surv-Tek Parties failed to show that Kymberlee Castillo signed the Lease Guarantee. The copy of the Lease Guarantee submitted as an exhibit to the Summary Judgment Motion was not executed by Mrs. Castillo. *See* Doc. 72-4 at 5.

---

[8] *See* AP Doc. 31-1.

(C) *Summary Judgment is Granted in Part and Denied in Part on Debtor Counts IX and XI*

(1) *Debtor Count IX – Violations of the Unfair Trade Practices Act*

The Surv-Tek Parties seek summary judgment denying the relief requested in Debtor's Count IX.[9] They assert that the New Mexico Unfair Practices Act, NMSA 1978 § 57-12 (the "UPA") does not apply to the sale of the surveying business, because it was a one-time sale and the UPA only applies to conduct that occurs "in the regular course of [one's] trade or commerce." Summary Judgment Motion at 19 (citing *In re Crespin*, 551 B.R. 886, 903 (Bankr. D.N.M. 2016)). Debtor responds that the UPA prohibits both: (1) unfair and deceptive trade practices and (2) unconscionable trade practices, and only "unfair and deceptive trade practices" must be in the regular course of one's trade or commerce. Debtor further argues that because the Surv-Tek Parties engaged in marketing the business for sale for over a year, the sale of the business was the "regular course" of conduct for Surv-Tek. Response ¶ 28.

The Court agrees that the plain meaning of the statute does not limit "unconscionable trade practices" to acts that occur in the regular course of one's trade or commerce. The definition of "unfair or deceptive trade practice" states that an unfair or deceptive trade practice "means an act . . . by a person in the regular course of the person's trade or commerce." NMSA 1978 § 57-12-2(D). However, the definition of "unconscionable trade practice" does not include that same phrase. An unconscionable trade practice is defined as:

> an act or practice in connection with the sale, lease, rental or loan, or in connection with the offering for sale, lease, rental or loan, of any goods or services, including services provided by licensed professionals, or in the extension of credit or in the collection of debts that to a person's detriment:
> > (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or
> > (2) results in a gross disparity between the value received by a person and the price paid.

---

[9] *See* Doc. 13-15.

NMSA 1978 § 57-12-2(E).[10] Therefore, summary judgment is denied in part, to the extent that Debtor Count IX pleads a violation of the UPA on account of unconscionable trade practices.

However, the Court disagrees that the sale of the surveying business was in the regular course of Surv-Tek's trade or commerce. Despite the length of time it took to market and sell the business, a one-time sale cannot be a regular course of trade or commerce. *See Crespin*, 551 B.R. at 903 (holding that a sale of mobile home was an "isolated consumer transaction" and therefore not in the course of defendant's trade or commerce). Therefore, summary judgment is granted in part, to the extent that Debtor Count IX pleads a violation of the UPA on account of unfair or deceptive trade practices.

(2) *Debtor Count XI – Conversion*

The Surv-Tek Parties seek summary judgment denying the relief requested in Debtor's Count XI.[11] They assert that all of Debtor's property located in or about the Leased Premises was subject to Surv-Tek and STIF's security interests, and that Debtor breached the Security Agreement by removing collateral from the Leased Premises. The Surv-Tek Parties further assert that there were no physical survey archives, OCE Scanner, microfilm, or client files on the Leased Premises when they regained control. Finally, the Surv-Tek Parties assert that neither Surv-Tek, STIF, Russ Hugg, Robbie Hugg, nor any employee of Surv-Tek received or signed for the GPS receiver sent to Debtor at the Leased Premises by Frontier Precision, Inc.

The Court determines that Surv-Tek and STIF had valid and enforceable security

---

[10] Some cases considering "unfair or deceptive trade practices" have made statements that the UPA only applies to transactions in the regular course of defendant's trade or commerce. *E.g.*, *Crespin*, 551 B.R. at 903. However, such cases appear not to have analyzed the "unconscionable trade practices" prong of the UPA, which does not include the same language.

[11] *See* Doc. 29.

interests in Debtor's personal property located at the Leased Premises.[12] However, with respect to the Security Agreement, Surv-Tek failed to meet its burden to establish breach of the Security Agreement because there are genuine issues of material fact (see section (IV)(B)(1) above regarding Surv-Tek Count I). Surv-Tek also failed to establish breach of the Lease (see section (IV)(B)(2) above regarding Surv-Tek Count II). If Surv-Tek and STIF were properly enforcing their security interests by foreclosing on the collateral, then such property would not have been converted. However, if Surv-Tek and STIF improperly took control of Debtor's personal property, that could constitute conversion. Further, there is a genuine of issue of material fact with respect to whether the physical survey archives, OCE Scanner, microfilm, and client files were at the Leased Premises.

However, summary judgment is granted in part on Debtor Count XI with respect to the GPS receiver. While the Surv-Tek Parties assert that they never received the GPS receiver, in addition to Debtor's allegation that the GPS receiver was mistakenly delivered to Surv-Tek or STIF at the Leased Premises, Debtor also concedes in its Count XI that the GPS receiver was returned to Debtor 12 days later.[13] The mistaken receipt of Debtor's property and its delivery to Debtor 12 days later does not constitute conversion.

Summary judgment is denied in all other respects on Debtor Count XI.

(D) *Summary Judgment is Denied for Debtor Counts X and XIV*

(1) *Debtor Count X – Tortious Interference with Business Relationships*

The Surv-Tek Parties seek summary judgment denying the relief requested in Debtor's

---

[12] *See* Doc. 72-2 at 1; Doc. 72-3 at 16. The Court notes that STIF's security interest may not have attached to Debtor's vehicles, if it was not listed on the certificates of title as a lienholder. Further, while Surv-Tek's security interest in Debtor's personal property was perfected, STIF has not demonstrated that its security interest was. *See* Ex. B ¶ 38.

[13] "The receiver was delivered to the Premises on January 22, 2021. . . . On February 3, 2021, the Receiver was finally delivered to S-Tek [Debtor]." AP Doc. 29 ¶¶ 151, 155.

Count X.[14] They assert that the Huggs made no communications that interfered with Debtor's business relationships. However, Debtor submitted competing evidence that such communications in fact occurred. *See* Ex. B ¶ 52. Therefore, the Surv-Tek Parties have failed to meet their burden because there are genuine issues of material fact.

(2) *Debtor Count XIV – Prima Facie Tort*

The Surv-Tek Parties seek summary judgment denying the relief requested in Debtor Count XIV.[15] The Surv-Tek Parties argue that Debtor Count XIV consists only of the same actions as the conversion claim and as the undisputed facts show that those actions were not taken, summary judgment should be granted in Surv-Tek's favor on Debtor Count XIV. However, Debtor Count XIV does not rest on the same factual allegations as the conversion claim, but rests on other facts alleged in support of Debtor's claim for fraudulent inducement. That claim is not the subject of the Summary Judgment Motion. The Surv-Tek Parties have not established facts that would merit summary judgment on this count.

Prima facie tort was developed on the theory that "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances [even if such] conduct does not come within a traditional category of tort liability." *Schmitz v. Smentowski*, 1990-NMSC-002, ¶ 39, 785 P.2d 726, 734 (quoting RESTATEMENT (SECOND) OF TORTS § 870 (1977)). While the factual allegations in the prima facie tort claim mirror those in the fraudulent inducement claim (Debtor Count XIII),[16] Debtor is permitted to plead prima facie tort in the alternative. *Schmitz*, 1990-NMSC-002, ¶ 48, 785 P.2d at 736 ("We also accept the view . . . that prima facie tort may be

---

[14] *See* Doc. 29.
[15] *See* Doc. 29.
[16] *See* Doc. 29.

pleaded in the alternative[.]"). However, it should be noted that prima facie tort can "not be used to circumvent required elements of more traditional torts." *In re Borges*, 485 B.R. 743, 789 (Bankr. D.N.M. 2012), *aff'd*, 510 B.R. 306 (B.A.P. 10th Cir. 2014); *see also Bogle v. Summit Inv. Co.*, 2005-NMCA-024, ¶ 22, 107 P.3d 520, 529 ("Prima facie tort should be used to address wrongs that otherwise 'escaped categorization,' but 'should not be used to evade stringent requirements of other established doctrines of law.'") (quoting *Schmitz*, 1990-NMSC-002, ¶¶ 49 & 63, 785 P.2d at 736, 738).

(E) *Summary Judgment is Granted for Debtor Count XII – Intentional Violations of Automatic Stay*

The Surv-Tek Parties seek summary judgment denying the relief requested in Debtor's Count XII.[17] The Surv-Tek Parties argue that the undisputed facts show that the actions alleged in Count XII did not occur. That is clearly not the case. However, taking the facts in the light most favorable to Debtor, the only allegations regarding post-petition activity are those regarding the GPS receiver. As discussed above, Debtor concedes that after the GPS receiver was mistakenly delivered to the Leased Premises, it was turned over to Debtor 12 days later. This does not constitute an intentional violation of the automatic stay, and summary judgment is granted in Surv-Tek's favor on this claim.

(F) *Debtor Count XVI—Subordination Claim Pursuant to § 510(b)—Is Moot*

Debtor has withdrawn its Count XVI for subordination of Surv-Tek's first proof of claim pursuant to § 510(b). *See* AP Doc. 82 at 53 ("S-Tek withdraws its count in the Complaint for Subordination under 11 U.S.C. § 510(b)[.]")

---

[17] *See* Doc. 29.

The Court will enter a separate order and judgment consistent with this Memorandum

Opinion.

_____

ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: December 10, 2021

COPY TO:

Nephi Hardman
Attorney for Debtor
Nephi D. Hardman Attorney at Law, LLC
9400 Holly Ave NE Bldg 4
Albuquerque, NM 87122

Chris M. Gatton
Attorney for Surv-Tek, Inc.
Giddens & Gatton Law, P.C.
10400 Academy Rd, NE, Ste 350
Albuquerque, NM 87111

Patrick Malloy, III
Subchapter V Trustee
Patrick J. Malloy, III, Trustee
401 S. Boston Ave, Ste 500
Tulsa, OK 74103

Jaime A. Pena
Office of the U.S. Trustee
P.O. Box 608
Albuquerque, NM 87103-0608

**EXHIBIT A**

**The Surv-Tek Parties' Undisputed Facts Established for Trial**

1. S-Tek filed a voluntary petition for relied under chapter 11 of the Bankruptcy Code on December 2, 2020.

2. Russ and Robbie Hugg each own 50% of the shares of Surv-Tek, Inc., and 50% of the membership interests of STIF, LLC.

4. Pursuant to the Closing Agreement, S-Tek was to purchase all assets and properties of Surv-Tek, including its name and the majority of its tangible and intangible assets, including its goodwill, but excluding Surv-Tek's cash and accounts receivable for work completed prior to closing (the "Company Transferred Assets").

5. Under the Closing Agreement, neither Russ nor Robbie Hugg sold any stock in Surv-Tek to any buyer, including S-Tek, Randy Asselin, Christopher Castillo, or Kymberlee Castillo.

6. S-Tek has never owned stock in Surv-Tek, and Surv-Tek has never owned a membership interest in S-Tek.

7. Neither Russ nor Robbie Hugg has ever owned a membership interest in S-Tek.

8. Randy Asselin, Christopher Castillo, and Kymberlee Castillo have never owned stock or any interest in Surv-Tek.

10. There was no subordination agreement made as part of the Closing Agreement or associated documents.

11. For purchase of the Company Transferred Assets, Plaintiff was to pay to Surv-Tek a purchase price of $1,800,000.00, with $250,000.00 paid at closing and $1,550,000.00 paid pursuant to a promissory note (the Promissory Note").

12. The Promissory Note provides that Plaintiff would make payments commencing on April 1, 2019, and continuing on the first day of each month thereafter, of $16,440.15 per month.

13. The Note accrued interest at the rate of 5.00% per annum, with a default interest rate of 12.00%.

14. The loan was to mature on April 1, 2029, with all remaining amounts due at that time.

17. Pursuant to the Closing Agreement, the parties entered into an Escrow Agreement, which required all payments on the Promissory Note to be made via Weststar Escrow.

19. As February 1, 2021 date is 61 days after the Petition Date, the balance on the Petition Date (calculated by backing out 61 days at the per diem rate) is $1,553,454.77.

23. S-Tek's obligations to Surv-Tek under the Promissory are secured by a Security Agreement (the "Security Agreement"), under which Plaintiff granted a security interest in all of its assets (more specifically enumerated in the Security Agreement) to Surv-Tek.

24. Surv-Tek's security interest was perfected on January 2, 2019, by the filing of a UCC-1 Financing Statement, filed with the office of the Secretary of State as No. 20190072065I.

26. On October 2, 2020, the Court entered an Order Resulting from Hearing on Order to Show Cause, in which the State Court sanctioned S-Tek for failing to provide Surv-Tek financial statements in the form, manner, and detail required under the Security Agreement.

28. On October 21, 2020, the State Court entered an Order Resulting from Hearing to Show Cause, in which the Court ordered S-Tek to become current on all past-due indebtedness to Surv-Tek by November 2, 2020, which consisted at that time of ten (10) monthly payments in arrears in the amount of $180,841.70.

29. The State Court also held that S-Tek's failure to perform as ordered would result in S-Tek and its owners being immediately subject to a non-compete agreement, including ceasing operating in competition with Surv-Tek.

33. Just as with the Promissory Note, the last payment made by Plaintiff under the lease was for the January 2020 payment.

44. Surv-Tek did not consent to S-Tek granting a security interest in its collateral to FICOSO, nor was approval even sought from Surv-Tek by S-Tek or Guarantors.

45. In a letter dated March 16, 2020, demand was made on S-Tek for payment of all amounts owed under the Promissory Note and Lease.

50. Surv-Tek and STIF did not consent to the removal of such collateral items.

58. Neither Surv-Tek, STIF, or I am in possession or control of an OCE Scanner, microfilm, client files, or archived surveys.

59. To the best of my knowledge, neither Surv-Tek, STIF, myself, nor any of Surv-Tek's employees ever signed for the receipt of a GPS receiver sent to S-Tek by Frontier Precision.

60. To the best of my knowledge, neither Surv-Tek, STIF, myself, nor any of Surv-Tek's employees ever received a GPS receiver sent to S-Tek by Frontier Precision.

61. On September 3, 2021, Bob Sprenger testified under oath at his deposition, taken by Plaintiff, that he did not sign for the GPS receiver sent to S-Tek by Frontier Precision, did not ever see any such receiver, and did not know who "Stringer" was that allegedly signed for the package.

62. Neither Surv-Tek nor STIF have any employees named Stringer.

63. The Court found in its Memorandum Opinion on the Surv-Tek Parties' Motion to Dismiss that "Surv-Tek's claim against [S-Tek] is not subject to subordination under § 510(b)."

# EXHIBIT B

## Rulings on the Surv-Tek Parties' Disputed Facts

**3. On or about December 28, 2018, Surv-Tek and S-Tek entered into an agreement (the "Closing Agreement") under which S-Tek was purchasing the assets of S-Tek.**

<u>Ruling</u>. Fact #3 is not in genuine dispute, and is deemed established pursuant to Rule 56(g), but it does not describe the entirety of the transaction. For example, as set forth in paragraphs 1, 3(B), and 3(C) of the Closing Agreement, S-Tek (Debtor) purchased from Surv-Tek the business known as Surv-Tek Inc. and as part of that transaction purchased assets and assumed liabilities. *See* AP Doc. 72-1 at pp. 22-24.

**9. There was no purchase or sale of a security of S-Tek, or an affiliate of S-Tek, contemplated in the Closing Agreement and associated documents.**

<u>Ruling</u>. Fact #9 is not in genuine dispute, and is deemed established pursuant to Rule 56(g), assuming "security," as used in the fact, means an ownership interest of shareholders, members, or partners of a business entity, such as stock or membership interests.

**15. S-Tek has failed to make the payments required under the Promissory Note when due, with the last such payment having been applied to the payment due on January 1, 2020.**

<u>Ruling</u>. Fact #15 is not in genuine dispute, and is deemed established pursuant to Rule 56(g), to the following extent: S-Tek (Debtor) did not make payments due after January 2020 as required by the terms set forth in the Note. Establishing this fact does not preclude Debtor from asserting defenses to nonpayment, such as Debtor was excused from making payments under the Note or is entitled to a setoff.

**16. No payment has been made for amounts owed for February 1, 2020, through September 1, 2021.**

<u>Ruling</u>. Fact #16 is not in genuine dispute, and is deemed established pursuant to Rule 56(g), to the following extent: S-Tek (Debtor) made no payments for amounts due from February 1, 2020, through September 2021 as required by the terms set forth in the Note. Establishing this fact does not preclude Debtor from asserting defenses to nonpayment, such as Debtor was excused from making payments under the Note or is entitled to a setoff.

**18. As of February 1, 2021, the amount due under the Note is $1,565,867.05, with a per diem interest rate of $203.48.**

<u>Ruling</u>. Fact #18 is not in genuine dispute, although establishing this fact does not preclude Debtor from asserting defenses to any or all of the payoff amount.

**20. However, it appears that Westar was not applying the default interest rate of 12.00% per annum provided for in the Promissory Note.**

<u>Ruling</u>. Fact #20 is not in genuine dispute and is deemed established pursuant to Rule 56(g),

The Promissory Note provides for a default interest rate of 12.00% per annum (AP Doc. 72-1 at p. 46), but the Weststar payoff calculation applies a 5.00% interest rate (AP Doc. 72-1 at p. 54). Establishing this fact does not preclude Debtor from asserting that the default interest rate should not apply—although it does not appear that the Surv-Tek Parties are seeking to apply the default interest rate, since they have requested summary judgment using the Weststar payoff calculation with the lower interest rate.

**21. Pursuant to the Promissory Note, and based upon Plaintiff's default, the entire principal balance is due under the Note, together with Surv-Tek's costs and attorney's fees incurred in attempting to collect the balance owed.**

Ruling. Fact #21 is not in genuine dispute, and is deemed established pursuant to Rule 56(g), to the following extent: according to the terms of the Promissory Note, and based upon Debtor's default, the entire principal balance is due under the Note, together with Surv-Tek's costs and attorney's fees incurred in attempting to collect the balance owed. Establishing this fact does not preclude Debtor from asserting defenses to liability, such as Debtor was excused from making payments under the Note or is entitled to a setoff.

**22. The Surv-Tek Parties calculate that as of the Petition date its fees and costs total $201,487.06.**

Ruling. Fact #22 is in genuine dispute.

Discussion Regarding the Ruling

The fact does not state for what purpose the fees have been incurred. The Promissory Note dated January 1, 2019, executed by Debtor, provides that Debtor "agrees to pay (a) all costs of collection, (b) all costs of defending and/or bringing suit, and (c) all costs of foreclosure or other enforcement proceedings, arising out of or in connection with this Note or the other Loan Documents." AP Doc. 72-1 at p. 48. However, the Surv-Tek Parties did not tie Fact #22 to the note. Fact #22 also merely refers to the Surv-Tek Parties' own calculation, which is not relevant. Finally, to the extent fees and costs are based on invoices, pursuant to the best evidence rule, the invoices should be provided.

**25. S-Tek further owes Surv-Tek amounts set forth in Orders in Case No. D-202-CV-2019-05359.**

Ruling. Fact #25 is in genuine dispute.

Discussion Regarding the Ruling

Debtor objected that the fact is vague, and the Court agrees, since the fact does not specify which amounts and which orders.

**27. S-Tek was sanctioned $250.00 per day after October 7, 2020, for every day that it fails to be in compliance. As of the Petition Date, S-Tek was in violation of the Court's Order for 56 days, totaling $14,000.00 in unpaid sanctions.**

<u>Ruling</u>. Fact #27 is not in genuine dispute, and is deemed established pursuant to Rule 56(g), to the following extent: S-Tek (Debtor) was sanctioned $250.00 per day after October 7, 2020, for every day that it failed to be in compliance with the October 2, 2020, order in Case No. D-202-CV-2019-05359. *See* AP Doc. 72-2 at pp. 16-18. However, whether Debtor was in violation of the order is in genuine dispute.

<u>Discussion Regarding the Ruling</u>

- Surv-Tek submitted affidavit evidence that, "As of the Petition Date, the Plaintiff was in violation of the Court's Order for 56 days, totaling $14,000 in unpaid sanctions." Exhibits 1 and 2, ¶ 21.
- Debtor responded that it cured nearly every defect and was in substantial compliance with the order (citing AP Doc. 13-132 ¶ 8, which is Surv-Tek's second motion for order to show cause, that states in ¶ 8 that, "On October 7, 2020, S-Tek produced a roll of accounts and work in progress, with the name of the customer and the account balance, and correspondence between S-Tek and its insurance agent for USI Insurance Services, LLC."; citing AP Doc. 13-141 at p. 7, which is an email thread between Mr. Castillo and the insurance company seeking to make the court-ordered changes to Debtor's policy).

**30. The subtotal due under the Promissory Note (pursuant to Westar's calculation at the non-default interest rate), including attorney's fees and costs and Court-ordered sanctions, is $1,768,941.83.**

<u>Ruling</u>. Fact # 30 is in genuine dispute.

<u>Discussion Regarding the Ruling.</u>

The amount owed for attorney's fees and costs is in genuine dispute—see Fact #22.

The $1,553,454.77 amount of the accrued balance on the Note is not in genuine dispute, but whether S-Tek (Debtor) owes that balance accrued on the Note as of the Petition Date is in genuine dispute.

Whether Debtor owes $14,000 in sanctions is in genuine dispute—see Fact #27.

**31. Also as part of the Closing Agreement, S-Tek entered into a lease agreement with STIF captioned NNN Office Lease – 9384 Valley View Drive (the "Lease"), under which S-Tek was to lease commercial space from STIF for a five (5) year term, commencing on January 1, 2019, and ending on December 31, 2023, subject to a five (5) year renewal option, for monthly lease payments of $5,800.00 and a common area maintenance payment of $1,386.00, for a total of $7,186.00 per month.**

<u>Ruling</u>. Fact #31 is not in genuine dispute, and is deemed established pursuant to Rule 56(g), to the following extent: As part of the Closing Agreement, Debtor entered into a lease agreement

with STIF captioned *NNN Office Lease – 9384 Valley View Drive* (the "Lease"), under which Debtor was to lease commercial space from STIF for a five (5) year term, commencing on January 1, 2019, and ending on December 31, 2023, subject to a five (5) year renewal option, with monthly base rent payments of $5,800.00. There is a genuine dispute over the amount of the common area maintenance payment.

Discussion Regarding the Ruling.

- The Lease provides that Debtor shall pay the common area maintenance payment (called the "Tenant's Cost Allocation") as follows:
    - 4.2.1 <u>Estimated Payments</u>. Tenant shall pay Landlord's reasonable estimate of Tenant's Cost Allocation for each year (the "Estimated Payment") in advance, in monthly installments, commencing on the Commencement Date and continuing on the first (1st) day of the month thereafter until the first (1st) day of the month following the month in which Landlord notifies Tenant of any revised Estimated Payment. Landlord shall estimate from time to time (but no more than two (2) times per year) the amount of the Tenant's Cost Allocation for each year and then make an adjustment in the following year based on the actual Tenant's Cost Allocation incurred for the prior year. In the event of any fractional calendar month, Tenant shall pay for each day in such partial month a rental equal to 1/30 of the Estimated Payment.
    - 4.2.2 <u>Reconciliation</u>. Within a reasonable period of time, but in any event not later than one hundred and twenty (120) days after the end of each calendar year, Landlord shall deliver to Tenant a statement (the "Statement"), in reasonable detail, setting forth Tenant's Cost Allocation for such year.

    *See* AP Doc. 72-3 at pp. 1-2.
- The Surv-Tek Parties seek the Estimated Payment amount of $1,386.00 for each month, but the Lease requires STIF to provide a reconciliation based on Debtor's actual cost allocation for the prior year. Whether STIF provided required reconciliations, and the legal effect of not providing required reconciliations (if applicable), is in genuine dispute.

**32. The Lease provides for interest on unpaid amounts of prime plus 4%, and late charges of 5% of the late payment.**

<u>Ruling</u>. Fact #32 is not in genuine dispute, and is deemed established pursuant to Rule 56(g), to the following extent: the Lease provides that certain unpaid past due rent amounts will bear interest at the rate of prime plus 4% per annum subject to a cap, and the Lease also provides that a late charge of 5% of the payment will be charged on certain late payments of rent.

**34. As of the Petition Date, S-Tek owed $82,998.30 in back lease payments to STIF for February 1 through and including December 1, 2020.**

<u>Ruling</u>. Fact #34 is in genuine dispute.

Discussion Regarding the Ruling.

- Debtor alleges that: (1) the 5% late fee was improperly applied to its first missed payment, (2) the use of Estimated Payment amount rather than actual cost allocation was improper, (3) the Lease damages provisions are unconscionable, (4) there was no adjustment for the fact that STIF had uncontested possession of the premises and Surv-Tek was back operating in the premises no later than July 2020, and (5) STIF's breach of the written modification regarding the timeline to vacate the premises excuses Debtor's performance from April 4, 2020, the date that STIF regained possession and control of the premises. These are issues that will be decided after trial.

**35. Upon Plaintiff's default under the Lease, Plaintiff was liable to STIF for the past rent owed, all unpaid rent up until a time of award of damages, and the worth at the time of award by which the unpaid rent for the balance of the term exceeds the amount of the rental loss that Plaintiff proves could have been reasonably avoided.**

Ruling. Fact #35 is a legal conclusion and not a fact. Therefore, it is not deemed established for trial.

**36. Pursuant to the Lease, all property of Plaintiff's located in or about the leased premises was subject to an enforceable landlord's lien and UCC security interest.**

Ruling. Fact #36 is not in genuine dispute, and is deemed established pursuant to Rule 56(g), to the following extent: the Lease contains a grant of security interest under the UCC by Plaintiff (Debtor) to STIF in all of Debtor's property located in or on the leased premises. *See* AP Doc. 72-3 at p. 17. Otherwise, Fact #36 contains legal conclusions.

**37. Plaintiff's obligations under the Lease are secured by a security interest in all goods, furniture, equipment, inventory, and other personal property owned by S-Tek that were located at or used for Plaintiff's business.**

Ruling. Fact #37 is not in genuine dispute and is deemed established pursuant to Rule 56(g), to the following extent: the Lease contains a grant of security interest under the UCC by Plaintiff (Debtor) to STIF in all of Debtor's property located in or on the leased premises, including, but not limited to, all fixtures, machinery, equipment, furnishings, and other articles of personal property. *See* AP Doc. 72-3 at p. 17. Otherwise, Fact #37 contains legal conclusions.

**38. This security interest was perfected by the filing of a UCC-1 Financing Statement on January 2, 2019, filed with the Secretary of State as No. 20190072066F.**

Ruling. Fact #38 is in genuine dispute.

Discussion Regarding the Ruling.

The UCC-1 financing statement referenced in Fact #38 and attached as Exhibit K to the Huggs' affidavits, *see* AP Doc. 72-3 at p. 41, lists Surv-Tek, Inc. as the secured party. Surv-Tek, Inc. was not a party to the Lease.

**39. Randy Asselin, Christopher Castillo, and Kymberlee Castillo (collectively the "Guarantors") all signed guarantees of all indebtedness owed under the Promissory Note and Lease owed to Surv-Tek and STIF.**

<u>Ruling</u>. Fact #39 is not in genuine dispute, and is deemed established pursuant to Rule 56(g), to the following extent: All three Guarantors signed a guarantee of indebtedness owed under the Promissory Note, and Mr. Asselin and Mr. Castillo signed a guarantee of indebtedness owed under the Lease.

<u>Discussion Regarding the Ruling</u>.

Debtor argued that the Surv-Tek Parties provided insufficient evidence that Kymberlee Castillo signed either guarantee, but the Surv-Tek Parties located the version of the guarantee for the Note signed by Mrs. Castillo (in addition to the other two guarantors) and attached it as Exhibit 5 to their reply. *See* AP Doc. 84-1 at pp. 42-46. Therefore, the only outstanding part of this fact in genuine dispute is whether Mrs. Castillo signed the guarantee of indebtedness owed under the Lease.

**40. On or about January 1, 2019, the Guarantors [Randy Asselin, Christopher Castillo, and Kymberlee Castillo] executed a Commercial Guaranty (the "Commercial Guaranty") under which they absolutely and unconditionally guaranteed full and punctual payment and satisfaction of all of S-Tek obligations and indebtedness owed to Surv-Tek, including all obligations owed under the Promissory Note.**

<u>Ruling</u>. Fact #40 is not in genuine dispute and is deemed established pursuant to Rule 56(g).

<u>Discussion Regarding the Ruling</u>.

Debtor argued that the Surv-Tek Parties provided insufficient evidence that Kymberlee Castillo signed the Commercial Guarantee, but the Surv-Tek Parties located the version signed by Mrs. Castillo, in addition to the other two guarantors, and attached it as Exhibit 5 to their reply. Debtor further argued that the Surv-Tek Parties were attempting to incorporate a legal conclusion (that the guarantors "unconditionally guaranteed full and punctual payment" of Debtor's obligations) without the support of admissible evidence. However, the Commercial Guarantee provides that exact language: "For good and valuable consideration, Christopher B. Castillo, Kymberlee A. Castillo, and Randy P. Asselin, each herein a Guarantor, absolutely and unconditionally guarantees full and punctual payment and satisfaction of [the debt owed by Debtor to Surv-Tek and the performance of Debtor's obligations] under the Note and the Loan Document." AP Doc. 84-1 at p. 42.

**41. On or about December 18, 2018, the Guarantors [Randy Asselin, Christopher Castillo, and Kymberlee Castillo] executed a Personal Guaranty (the "Lease Guaranty") under which they unconditionally guaranteed the prompt, punctual and full payment of the rent and all other sums due under the Lease, and unconditionally guaranteed the performance of all agreements, covenants, terms, and conditions agreed to be performed by S-Tek under the Lease.**

Ruling. Fact #41 is not in genuine dispute, and is deemed established pursuant to Rule 56(g), to the following extent: Mr. Castillo and Mr. Asselin executed the Lease Guaranty which contains the language set forth in Fact #41.

Discussion Regarding the Ruling.

The Surv-Tek Parties did not provide sufficient evidence that Mrs. Castillo signed the Lease Guaranty.

**42. The Commercial Guaranty and Lease Guaranty [Randy Asselin, Christopher Castillo, and Kymberlee Castillo] both provide that the Guarantors are jointly and severally liable for all obligations owed by S-Tek to Surv-Tek and STIF, respectively.**

Ruling. Fact #42 is not in genuine dispute, and is deemed established pursuant to Rule 56(g) to the following extent: the Commercial Guarantee provides, "Each Guarantor executing this Guaranty is jointly and severally liable for the full unpaid balance of the Note and for all charges and expenses related thereto including, in the event of a default, all costs of collection including Lender's attorney's fees," AP Doc. 84-1 at p. 42, and the Lease Guarantee provides,

> The Guarantor, as primary obligor, hereby (a) unconditionally guarantees the prompt, punctual and full payment of the rent and all other sums due under the Lease in accordance with the terms and tenor thereof as completely and effectually as if such guarantee had been made by Guarantor on the face of the Lease; (b) unconditionally guarantees the prompt, punctual and full performance by Tenant of any and all of the agreements, covenants, terms and conditions agreed to be performed by Tenant under the Lease; and (c) covenants and agrees that in the event of default in payments or any default in the performance of any of the terms, covenants, or conditions thereof, the Guarantor will promptly make or cause such payment to be made or will perform or cause to be performed all such terms, covenants and conditions, irrespective of any invalidity therein, the unenforceability thereof or the insufficiency, invalidity or unenforceability or any security therefor." AP Doc. 72-4 at p. 3.

However, the Surv-Tek Parties have not established that Kymberlee Castillo is a guarantor pursuant to the Lease Guarantee. *See* AP Doc. 72-4 at p. 5.

**43. In or about August 2019, S-Tek further breached the Promissory Note and Security Agreement by granting a security interest to a third party, First Corporate Solutions, Inc. ("FICOSO").**

Ruling. Fact #43 is in genuine dispute.

Discussion Regarding the Ruling.

There was no security agreement attached.

**46. Pursuant to the Security Agreement, S-Tek was obligated to keep all of Surv-Tek's collateral at the leased premises.**

Ruling. Fact #46 is not in genuine dispute, and is deemed established pursuant to Rule 56(g), to the following extent: Under the Security Agreement, Debtor was obligated to keep all of Surv-Tek's collateral at the leased premises except in the ordinary course of Debtor's business. *See* AP Doc. 72-2 at p. 2.

**47. On April 3, 2020, Surv-Tek discovered that S-Tek had removed vehicles which were its collateral from the leased premises without Surv-Tek's approval and in violation of the Security Agreement and Lease.**

Ruling. Fact #47 is in genuine dispute.

Discussion Regarding the Ruling.

Debtor presented affidavit testimony that the vehicles were removed from the leased premises in the ordinary course of business, as permitted by the Security Agreement. *See* AP Doc. 72-2 at p. 2. Further, whether the removal of the vehicles from the leased premises was in violation of the Security Agreement and the Lease is a legal conclusion.

**48. On April 4, 2020, after providing notice and a cure period for S-Tek's defaults under the Promissory Note and Lease, Surv-Tek and STIF exercised their rights pursuant to the Security Agreement and Lease to regain possession of the leased premised [*sic*] and to secure and protect the collateral.**

Ruling. Fact #48 is not in genuine dispute, and is deemed established pursuant to Rule 56(g), to the following extent: On April 4, 2020, Surv-Tek and STIF regained possession of the leased premises and took steps to secure and protect the collateral. Establishing this fact does not preclude Debtor from asserting that such actions were in violation of a written modification of the Security Agreement and the Lease.

Discussion Regarding the Ruling.

Debtor argues this was in violation of a written modification of the Security Agreement, while the Surv-Tek Parties assert that the email from counsel did not constitute a written modification because the Huggs did not authorize it. The Court will allow Debtor to present evidence at trial in support of its contention.

**49. Upon taking possession of the premises, Surv-Tek and STIF discovered that additional items of collateral were missing from the property in violation of the Security Agreement and Lease.**

Ruling. Fact #49 is not in genuine dispute, and is deemed established pursuant to Rule 56(g), to the following extent: Upon taking possession of the premises, Surv-Tek and STIF discovered

that items of collateral were not located at the property. Establishing this fact does not preclude Debtor from asserting that removal of the additional items of collateral was in the ordinary course of business or otherwise defending why such removal did not constitute a violation of the Security Agreement nor the Lease.

**51. All sales of assets by Surv-Tek to S-Tek were set forth in the Closing Agreement and associated documents. Surv-Tek did not sell, lease, rent, or loan goods or services in the regular course of Surv-Tek's trade or commerce activities to S-Tek.**

<u>Ruling</u>. Fact # 51 is not in genuine dispute and is deemed established pursuant to Rule 56(g).

<u>Discussion Regarding the Ruling</u>.

The Court rejects Debtor's argument that the sale of the surveying business was in the "regular course of conduct" for the Huggs because they had been attempting to sell the business for more than a year prior to the execution of the Closing Agreement. The sale of the business was a one-time transaction.

**52. Between December 3, 2020 and January 18, 2021, or at any time before or thereafter, Russ and Robbie Hugg did not make any of the following alleged communications:**

> **a. Russ and Robbie Hugg did not contact Richard Salls and advise Mr. Salls that S-Tek was closing shop and that Salls Brothers needed to get all of its contracted surveying work done quickly;**

> **b. Russ and Robbie Hugg did not contact Renae Moran and advise Ms. Moran that S-Tek was closing shop and that J-Mar & Associates should consider not giving S-Tek terms to collect any outstanding balances owed by S-Tek;**

> **c. Russ and Robbie Hugg did not contact Mollie Encee and advise Ms. Encee that S-Tek was going out of business and that USI insurance should "watch their back" in working with S-Tek;**

> **d. Russ and Robbie Hugg did not contact Freddie Huerta and advise Mr. Huerta that S-Tek was going out of business; and**

> **e. Russ and Robbie Hugg did not contact Surveyor Supply Superstore, Inc. and advise them that S-Tek was going out of business.**

<u>Ruling</u>. Fact # 52 is in genuine dispute.

<u>Discussion Regarding the Ruling</u>.

- The Surv-Tek Parties submitted affidavit evidence by the Huggs that they did not make the above communications.
- Regarding subpart (a): Debtor submitted a declaration by employee Harold Joy that he received a demand from Erich Ehlert of the Sall Brothers that all of the needed field work be done because he heard Debtor was going out of business.

- Regarding subpart (b): Debtor submitted an email by Renae Moran of J-Mar & Associates stating that they received a call from Russ Hugg to Larry Miller (an employee of J-Mar & Associates) regarding Debtor's bankruptcy filing.
- Regarding subpart (c): Debtor submitted a declaration from Mollie Encee stating that between Dec. 3-7, 2020, she received a call from one of the Huggs informing her that S-Tek was going out of business and USI should watch its back in working with Debtor.
- Regarding subpart (d): Debtor submitted a declaration from Mr. Asselin stating that he received a report from an employee on December 10, 2020, that Freddie Huerta had recently spoken with one of the Huggs who had told him that Debtor was going out of business. Although this is inadmissible hearsay, the Court will permit Debtor to proffer admissible evidence at trial on this issue.
- Regarding subpart (e): Debtor submitted a declaration from Travis King that he spoke with a customer service representative of Surveyors Supply Store, Inc., in January 2021 who said that Robbie Hugg was in the store a few days earlier and made statements that Debtor was filing for bankruptcy and going out of business. Although this is inadmissible hearsay, the Court will permit Debtor to proffer admissible evidence at trial on this issue.

**53. I did not make any other such similar statements to any of S-Tek's other customers, vendors, suppliers, insurance providers, etc. or any other communications for the purpose of interfering with or discouraging continued business relationships with S-Tek.**

Ruling. Assuming that this fact is intended to refer to Russ and Robbie Hugg, Fact # 53 is in genuine dispute.

Discussion Regarding the Ruling.

There is competing affidavit evidence.

**54. Both Fred Salls and Rich Salls have testified in the Bankruptcy Case in support of the fact that they were not contacted by either myself or my brother for any such purposes.**

Ruling. Assuming that this fact is intended to refer to Russ and Robbie Hugg, Fact # 54 is in genuine dispute.

Discussion Regarding the Ruling.

The evidence proffered in support of Fact #54 is inadmissible hearsay. The Surv-Tek Parties submitted affidavits by the Huggs to support Fact #54 but did not submit or point to the parts of the record in this case where such fact was established.

**55. When Surv-Tek and STIF took action to secure the leased premises and their collateral, the premises were found unlocked with the doors open.**

Ruling. Fact # 55 is in genuine dispute.

Discussion Regarding the Ruling.

There is competing affidavit evidence.

**56. An OCE Scanner was not present in the premises, nor were microfilm, client files, or archived surveys.**

Ruling. Fact # 56 is in genuine dispute.

Discussion Regarding the Ruling.

There is competing affidavit evidence.

**57. All surveys were archived electronically by Surv-Tek. Surv-Tek did not maintain a hardcopy survey archive with "40 years of archived surveys."**

Ruling. Fact # 57 is in genuine dispute.

Discussion Regarding the Ruling.

There is competing affidavit evidence.

**EXHIBIT C**

**Debtor's Undisputed Additional Facts Established for Purposes of the Summary Judgment Motion**

AMF 1: Between the mid-1980s and 2020, Dennis Smigiel was a business broker; he facilitated the sale of businesses. Exhibit C, p. 2 (deposition page 8, lines 23-25), p. 3 (deposition p. 11, lines 7-9). Dennis Smigiel was an independent agent under Keller Williams for a period of time that included 2017-2020.

AMF 2: Surv-Tek and the Huggs first hired Dennis Smigiel in about 2014 to act as a broker for selling Surv-Tek. *See* Exhibit C, p. 11 (deposition page 43, lines.17-22).

AMF 3: The original listing agreement between Surv-Tek and the Huggs on one hand and Dennis Smigiel on the other had a term of about six months, and when it expired, Surv-Tek, the Huggs, and Dennis Smigiel either renewed it, extended it, or entered into another listing agreement.

AMF 4: Over the approximate four years during which Dennis Smigiel worked with Surv-Tek and the Huggs to sell Surv-Tek before June of 2018, about fifteen persons expressed a serious interest in buying Surv-Tek. Exhibit C, p. 12 (deposition p. 48 lines 13-19). A subset of those (estimated at ten or fifteen by Mr. Smigiel, *id.* at p. 14 (deposition p. 55 lines 2-6)) made offers to purchase Surv-Tek, *id.* at p. 12 (deposition p. 48 lines 13-16), accompanied by earnest money deposits. *Id.* at p. 14 (deposition p. 54 lines 20-22). Many of these offers were accepted, *id.* at p. 14 (deposition p. 55 lines 7-10), but none of them were consummated. A majority of those that ultimately withdrew their offers did so because they were non-surveyors.

AMF 5: In June of 2018, after a prior listing agreement had expired, Surv-Tek and the Huggs entered the listing agreement attached hereto as Exhibit M (the "Listing Agreement").

AMF 6: The Listing Agreement defines "Seller" as both Surv-Tek and the Huggs, Exhibit M, p. 2 (p. 7 of 18), and "Broker" as "Keller Williams Realty / Business Opportunities," *id.*, and later identifies Dennis Smigiel as "transaction broker."

AMF 7: The Listing Agreement states: "Seller to prove: Annual Sales - $2,097,000[;] Cash Flow $1,051,000." *Id.* at p. 1 (p. 6 of 18) (capitalization altered).

AMF 8: The Listing Agreement states that "Seller . . . employs Broker and gives Broker the sole and exclusive right to sell, lease, trade or otherwise convey all or any part of [Surv-Tek] . . . ."

AMF 9: Although the Listing Agreement specifies that Broker is employed to "convey all *or any part* of [Surv-Tek]," *id.* (emphasis added), the inclusion of the "or any part" verbiage was included to protect business brokers, in case a customer sought to avoid a broker's commission based on the fact that only *a part* of the business was sold. Exhibit C, p. 9 (deposition p. 35 line 13 - p. 36 line 12). Dennis Smigiel generally did not act as a broker for the sale and marketing of discrete assets that were to be sold apart from a business, and he considered the sale of S-Tek to

be a business sale.

AMF 10: The Listing Agreement states: "Seller hereby appoints Broker as the sole and exclusive agent and authorizes Broker to present any and all offers Broker may receive . . . ." Exhibit M, p. 2 (p. 7 of 18) (capitalization altered). Similarly, the Listing Agreement states: "Seller understands and hereby acknowledges that all facts, figures and other information set forth above, and all additional supporting documentation pertaining to [Surv-Tek] have been provided to Broker by Seller, and Broker will rely upon Seller's representations of such facts, figures and other information when describing and promoting [Surv-Tek] to potential purchasers . . . ." *Id.* (capitalization altered). Further, the Listing Agreement provides that "Seller hereby represents and warrants that all such facts, figures and other information set forth above are true and accurate."

AMF 11: In early 2018, Christopher Castillo and Randy Asselin began to look for business investment opportunities.

AMF 12: Christopher Castillo and Randy Asselin came across online advertisements for a land surveying business for sale. The advertisements were identical or substantially similar to the ones attached hereto as Exhibit A-1.

AMF 13: Later, after inquiring about the online advertisements they had previously seen, Christopher Castillo and Randy Asselin received the advertisement attached hereto as Exhibit A-2.

AMF 14: Thereafter, beginning in June or July of 2018, Christopher Castillo and Randy Asselin began a lengthy series of email exchanges with Dennis Smigiel.

AMF 16: In July of 2018 Randy Asselin and Christopher Castillo were concerned that it would be unwise for non-surveyors such as themselves to acquire a surveying company.

AMF 19: On July 26, 2018, Dennis Smigiel emailed to them the marketing package attached hereto as Exhibit A-4 (the "July 2018 Marketing Package").

AMF 20: The July 2018 Marketing Package presented articulable and significant reasons for Randy Asselin and Christopher Castillo to purchase Surv-Tek. They noticed and accorded significance to the historical profits of Surv-Tek as set forth in the July 2018 Marketing Package.

AMF 22: The July 2018 Marketing Package contains financial records for Surv-Tek for 2014-2017, adjusted to reflect profit if the Huggs' salaries were taken out of expenses (an increase in yearly profit between $390,000 and $906,000) but a single new licensed surveyor had to be hired to replace the Huggs in their capacity as licensed surveyors (a yearly expense of $80,000). Exhibit A-4, p. 8. The reason for adjusting out the expense of the Huggs' salaries and pension from the calculation of profit is that an owner would be able to receive these amounts as company profits. *See* Exhibit C, p. 8 (deposition p. 29 lines 6-18). The July 2018 Marketing Package factors back in the expense of the salary of a licensed surveyor in recognition of the fact that a purchaser will have to pay someone to perform the services that the Huggs historically

performed. *Id.* at pp. 8-9. The Huggs told Dennis Smigiel that each of them spent about half of his working hours doing survey work, and the other half of his working hours on managerial work. Exhibit C, p. 22 (deposition p. 87 line 12 - p. 88 line 1). Thus, the reasoning went, a new owner who served as only a manager would need to hire a single licensed surveyor who could do survey work full time and complete the survey work historically performed by Russ Hugg and Robbie Hugg.

AMF 24: On August 27, 2018, Christopher Castillo and Randy Asselin organized S-Tek as a New Mexico limited liability company. *See* Asselin Declaration, Castillo Declaration, ¶ 17.

AMF 25: S-Tek's primary purpose was to serve as the business medium that would acquire and carry on the operations of Surv-Tek.

AMF 26: The document attached hereto as Exhibit A-5 is a true and correct copy of an email exchange between Christopher Castillo and Dennis Smigiel on which Randy Asselin was copied, between September 17 and September 18, 2018.

AMF 27: Dennis Smigiel's September 18, 2018 email to Mr. Castillo attached a new marketing package (the "September 2018 Marketing Package"), which is attached hereto as Exhibit A-6.

AMF 28: Randy Asselin noticed and accorded significance to the historical profits of Surv-Tek as set forth in the September 2018 Marketing Package.

AMF 29: Randy Asselin also noticed and accorded significance to the September 2018 Marketing Package's representations that Russ and Rob Hugg (the "Huggs"), the sellers of Surv-Tek, would provide sufficient training following a purchase to facilitate a successful transition for the buyer.

AMF 30: Randy Asselin relied on the representations in the September 2018 Marketing Package to ultimately make the decision to move forward with the purchase of Surv-Tek.

AMF 31: In the months and weeks leading up to December 28, 2018, Dennis Smigiel represented to Randy Asselin that Surv-Tek would be a turn-key business purchase; in other words, Christopher Castillo and Randy Asselin would be able to purchase Surv-Tek and start making profit immediately, without the need for restructuring or rebuilding the business. Randy Asselin and Christopher Castillo understood that the business had all the right components in place—its employees, its repeat customers, its licensure, its location, everything—and was ready to go.

AMF 33: In the months and weeks leading up to December 28, 2018, Randy Asselin and Christopher Castillo requested from Russ Hugg and/or Robbie Hugg the opportunity to meet one on one with Surv-Tek's employees. They wanted to talk with them to get a feel for how the business actually ran from the employees' perspectives.

AMF 34: Russ and/or Robbie Hugg denied Randy Asselin's and Christopher Castillo's

request to meet with Surv-Tek's employees one on one. In denying the request, Russ and/or Robbie Hugg explained that meeting with Surv-Tek's employees one on one would cause them to get nervous about the proposed purchase and potentially quit. Randy Asselin and Christopher Castillo understood that this would endanger the goal of purchasing a turn-key business.

AMF 38: One component of the Closing Agreement was a promissory note from S-Tek to Surv-Tek for $1,550,000 (the "Note"), which, with the down payment of $250,000, constituted the purchase price under the Closing Agreement.

AMF 39: Another component of the Closing Agreement was a lease (the "Lease") between S-Tek and STIF, a company that Randy Asselin understood to be owned by the Huggs.

AMF 40: Under the Lease, S-Tek leased suite 100 of the building located at 9384 Valley View Dr, Albuquerque, NM 87114, plus the non-exclusive right to use certain common areas associated with the building. The leased premises are hereafter referred to as the "Premises."

AMF 41: Up until the Closing Agreement, Surv-Tek had operated its business from the Premises.

AMF 43: On January 2, 2019, the first workday of 2019, Christopher Castillo and Randy Asselin were present as the persons previously employed by Surv-Tek arrived at the Premises. Randy Asselin had never met or spoken with Surv-Tek's employees before.

AMF 44: On that day Randy Asselin and Christopher Castillo had hoped to create a smooth transition for Surv-Tek's former employees so that they would have confidence in S-Tek, transfer their loyalty from Surv-Tek to S-Tek, and be reliable employees for S-Tek. Randy Asselin and Christopher Castillo had understood that without a smooth transfer of the employee base, S-Tek would not have gained the turn-key business operation that had been advertised.

AMF 45: Robbie Hugg was also present at the Premises on January 2, 2019. When Surv-Tek's former employees came to work that day, Robbie Hugg informed them that they no longer worked for him but worked for "these guys" (pointing at Randy Asselin and Christopher Castillo). This announcement was not accompanied by any reassurances from Robbie Hugg or expressions of confidence that S-Tek would take good care of Surv-Tek's former employees.

AMF 46: The aforementioned repeated announcement by Robbie Hugg on the first workday of 2019 had an unsettling and jarring effect on S-Tek's employees and it caused a general feeling of alarm and worry among them.

AMF 56: On April 22, 2019, Randy Asselin received a notice of default on the Security Agreement (the "First Notice of Default"), attached hereto as Exhibit A-7, claiming that S-Tek had missed a reporting deadline by failing to certify (sign) a financial statement that was due to the Huggs.

AMF 57: Randy Asselin was surprised by the First Notice of Default, because S-Tek had timely produced the required financial statement and the Huggs had ample opportunity to

informally request that he sign it, since at the time they still performed work for S-Tek.

AMF 58: In addition to purportedly accelerating the entire $1,550,000 balance of the Note, the First Notice of Default demanded over $7,000 in penalties and damages resulting in attorneys' fees allegedly sustained by Surv-Tek.

AMF 59: Mr. Castillo and Randy Asselin promptly cured the grounds for default asserted in the First Notice of Default by signing the financial statement that had previously been provided.

AMF 60: On the morning of May 3, 2019, the Huggs again claimed default (the "Second Notice of Default") based on S-Tek's non-payment of the payment due on May 1, 2019 under the Note (which had a ten-day grace period). On this occasion, the Huggs demanded that (1) S-Tek be turned over to the Huggs by that afternoon, and (2) the Note be paid in three days. The Huggs also advised that a notice of auction of Surv-Tek's collateral would be published in the Albuquerque Journal.

AMF 61: On May 7, 2019, Randy Asselin received a restatement of the Second Notice of Default from the Huggs' attorney, attached hereto as Exhibit A-8.

AMF 62: On May 9, 2019, S-Tek made the payment on the Note that was due on May 1, 2019.

AMF 63: Notwithstanding S-Tek's payment of the May 1, 2019 payment within the grace period provided in the Note, on May 10, 2019, a Notice of Auction was published in the Albuquerque Journal, disclosing the amount of the Note and a listing of S-Tek's key assets.

AMF 66: In his capacity as managing member of S-Tek, Randy Asselin observed that Russ Hugg and Robbie Hugg had a marked demoralizing and de-loyalizing effect on S-Tek's employees who interacted with them.

AMF 70: On July 9, 2019, S-Tek filed the above-captioned lawsuit against Surv-Tek and the Huggs in New Mexico State District Court.

AMF 75: Upon their arrival, Laurie Stansberry, the only S-Tek employee on the Premises when the Huggs arrived, called Randy Asselin in a panic.

AMF 76: From that conversation, Randy Asselin understood that the Huggs had announced they were changing the locks and that if Laurie Stansberry did not leave, she would be locked in.

AMF 77: Upon hearing this news, Christopher Castillo and Randy Asselin went to the Premises as quickly as they could.

AMF 78: Although they did not believe that the Huggs or Surv-Tek had the right to remove S-Tek from the Premises, Christopher Castillo and Randy Asselin were concerned that

the Huggs would change the locks at the Premises as soon as they left. Therefore, on the night of April 3, 2020, Randy Asselin and Christopher Castillo removed all or most of the computers from the Premises, as well as the server.

AMF 79: Randy Asselin and Christopher Castillo observed the Huggs in a parking lot of a nearby Burger King as Christopher Castillo and Randy Asselin drove away from the Premises on the night of April 3, 2020.

AMF 81: When Christopher Castillo returned to the Premises the next day in the early afternoon, the locks were changed. Randy Asselin has viewed the video that Christopher Castillo took of the changed locks.

AMF 82: In approximately late April of 2020, it was arranged by court order for some of S-Tek's employees to return to the Premises to retrieve their personal effects. Exhibit J, Stansberry Declaration, ¶ 10; Exhibit D, Unsworn Declaration of Kent Holland Under Penalty of Perjury ("Holland Declaration"), ¶ 4. None of S-Tek's employees reported to Randy Asselin or Christopher Castillo that their personal effects had been stolen or damaged.