In re:   S-Tek 1, LLC,                                                    No. 20-12241-j11

      Debtor.

---

S-Tek 1, LLC

      Plaintiff and Counter-Defendant,

      v.                                                    Adv. Proc. No. 20-01074-j

SURV-TEK, INC. *et al.*,

      Defendants and Counterclaimants,

-and-

SURV-TEK, INC. *et al.*,

      Third Party Plaintiffs,

      v.

 CHRISTOPHER CASTILLO *et al.,*

      Third Party Defendants.

## <u>MEMORANDUM OPINION REGARDING ADVERSARY PROCEEDING AND DEBTOR'S MOTION TO SUBORDINATE PURSUANT TO § 510(c)[1]</u>

THIS MATTER is before the Court on all claims, counterclaims, and third-party claims in

adversary proceeding number 20-01074-j (the "Adversary Proceeding") and on the Motion to

Subordinate Claims of Surv-Tek, Inc. Pursuant to 11 U.S.C. § 510(c) (the "Motion to Subordinate"

– Doc. 258)[2] filed by debtor S-Tek 1, LLC ("S-Tek"). Objection to proofs of claim filed by Surv-

Tek LLC ("Surv-Tek") and STIF LLC ("STIF") are at issue in the Adversary Proceeding, so

---

[1] Unless otherwise specified, references to "section __" or "§ __" are to sections of the Bankruptcy Code, found at 11 U.S.C. § 101, *et seq.*

[2] References to "Doc. __" are to the docket in the bankruptcy case, Case No. 20-12241.
References to "AP Doc. __" are to the docket in the Adversary Proceeding, Adv. Proc. No. 20-01074.

matters before the Court include the claims objections. On one side of the disputes are the "S-Tek Parties," consisting of S-Tek, its principals Randy Asselin and Christopher Castillo, and Mr. Castillo's wife, Kymberlee Castillo. On the other side of the disputes are the "Surv-Tek Parties," consisting of Surv-Tek, Inc., STIF, and the principals of Surv-Tek and STIF, Russ P. Hugg and Robbie T. Hugg. The Court held a combined trial and final hearing in the Adversary Proceeding and on the Motion to Subordinate on January 25 through February 7, 2022.

After consideration of the relevant filings, the evidence, and applicable law, the Court will (a) deny all of the S-Tek Parties' claims; (b) deny the Motion to Subordinate; (c) allow Surv-Tek's claim against the bankruptcy estate in the amount of (i) $1,552,454.77 (which is the principal balance owing under the Note (defined below) as of the bankruptcy petition date with interest accruing at the non-default rate, (ii) plus attorneys' fees in an amount to be determined, and (iii) $14,000.00 of unpaid State Court ordered sanctions; (d) disallow STIF's claim as an secured claim but allow the claim as an unsecured claim in the amount of unpaid prepetition rent specified on the face of STIF's proof of claim in the amount of $82,998.30, subject to a $5,800 security deposit setoff, (e) find liability on certain of the Surv-Tek Parties' other claims but award no damages on those claims, and (f) deny other of the Surv-Tek Parties' claims. The Court will award no punitive damages. The Court will issue a separate opinion and order addressing the claims of Surv-Tek and/or STIF against Mr. Asselin and Mr. and Mrs. Castillo as guarantors.[3]

## INTRODUCTION

In December 2018, Robbie Hugg and Russ Hugg (together, sometimes the "Huggs") sold

---

[3] The Court is reserving for a later decision Surv-Tek and STIF's claims against the guarantors because the Court has not yet determined whether those claims are affected by bankruptcy-related limitations on the claims against S-Tek. For example, as discussed below, Surv-Tek is not entitled to post-petition interest under the Note from S-Tek pursuant to § 502(b)(2); does that limitation affect its claim against the guarantors?

-2-

their surveying business to S-Tek, and entity formed by Randy Asselin and Christopher Castillo to purchase the business. All the parties had a stake in the success of the business after the sale. The sale was seller-financed by the Huggs, and the parties contemplated a training period during which the Huggs would train Mr. Asselin and Mr. Castillo to manage the business and facilitate a smooth transition of the business to S-Tek. When Mr. Asselin and Mr. Castillo took over operation of what had been Surv-Tek's business, they quickly concluded that what they purchased was quite different from what they expected. Mr. Asselin and Mr. Castillo believe that the Huggs perpetrated a fraud that infected the entire sale and is the reason S-Tek has not been financially successful. The Huggs, on the other hand, believe they are the victims of fraud and that Mr. Asselin and Mr. Castillo are not competent to manage the business.

The Court's decision goes into great detail about what went wrong. The Court ultimately finds that neither the S-Tek Parties nor the Surv-Tek Parties perpetrated fraud but finds S-Tek liable under contracts it signed. The Court's award of damages is limited by the nature of the evidence and the proofs of claim that Surv-Tek and STIF filed.

## PROCEDURAL HISTORY

### I.    State Court Action

S-Tek filed the complaint (AP Doc. 13-2) that initiated this lawsuit in state court on July 9, 2019, as *S-Tek 1, LLC v. Surv-Tek, Inc.*, Case No. D-202-CV-2019-05359, in the Second Judicial District Court for the State of New Mexico (the "State Court Action").

On May 1, 2020, S-Tek filed its first amended complaint (the "Amended Complaint" – AP Doc. 13-15), which added STIF, LLC; Russ Hugg; Robbie Hugg; and Dennis Smigiel as defendants to the litigation. The Amended Complaint asserted claims for fraud (Count I), negligent misrepresentation (Count II), material breach of contract (Count III), breach of contract

-3-

(Count IV), breach of the covenant of good faith and fair dealing (Count V), equitable recovery under the principles of restitution and unjust enrichment (Count VI), recission (Count VII), violation of the Uniform Commercial Code ("UCC") (Count VIII), and violation of the New Mexico Unfair Trade Practices Act (Count IX).

On May 5, 2020, Surv-Tek and STIF filed counterclaims against S-Tek and third-party claims against Mr. Asselin, Mr. Castillo, and Kymberlee Castillo (AP Doc. 31-1). The claims were for breach of promissory note and security agreement (Count I), breach of lease (Count II), breach of commercial and personal guarantees (Count III), post-judgment write of replevin (Count IV), breach of non-compete agreement (Count V), declaratory relief (Count VI), conversion (Count VII), injunctive relief (Count VIII), and appointment of receiver (Count IX).

On June 8, 2020, Mr. Asselin and Mr. Castillo filed third-party counterclaims against Surv-Tek and STIF for fraud (Count I) and violation of the Unfair Practices Act (Count II).

On November 11, 2020, S-Tek and Mr. Smigiel executed a settlement agreement (the "Settlement Agreement"), under which S-Tek released Mr. Smigiel from all liability and agreed to dismiss all claims against Mr. Smigiel with prejudice. Doc. 11 at pp. 7-14.[4] The claims against Mr. Smigiel were dismissed on November 30, 2021. Doc. 97.

## II.  S-Tek's Bankruptcy Filing and Assertion of Additional Claims in this Adversary Proceeding

S-Tek commenced its voluntary chapter 11 case on December 2, 2020. The State Court Action was removed to bankruptcy court on December 10, 2020, as adversary proceeding number 20-01074 (the "Adversary Proceeding").

---

[4] S-Tek attempted to reject the Settlement Agreement as an executory contract. Doc. 112. However, the Court held that upon receipt of the settlement amount to S-Tek, the release of claims against Mr. Smigiel was complete. Doc. 187.

On January 11, 2021, the Court stayed a portion of an earlier interlocutory order entered in the State Court Action that had ordered S-Tek, Mr. Asselin, and Mr. Castillo to "cease and desist" from engaging in any competition with Surv-Tek. *See* AP Doc. 13-127. The Court stayed the earlier order with respect to S-Tek and with respect to Mr. Asselin and Mr. Castillo to the extent they compete with Surv-Tek solely through their operation of S-Tek. AP Doc. 17.

On February 16, 2021, S-Tek filed a supplement to the first amended complaint (the "Supplement to Amended Complaint" – AP Doc. 29), adding claims against Surv-Tek and the Huggs. The Supplement to Amended Complaint asserts claims for tortious interference with business relationships (Count X), conversion (Count XI), intentional violations of the automatic stay (Count XII), fraudulent inducement (Count XIII), prima facie tort (Count XIV), objection to Surv-Tek's first proof of claim, Claim 6-2 (Count XV), subordination of Surv-Tek's first proof of claim under § 510(b) (Count XVI), and objection to Surv-Tek's second proof of claim, Claim 7-1 (Count XVII).

On March 9, 2021, Surv-Tek and STIF filed supplemental counterclaims against S-Tek, Randy Asselin, Christopher Castillo, and Kymberlee Castillo (AP Doc. 31). The supplemental counterclaims were for malicious abuse of process (Count X) and fraud (Count XI).

On September 22, 2021, the Surv-Tek Parties filed a motion for summary judgment (the "Summary Judgment Motion" – Doc. 72). The Surv-Tek Parties sought partial summary judgment: (i) holding that S-Tek is liable for breaches of a promissory note, security agreement, and commercial lease and that Randy Asselin, Christopher Castillo, and Kymberlee (together, the "Guarantors") are liable for breaches of guarantees thereof and (ii) determining the amounts owed as a result of those breaches, pending resolution of defenses and offsetting claims at trial.

The Surv-Tek Parties also sought full summary judgment on six of S-Tek's claims, asking the Court to deny the requested relief.

On October 11, 2021, S-Tek filed a motion to strike Amended Claim 7-2 (the "Motion to Strike" – Doc. 245), asserting that the proof of claim could not be amended to change the creditor on the proof of claim from Surv-Tek to STIF. The Court permitted the filing of the amended proof of claim, ruled that the amended claim related back to the date of the original filing was therefore timely, and denied the Motion to Strike. Doc. 310.

On October 26, 2021, S-Tek filed its *Motion to Subordinate Claims of Surv-Tek, Inc. Pursuant to 11 U.S.C. § 510(c)* (the "Motion to Subordinate" – Doc. 258). Surv-Tek filed an objection to the Motion to Subordinate. The Court decided to hold a final hearing on the Motion to Subordinate concurrently with the trial of the Adversary Proceeding. *See* Doc. 246.

On December 10, 2021, the Court issued a memorandum opinion regarding the Summary Judgment Motion. The Court granted in part and denied in part the Summary Judgment Motion. The Court denied the Surv-Tek Parties' requests for partial summary judgment because there can be no determination that parties are liable when there are defenses to liability that have not been determined. With respect to the Surv-Tek Parties' request for full summary judgment denying certain of S-Tek's claims, the Court held:

> (1) *S-Tek's claim for intentional violation of the automatic stay*. The Court granted summary judgment in the Surv-Tek Parties' favor on this claim, because considered in the light most favorable to S-Tek, the facts did not demonstrate a stay violation.

> (2) *S-Tek's claims for tortious interference with business relationships and prima facie tort*. The Court denied summary judgment on these claims because there were genuine issues of material fact.

> (3) *S-Tek's claims for violations of the Unfair Trade Practices Act and conversion of personal property*. The Court granted summary judgment in favor of the Surv-Tek Parties and denied S-Tek's claim for violations of the Unfair Trade Practices Act to the extent S-Tek alleged unfair or deceptive trade practices. The

-6-

Court denied summary judgment and permitted S-Tek's claim to survive to the extent S-Tek alleged unconscionable trade practices. The Court granted summary judgment in favor of the Surv-Tek Parties and denied S-Tek's conversion claim with respect to the GPS receiver, but the conversion claim survived summary judgment with respect to all other property.

(4) *S-Tek's claim for subordination of Surv-Tek's claim pursuant to 11 U.S.C. § 510(b).* The request for summary judgment on this claim was moot because S-Tek had withdrawn the claim.

On December 23, 2021, the Court entered an opinion and order granting in part and denying in part a motion by S-Tek to determine the scope of Surv-Tek's security interest. Docs. 299 and 300. The Court held that (1) Surv-Tek has a valid lien in S-Tek's after-acquired accounts receivable and other after-acquired property, but (2) Surv-Tek's lien does not extend to the $30,000 in settlement funds that S-Tek received from Mr. Smigiel pursuant to the Settlement Agreement. Doc. 299.

All parties consented to the Court entering final orders and judgments on all claims and issues in this Adversary Proceeding. S-Tek filed a notice of consent (AP Doc. 10), and the Surv-Tek Parties gave their express consent on the record at a status conference (*see* AP Doc. 131), reversing U-Tek's previous non-consent (Doc. 7). The previously Guarantors has impliedly consented. *See* Doc. 130.

Starting January 24, 2022, the Court conducted a nine-day combined trial on the merits in the Adversary Proceeding and final hearing on the Motion to Subordinate. The Court imposed time limits on the parties at trial but tolled the time if there was argument on an evidentiary objections and for other reasons. The Court gave the S-Tek parties additional time for rebuttal argument. The trial issues included S-Tek's objections to Surv-Tek and STIF's proofs of claim. At the close of the S-Tek Parties' case-in-chief, the Surv-Tek Parties moved for directed verdict dismissing the following claims of S-Tek: rescission, violation of the UCC, tortious interference with business relationships, prima facie tort, and equitable subordination pursuant to § 510(c).

-7-

Subsequently, S-Tek withdrew its claim for rescission, so the Court ruled that the request to dismiss such claim was moot. *See* AP Doc. 126. The Court granted the motion for directed verdict with respect to the claim for tortious interference and dismissed such claim; the Court denied the motion for directed verdict with respect to all other claims. *See* AP Docs. 126-27.

With the consent of the parties, the Court ruled that it would address billing issues and the attorney's fees that form part of the Surv-Tek Parties' damages claim at a subsequent hearing, if needed. *See* AP Doc. 128. The Court indicated that it would defer ruling on whether to admit Exhibit Z, with attorney invoices, into evidence, until a separate hearing is held on attorney fee claims. *See* AP Doc. 128. After the Surv-Tek Parties rested their case-in-chief, the S-Tek Parties moved for directed verdict dismissing the Surv-Tek Parties' claim for malicious abuse of process. The Court took the motion for directed verdict under advisement. *See* AP Doc. 128. The Court now denies a directed verdict on that claim and the claim below

The Court further took under advisement whether to admit into evidence Cate Stansberry's testimony regarding what John Montoya said and the hearsay objection thereto. *See* AP Doc. 129. The Court took judicial notice of: (1) the docket in the bankruptcy case, Case No. 20-12241, (2) the docket in this Adversary Proceeding No. 20-01074, and (3) all the documents filed of record in the bankruptcy case and this adversary proceeding, but the Court noted that any hearsay information in a document is not admitted for the truth of the matter asserted. *See* AP Doc. 129.

The S-Tek Parties moved for the Court to conform the pleadings to the evidence and find malicious abuse of process against the Huggs, the Surv-Tek Parties objected, and the Court took the matter under advisement. *See* AP Doc. 129. The Court grants the motion and considers the malicious abuse of process claim below.

## I.    Nature of Surv-Tek's Business and its Operations

In or around 1989, brothers Russ Hugg and Robbie Hugg founded Surv-Tek, Inc. ("Surv-Tek"). The Huggs each own 50% of the shares of Surv-Tek. Surv-Tek is a land surveying company, which conducts surveys of real property defining boundaries, platting property, and locating improvements, easements and topographical features, among other things. Their father had been a surveyor before them, and the Huggs were raised in the surveying business. They owned and managed Surv-Tek. They are both licensed as surveyors in New Mexico.

### A.   Types of Survey Work Performed and Surv-Tek's Clientele

Surv-Tek performed various types of survey work, including: (1) construction, (2) topographic, (3) boundary, (4) plats, (5) ALTA, (6) as constructed, and (6) improvement location reports ("ILRs"). Construction surveys include staking the property for curbs and gutters, sewer and water lines, corners, and other reference points to guide construction crews. Topographic surveys identify the natural features of the land, such as elevations. Boundary surveys formally determine the limits or boundaries of property and include preparation of plats to subdivide property into lots. ALTA surveys are the most complete type of survey and include the topography, boundaries, and improvements. Finally, ILRs are simple surveys that identify

---

[5] Although the parties agreed that all evidence admitted at the trial on the merits of the adversary proceeding (No. 20-1074-j) is admitted for purposes of S-Tek's motion to value brought under § 506(a)(1), the parties did not stipulate that evidence admitted at the motion to value hearing is admitted in this adversary proceeding.

[6] The Court makes findings of fact in this section pursuant to Fed. R. Civ. P. 52, incorporated into bankruptcy adversary proceedings by Fed. R. Bankr. P. 7052 (with one exception that is not applicable here). To the extent that the Discussion section contains facts not enumerated in this section, the Court adopts them as additional fact findings.

[7] In the Summary Judgment Opinion, the Court established certain facts for purposes of trial. *See* Doc. 99 at p. 7. The Court has included many of the established facts in the narrative of this section.

and locate on-site property improvements. Draftsman prepare survey drawings using AutoCAD software, among other things.

Surv-Tek's clients and referral sources included real estate developers, home builders, realtors, title companies, and civil engineers. Surv-Tek had repeat business from many of its real estate developer and home builder clients. Those tended to be higher profits jobs. Title companies were good referral sources for ILR work. Those entailed less work and were lower profit jobs.

**B. Surv-Tek's Workforce**

Surv-Tek's workforce was divided into two main groups: employees who worked primarily in the office and employees who worked primarily outside. Work in the office (inside work) consisted of administrative work (such as billing and bookkeeping), preparation of survey drawings and plats by draftsmen, preparation of job proposals, and IT support. Work outside the office (outside work) was performed by field crews.

1. *Russ Hugg*

Among his duties while he worked for Surv-Tek, Russ Hugg did drafting, including ALTA surveys, topographical surveys and plats, and oversaw the other draftsmen. Russ Hugg was highly experienced and skilled. Russ Hugg also coordinated with other parties who needed to sign off on a survey, such as civil engineers and attorneys. In addition, Russ Hugg prepared job proposals, assisted others in preparing proposals, supervised the billing, managed employees, and interacted with clients and referral sources.

2. *Robbie Hugg/The Archived Survey Database*

While he worked for Surv-Tek, Robbie Hugg did pre-field work and oversaw field crews. In overseeing the field crews, Robbie Hugg designated which field crew workers went to which

-10-

job sites and on what days. Robbie Hugg was skilled and efficient at dispatching the field crews, in part because he was familiar with the tasks needed to be performed and the strengths and weaknesses of each field crew member in performing those tasks. He knew how quickly or slowly a worker would be able to get his duties completed, and he knew who needed oversight to make sure that a small mistake did not get compounded. He could also have field crews conduct a small ILR or two on the way to or from a bigger job.

Robbie Hugg was efficient in "stacking the jobs." It is not entirely clear from the evidence what that means. It apparently entails scheduling smaller jobs to be done on the way to or from a larger job located in proximity to the larger job. It may also mean efficiently doing the front-end work (i.e., pre-loading the data into the controller) on multiple jobs so that there are always jobs ready for the crews.

Before a field crew started work on a project, Robbie Hugg would preload data into the controller used to survey in the field, including control points and GPS calibrations. A control point is a point on the ground whose coordinates are known. Robbie Hugg would obtain the information from various public sources and from nonpublic information contained in Surv-Tek's Archived Survey Database (described below). Preloading control points and GPS calibrations from nonpublic information in the Archived Survey Database could save the field crew substantial time – a time saving not available to Surv-Tek's competitors. The time savings reduced the cost of the job and gave Surv-Tek a competitive advantage. Robbie Hugg had a high level of skill in performing that work efficiently and well. Having been trained by Robbie Hugg, John Montoya was also skilled in setting up control points and calibrations for jobs, including by use of information in the Archived Survey Database.

Over the years, Surv-Tek has performed as many as 40,000 surveys in New Mexico. Surv-Tek had a substantial inventory of surveys archived from surveying work it has performed since 1979 in almost every city in New Mexico. The archived survey database ("Archived Survey Database") included CAD files, plats, drawings, legal descriptions, GPS calibrations, photos, boilerplate proposals, and certifications.

While working for Surv-Tek, Bob Sprenger spent months scanning all or substantially all of the hard copy surveys included in the Archived Survey Database, which were stored on hard drives together with the other information comprising the archived database. Mr. Springer developed an indexing system to access the Archived Survey Database. He maintained the database, which included the digitized survey drawings and other information, as well as the indices, in his role as IT support, and kept back-up hard copies of the drawings. He also kept backups of certain of the historical surveys on microfiche.

Use of the Archived Survey Database gave Surv-Tek a substantial competitive advantage on many jobs, increasing profitability by as much as 20% or more and sometimes by as much as 50%. Use of the Archived Survey Database enabled Surv-Tek to underbid competitors and still make a good profit. The information in the Archived Survey Database was also helpful in formulating job proposals more quickly and efficiently to obtain work and in preparing Surv-Tek's final work product. The Archived Survey Database could enable Surv-Tek to put together a proposal in a day that might take a competitor several days. S-Tek acquired the Archived Survey Database and the backup hard copies and microfiche, as part of its purchase of Surv-Tek's business.

Robbie Hugg dealt with Surv-Tek's clients and referral sources and with Bob Green, the manager of the local Trimble dealership, which sold survey equipment.

-12-

3. *Stamping surveys*

Both of the Huggs "stamped" surveys for Surv-Tek, and, later, for S-Tek. The stamp is the final step in completing a survey before it can be sent to the customer. The stamp is a certification signed by a surveyor licensed in New Mexico that the survey meets certain requirements imposed by law, and it carries lifetime potential liability by the licensed surveyor if the survey is inaccurate. Only a licensed surveyor, licensed by the state in which the survey is conducted, may stamp the survey.

While the Huggs are both licensed surveyors authorized to stamp surveys, the other survey-related work that they performed did not need to be performed by a licensed surveyor. Such other survey-related work they performed for Surv-Tek included setting up a job with control points and calibrations, managing outside field crews and inside draftsmen, and working as a draftsman. In addition, it is not necessary that a licensed surveyor prepare job proposals.

4. *The other Surv-Tek employees who went to work for S-Tek*

At the time of the sale of the Surv-Tek business to S-Tek, Surv-Tek had 13 employees identified at trial in addition to the Huggs, consisting of:[8]

Andrew and Cole (whose last names are not in evidence) were newer employees.

Rick Garcia was a draftsman who was skilled at preparing plats, particularly the legal aspects.

Davin (Lefty) Hardman, Manny Herrera, Freddie Huerta were field crew members.

Renae Levis was Surv-Tek's bookkeeper and part-time IT technician. She also prepared some proposals.

Eric Mercado has been in the surveying business for roughly 30 years. He variously worked for Surv-Tek as a draftsman and in the field.

---

[8] The evidence identifying the Surv-Tek employees who became S-Tek employees was presented in such a way that it is possible it involved more than 13 employees. Further, the evidence of what some of the employees did, and their skillsets, was sparse.

<u>Michael Mergler</u> was a lead construction staker. He was fast and accurate.

<u>John Montoya was</u> a highly skilled employee who had worked for Surv-Tek for 17 years, spent a lot of time in the field, knew how to set up controls using the Archived Survey Database, and could work as a draftsman under supervision. He was Robbie Hugg's right hand man.

<u>Joe Orloski</u>. Mr. Orloski was in charge of surveying for construction projects, including ALTA surveys. He would communicate with the client and take care of the field crews, and was self-sufficient managing the jobs. Mr. Asselin variously referred to Mr. Orloski as a master or as a Yoda. Russ Hugg described Mr. Orloski as the Yoda of construction surveying. He is a licensed surveyor but did not stamp surveys. He did not want to assume the personal liability associated with stamping.

<u>Dick Smith</u> is a surveyor licensed in Connecticut (but not in New Mexico) and did not stamp surveys for Surv-Tek. He was a highly skilled draftsman.

<u>Bob Sprenger</u> was also a highly skilled draftsman (he had prepared surveys for about 40 years). He also provided IT support for Surv-Tek, having done IT work for about 25 years.

## II.     The Marketing Materials Used for the Sale of Surv-Tek's Business

With both the Huggs getting older and Robbie Hugg having serious back issues, the Huggs decided that they would like to sell the Surv-Tek business. They hired a business broker, Dennis Smigiel, with Keller Williams, in early 2015 to market the business. Mr. Smigiel had been a business broker since 1985 and by the time he retired in 2019 he had worked on over 800 transactions. He primarily marketed and facilitated the sales of profitable small businesses as a going concern. Mr. Smigiel marketed Surv-Tek for the Huggs on and off from early 2015 through the eventual sale to S-Tek at the end of 2018.

As the broker, Mr. Smigiel set the listing price of $2.2 million for the business. Mr. Smigiel calculated the purchase price for Surv-Tek's business on a going concern basis based on cash flow. His calculation of going concern value did not take into account the value of the company's assets. Mr. Smigiel's methodology to determine going concern (enterprise) value was to start by analyzing cash flow and then applying a multiplier, typically in the 2.5 to 3.0 range, to

-14-

an adjusted cash flow profit. He would use a lower multiplier for a business that was not running smoothly or that was not managed well. Mr. Smigiel typically advised his clients to ask for a down payment of one third of the purchase price.

Using this methodology Mr. Smigiel determined that a fair market price for Surv-Tek's business was $2.2 million. He listed the business for sale for that amount, with a down payment of $735,000. Mr. Smigiel identified the average profit for each of four calendar years (2014, 2015, 2016, 2017), calculated an adjusted profit, and applied the multiplier to the average adjusted profit for the four-year period. To arrive at the adjusted profit, Mr. Smiegel added to the profit depreciation, interest expense, owner's salaries, certain discretionary expenses, and a portion of the rent Surv-Tek paid to an insider under its premises lease (those items having been included as expenses) and subtracted from profit $80,000 for the cost of hiring a licensed surveyor/manager to replace surveyor duties being performed by the Huggs.

Mr. Smigiel put together a marketing package for the sale of Surv-Tek's business (Exhibit 6) later replaced by a revised marketing package (the "Marketing Package – Exhibit 9). The marketing materials that Smigiel used to market the Surv-Tek business included a website and internet ad (Exhibit 3) and a short profile of the business (Exhibit 4) in addition to the Marketing Package.

To prepare the Marketing Package, Mr. Smigiel used information he obtained from the Huggs and Surv-Tek's accountant (including tax returns and profit and loss statements) and Surv-Tek's website. Cash flow information, and adjustments to profit, that Mr. Smigiel used to determine the $2.2 million listing price was included in a chart in the original marketing package and in a revised chart in the Marketing Package, with notes explaining several of the adjustments to profit made before applying the multiplier. To arrive at the $2.2 million listing price, Mr.

Smigiel originally used a multiplier of approximately 2.5 (Exhibit 6) and later used a multiplier of 3.0. (Exhibit 9).

Cash flow information included in the Marketing Package included the following total revenue and owner salary information:

|  | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| Total Revenue | 1,784,000 | 1,765,000 | 1,560,000 | 2,100,000 |
| Owner salaries | 656,000 | 563,000 | 390,000 | 906,000 |

A note to the cash flow summary for 2016 states,

> Accounts receivable remained some $200,000 higher at the end of 2016 than in previous years. Had this money been collected cash flow would have been similar to previous years.[9]

The Huggs believed that most surveyors would not be able to afford to purchase the Surv-Tek business for the price Mr. Smigiel determined to be fair market value. Therefore, the original marketing package and revised Marketing Package were targeted to non-surveyors. Consistent with the marketing materials being targeted to non-surveyors, the Marketing Package factored into adjusted cash flow that the buyer would need to hire a licensed surveyor and represented that "[t]he owner of a Survey Company **does not** have to be a Licensed Surveyor." (emphasis in original).[10]

A note explaining an $80,000 adjustment to profit for the cost of hiring a licensed surveyor/manager to replace the duties being performed by the Huggs states,

> Sellers will help buyer hire a new surveyor/manager who will focus on performing the survey duties currently performed by the sellers. As the new owner and surveyor/manager become capable of operating the company, the sellers will fade out of the day to day operations.[11]

The Marketing Package further states,

---

[9] Ex. 9 at p. 9.
[10] Ex. 9 at p. 6.
[11] Ex. 9 at p. 8.

-16-

The quality and depth of personnel are good and contribute to the business's success. Most key employees would be expected to remain in the event the business is sold. The seller's [sic] will work with a purchaser through a reasonable training and transition period. Since both owners work in the business full-time, it is assumed that the buyer will perform the duties of one of the sellers and a new employee[,] a licensed surveyor[,] would be necessary to perform the duties of the owner. The sellers will provide sufficient training during the transition period[.] [T]hey understand that in order for the sale to be successful the buyer needs to be successful with the business.[12]

(emphasis in original).

The Marketing Package also stated that the seller would "introduce Purchaser to all major accounts."[13] None of the marketing materials stated that the business would be "turnkey" or "turnkey operational." While the Huggs provided information to Mr. Smigiel, they did not expressly approve the marketing materials viewed by Mr. Asselin and Mr. Castillo.

The Marketing Package listed an Asset Value of $505,000, consisting of $500,000 for furniture, fixtures, equipment, and vehicles, and $5,000 for inventory.[14] The exhibits to the Marketing Package included a list of equipment (including computer and field surveying equipment) and vehicles with values assigned to each item on the list, although using the assigned values the aggregate value of the listed equipment and vehicles totals only $246,500.[15] The list of assets with assigned values attached to the Marketing Package did not include accounts receivable, cash, or the Archived Survey Database. It also did not list any fixtures or furniture.

Mr. Smigiel would screen prospective buyers for the Surv-Tek business. If an interested party seemed like a viable candidate, Mr. Smigiel would introduce the prospective buyer to the Huggs. Over the years, approximately 15 prospective buyers advanced through the process to a

---

[12] Ex. 9 at p. 7.
[13] Ex. 9 at p. 10.
[14] Ex. 9 at p. 9.
[15] Ex. 9 at pp. 12-14.

meeting with the Huggs. Four or five offers were made, which the Huggs did not accept for various reasons, before S-Tek made its offer.

## III.     Due Diligence Prior to Reaching Agreement for the Purchase and Sale

Randy Asselin and Christopher Castillo first reached out to Dennis Smigiel in or around early summer 2018. It is customary for a prospective buyer of a business to make a reasonable investigation before making an offer by conducting due diligence. Mr. Asselin and Mr. Castillo understood that they were expected to conduct such due diligence. They conducted due diligence through the rest of the summer and most of the fall, resulting in the Offer for Purchase and Sale of Assets, Earnest Money Receipt, and Agreement, which was signed November 16 and 20, 2018 (the "Original Purchase Agreement"). Exhibit E.

In the early stages of the due diligence, on July 26, 2018, Mr. Smigiel sent Mr. Castillo the original marketing package (Exhibit 6). Then Mr. Smigiel emailed a revised version to Mr. Asselin and Mr. Castillo on September 18, 2018 (Exhibit 8), instructing them to disregard the prior original marketing package and replace it with the revised Marketing Package, and explaining the changes in the revised Marketing Package. The revised Marketing Package (Exhibit 9) deleted an incorrect "add back" to the cash flow analysis, for a retirement plan, that had resulted in annual profit being shown as $88,000 more than it actually was.

### A.  Due Diligence Conducted

In conducting due diligence, Mr. Asselin and Mr. Castillo took several steps to explore whether the purchase of Surv-Tek would be a good investment for them. After receiving the original marketing package from Mr. Smigiel, they asked him questions via email and had an initial meeting with Mr. Smigiel. Then they had a series of meetings with Mr. Smigiel, Robbie Hugg, and/or Russ Hugg. During this time, Surv-Tek provided financial information, including

-18-

tax returns and profit and loss statements for Surv-Tek. Mr. Asselin and Mr. Castillo had their

accountant, Frank Shannon, review Surv-Tek's financial documents, and he confirmed that they

matched the financial information listed in the marketing materials.

Mr. Asselin and Mr. Castillo were concerned about their ability to run the company as

non-surveyors, so they sought reassurance from the Huggs and also spoke with Mr. Castillo's

uncle, who was a licensed surveyor. Mr. Castillo's uncle told them that with the right systems in

place, non-surveyors could successfully run a surveying business.

In relation to due diligence, Mr. Asselin testified several times that because "you don't

know what you don't know" he was very concerned that he and Mr. Castillo did not know what

questions to ask. That concern was justified. But they did not retain someone with expertise to

assist them in conducting due diligence.

### B. Representations Made Prior to or During Due Diligence

#### 1. *The Revised Marketing Package*

The marketing materials made a variety of representations.

As described in greater detail above, the revised Marketing Package contained a

summary of Surv-Tek's cash flow for calendar years 2014-2017, with adjustments. It shows that

the average annual combined salaries of the Huggs was $628,750 during that period.

The revised Marketing Package stated that Surv-Tek's hours of operation were Monday

through Friday, 8:00 a.m. to 5:00 p.m. However, the Huggs worked substantially longer,

typically around 50 to 60 hours a week each. There is no credible evidence that Robbie Hugg or

Russ Hugg were asked during the due diligence period to estimate the number of hours per week

they worked, although Russ Hugg suggested Mr. Asselin and Mr. Castillo were aware of the

hours he and his brother worked. There is no evidence of how many hours the Huggs spent on

each of the different types of tasks they performed in a typical week or month or that they were asked about that prior to closing. That information would have helped Mr. Asselin and Mr. Castillo to assess whether they and one newly hired surveyor could perform the work that the Huggs performed, and to ask to follow up questions about the types of work they would need to perform to keep overhead down.

The revised Marketing Package stated that Surv-Tek employed 17 full- and part-time employees, in addition to the two owners. Upon the closing of the sale, it appears Surv-Tek had 13 employees in addition to the two owners. The evidence does not indicate which employees left Surv-Tek before the closing or why they left; whether the employees that left worked full-time or part-time; what duties the employees that left performed; or whether any of the employees that left were key employees that could not be replaced easily. But from the evidence, it appears that none of the employees that left were key employees and that the Surv-Tek workforce as a practical matter was intact at closing.

The revised Marketing Package implies that the new owner could hire a licensed surveyor for $80,000 to perform the survey duties then being performed by the Huggs, and the new non-surveyor owners could perform the other work performed by the Huggs in managing the business. *See* Exhibit 9, p. 8. Either or both of the Huggs testified that business functions they understood Mr. Asselin and Mr. Castillo would perform consisted of such things as dealing with clients, billing, preparing job proposals, reviewing employee timesheets, reviewing project files, and managing employees. Robbie Hugg testified that it did not make sense to delegate those tasks to technical people as it would take them away from the technical work and create overhead.

Neither Robbie Hugg, Russ Hugg, nor Mr. Smigiel intended to deceive S-Tek, Mr. Asselin or Mr. Castillo with respect to the representations made in the Marketing Package.

Beyond the marketing materials, Mr. Smigiel made various representations to Mr. Asselin and Mr. Castillo. In an email dated July 20, 2018, Mr. Smigiel wrote to Mr. Castillo, with a copy to Mr. Asselin, trying to convince them to buy the Surv-Tek business. Exhibit 5. Neither Hugg brother was copied on the email and the evidence does not establish they saw it or were aware of its contents. The email makes the following statement: "[Y]ou will have a return on your investment at the end of the first year after paying all expenses and monthly debt service to the sellers of approximately $460,000."[16] It goes on to say, "And you will make this money each year if sales and operating expenses stay about the same as they are now. If you increase sales, you will earn even more."[17]

In that same email, Mr. Smigiel also tried to persuade Mr. Asselin and Mr. Castillo that the purchase of Surv-Tek was a better investment than a real estate investment they were contemplating as an alternative to purchasing Surv-Tek's business. Among other things, Mr. Smigiel stated, "The amount of return on your investment is always going to be much higher when purchasing a business and much lower when buying real estate."[18]

By making the statements in the email about future profitability of the business, Mr. Smigiel did not intend to deceive S-Tek, Mr. Asselin or Mr. Castillo. The statement was based on past profitability which Mr. Smigiel believed the buyer could achieve. He also believed, reasonably, that in buying a small business there are no guarantees as to future profitability and his statements were subject to Mr. Asselin and Mr. Castillo performing their own due diligence.

---

[16] Ex. 5 at p. 1.
[17] Ex. 5 at p. 1.
[18] Ex. 5 at p. 1.

-21-

S-Tek argued that because it is a tautology to state that "you will make this money each year if sales and operating expenses stay about the same as they are now," Mr. Smigiel must have meant more—he must have meant that S-Tek *would* make the same money or more. The Court disagrees. The tautological statement is "sales speak" and makes no promises.

Any reliance by Mr. Asselin and Mr. Castillo on the representations in the email about future profitability, which were made by a business broker trying to make a sale of a business, was unreasonable and was not justifiable under the circumstances. There are no guarantees in buying a small business, such as a surveying business, about future profitability. It was not reasonable or justifiable for Mr. Asselin and Mr. Castillo to rely on a business broker who says otherwise.

Mr. Smigiel's statement in the email that "[t]he amount of return on your investment is always going to be much higher when purchasing a business and much lower when buying real estate" is patently absurd. Neither Mr. Asselin and Mr. Castillo nor S-Tek reasonably or justifiably relied on that statement. It is also not reasonable or justifiable for Mr. Asselin and Mr. Castillo to rely on a business broker's assessment of the relative profitability of buying the Surv-Tek business with the profitability of a real estate investment.

Mr. Asselin and Mr. Castillo were quite concerned about whether they, as non-surveyors, could run the business profitably. Mr. Castillo's uncle, a licensed surveyor himself, told Mr. Castillo that if the business was in fact turnkey that non-surveyors could run the business. Mr. Smigiel did not specifically tell Mr. Asselin or Mr. Castillo that the Surv-Tek business would be turnkey operational. Mr. Castillo concluded that from what his uncle told him and from information in the Marketing Package, including the facts that (a) they would be buying an established business with a history of profitability and longevity, (b) that the business had an

-22-

established employee and customer base and the equipment needed to run the business, and (c) the seller would provide reasonable training for the new owners during a transition period. Mr. Asselin and Mr. Castillo inferred that the business would be turnkey operational based on Mr. Smigiel, who has over 30 years of experience, telling them that non-surveyors could run the business profitably.

Mr. Smigiel believed in good faith that non-surveyors could profitably operate the Surv-Tek business. He was familiar with other businesses requiring a licensed contractor operated by owners that do not have a license.

The evidence does not establish that Mr. Smigiel told Mr. Asselin or Mr. Castillo that the Huggs would bid jobs for S-Tek during the transition period described in the Marketing Package.

Beyond Mr. Smigiel, the Huggs made certain representations during their meetings with Mr. Asselin and Mr. Castillo. The Huggs represented that they would train Mr. Asselin and Mr. Castillo and introduce them to Surv-Tek's customers. Those representations were also made in the Marketing Package. The Huggs further impliedly represented to Mr. Asselin and Mr. Castillo that if they managed the business competently and hired one full-time, quality licensed surveyor, there was reasonable prospect that S-Tek, owned by non-surveyors, could achieve a comparable level of profitability as Surv-Tek (less an estimated $80,000 annual cost of hiring a full-time licensed surveyor and taking into account the cost of making payments under the Note). The Huggs assured Mr. Asselin and Mr. Castillo that given their impressive business experience and skills as reflected in their resume they could run the business as non-surveyors.

### C. What the Due Diligence Omitted

There was little if any evidence of discussions during the due diligence period regarding whether it might be difficult for S-Tek to hire a full-time licensed surveyor. In any event, the Huggs did not know how difficult it would be. There was no evidence that the Huggs had

-23-

recently tried to hire a licensed surveyor, nor any evidence that Mr. Castillo's licensed surveyor uncle discussed this with Mr. Castillo or Mr. Asselin.

Mr. Asselin and Mr. Castillo did not perform adequate due diligence to enable them to assess whether they would be able to operate S-Tek successfully as non-surveyors and maintain profitability comparable to what Surv-Tek had achieved, without the Huggs.

While the Court recognizes that it has the benefit of hindsight, the following steps should have been taken by any reasonable prospective purchaser of Surv-Tek who is not experienced in the survey business, as part of its due diligence.

- Gain a general understanding of the types of land surveying that Surv-Tek conducted, including boundary, construction, topographical, ALTA, and platting; and what type of work that each type of survey entails, and the profitability of the different types of surveying work.
- Learn about Surv-Tek's customer base for each type of survey work it performed.
- Learn about the roles that each of Robbie Hugg and Russ Hugg played in producing the different types of surveys and in managing the company, and what that work entailed.
- Gain an understanding of how jobs are bid, the expertise required to bid jobs, and the Huggs' roles in bidding the jobs.

The evidence does not establish that Mr. Asselin or Mr. Castillo did any of this due diligence or did it adequately. Indeed, Mr. Asselin testified that he was surprised when he learned after closing that Robbie Hugg went out into the field.

In addition, the evidence does not show that Mr. Asselin and Mr. Castillo, in a meaningful way:

- Identified the tasks the Huggs performed that they contemplated Mr. Asselin and Mr. Castillo would perform, such as preparing job proposals. Mr. Asselin and Mr. Castillo did not inquire about what preparation of job proposals entailed so they could assess whether it could be adequately done by someone without technical surveying knowledge.
- Learned about Surv-Tek's workforce, including the type of work each employee performed and their experience and skillsets.

Mr. Asselin and Mr. Castillo did want to meet with the employees, but the Huggs refused. Mr. Smigiel testified that it would be highly unusual and disruptive to the company, and he

discouraged it based on his experience with what is ordinary and customary. The evidence does not show that Mr. Asselin and Mr. Castillo asked the Huggs about the employees' roles.

## IV. Whether Robbie Hugg was an Irreplaceable Key to Surv-Tek's High Level of Profitability

S-Tek contends that Surv-Tek inflated the purchase price of its business by inflating its goodwill because its business could not operate nearly as profitably without the services of the Huggs, particularly Robbie Hugg, even if their services were replaced by another full-time licensed surveyor and the work performed by two new non-surveyor owners.

Mr. Castillo testified that Surv-Tek defrauded S-Tek by failing to disclose that Robbie Hugg was the key to Surv-Tek's "profitability machine," which S-Tek could not replicate without Robbie Hugg. Mr. Castillo described Robbie Hugg as a "virtuoso" in setting up jobs with control points and calibrations, and stacking jobs, to create greater efficiency and higher profitability. He described Robbie Hugg's work for Surv-Tek as the "secret sauce" to its high level of profitability.[19] Mr. Castillo testified that it was misrepresented to him and Mr. Asselin that all they needed to do was replace the Huggs with a licensed surveyor for about $80,000 a year and they could maintain the level of profitability that Surv-Tek achieved (less the cost of the licensed surveyor and taking into account payments under the Note).

Robbie Hugg denied he has special skills that prevent S-Tek from achieving Surv-Tek's level of profitability without him. John Montoya testified that his skill in setting up jobs, including by identifying control points from public sources and the Archived Survey Database, matched that of Robbie Hugg.

---

[19] Robbie Hugg's work to set up jobs is described above – stacking jobs; setting control points and GPS calibrations based on public information and the Archived Survey Database; and assigning field crew employees to each job.

Robbie Hugg has severe back problems and has undergone seven back surgeries. In the years leading up to 2017, he dealt with back pain and related mobility limitations. He began delegating more responsibility to John Montoya. Robbie Hugg's first back surgery took place in August 2017, and he was unable to work at Surv-Tek due to recovery and follow-up surgeries for approximately the following year. During that approximate one-year period, Robbie Hugg's duties were taken over for a time by Russ Hugg's son and then later by John Montoya.

The Court reviewed the evidence in an effort to compare Surv-Tek's profitability during the approximate one-year period when Robbie Hugg was absent due back problems with the periods before and after the one-year hiatus. Tax returns show that on a cash basis Surv-Tek had the following total revenue and paid the Huggs' salaries in the following amounts for each year from 2014 to 2018:

|  | **2014** | **2015** | **2016** | **2017** | **2018** |
|---|---|---|---|---|---|
| Total Revenue | 1,784,000 | 1,765,000 | 1,560,000 | 2,100,000 | 1,630,000 |
| Owner salaries | 656,000 | 563,000 | 390,000 | 906,000 | 583,000 |

Robbie Hugg's one-year back surgery absence from working for Surv-Tek following a back surgery spans two calendar years, August 2017 to July 2018. Surv-Tek is a calendar year taxpayer. Its financial information is prepared on a cash basis. There is no monthly cash flow information in evidence that would allow the Court to determine Surv-Tek's level of profitability during Robbie Hugg's one-year absence. Further, there is no evidence showing whether Surv-Tek had unusually high or low accounts receivable balances at the end of 2017 or 2018 or extraordinary expenses in either year that would affect annual cash flow for those years. The evidence does not establish that Surv-Tek was less profitable during the approximate one-year period of Robbie Hugg's absence from the company following back surgery.

The Marketing Package prepared by Dennis Smigiel, the broker that Surv-Tek retained to market its business, state that Surv-Tek's accounts receivable were some $200,000 higher at the

-26-

end of 2016 than in previous years, and that if the money had been collected in 2016 cash flow in 2016 would have been similar to previous years. If that is true, it may account for the lower owner salaries in 2016 and higher owner salaries in 2017 as compared with other years.

The evidence does not establish that without the Huggs S-Tek could not achieve a level of profitability comparable to when Surv-Tek operated the business less the cost of hiring a full-time licensed surveyor and taking into account Note payments.

The Huggs further impliedly represented to Mr. Asselin and Mr. Castillo that if they managed the business competently and hired one full-time, quality licensed surveyor, there was reasonable prospect that S-Tek, owned by non-surveyors, could achieve a comparable level of profitability as Surv-Tek (less the cost of hiring a full-time licensed surveyor). The evidence does not establish that this implied representation was false.

## V.     Pre-Closing Negotiations

The Huggs accepted S-Tek's offer to purchase the Surv-Tek business in part because they thought the new owners would have the ability to manage the company successfully based on Mr. Asselin and Mr. Castillo's impressive resumes. *See* Exhibits H and I. Mr. Castillo's resume portrays him as highly accomplished and successful in sales and marketing in the insurance and banking industries, among others. Mr. Asselin's resume portrays him as highly accomplished and successful in providing business consulting services and managing businesses in the technology field, in starting up a new business, and as a turnaround expert.

Mr. Smigiel prepared the Original Purchase Agreement. S-Tek executed the agreement, through Mr. Asselin and Mr. Castillo, on November 16, 2018. Surv-Tek executed the agreement, through the Huggs, on November 20, 2018. While a significant portion of the due diligence occurred prior to the signing of the Original Purchase Agreement, the Original Purchase

Agreement includes a 14-day "examination of books, records and assets."[20]

The parties negotiated the purchase price from the $2.2 million listing price to $1.8 million, and the down payment from $735,000 to $250,000. Mr. Asselin and Mr. Castillo applied and were approved for a loan for the down payment, plus funds for initial working capital, to be secured by a first lien against S-Tek's assets. However, Surv-Tek, which was providing seller financing for most of the purchase price secured by S-Tek's assets, was not willing to subordinate its lien. Therefore, Mr. Asselin and Mr. Castillo had to provide the down payment and initial working capital from their own pockets. Surv-Tek's decision not to subordinate its lien was a good faith, reasonable business decision. Ultimately, Mr. Castillo provided $300,000 from his personal resources – $250,000 for the down payment and $50,000 for initial working capital. Mr. Asselin did not contribute financially to the down payment or initial working capital.

S-Tek has alleged that Surv-Tek agreed to support S-Tek's revenue-building as a result of its refusal to subordinate its lien to permit S-Tek to borrow enough funds to make the down payment of $250,000 and adequately capitalize S-Tek. The evidence does not establish that there was any specific commitment on the part of Robbie Hugg or Russ Hugg to help S-Tek build its revenues or what those alleged obligations would entail apart from Surv-Tek's obligations under the Closing Agreement. The evidence does not establish that Surv-Tek's failed to support S-Tek's revenue-building in breach of an obligation set forth in the Closing Agreement.

Mr. Smigiel had estimated that the buyer needed $100,000 of initial working capital to adequately capitalize the business. With only $50,000 of initial working capital, S-Tek was undercapitalized from the start. To address the capitalization concerns, the parties negotiated that (1) S-Tek would not be required to make any payment on the promissory note for the unpaid

---

[20] Ex. E at ¶ 10.

balance of the purchase price and, except for the first payment due at closing, would not be required to make payment under the premises lease, until April 1, 2019[21] and (2) S-Tek could keep the funds paid by customers for work in progress on the closing date.

## VI. Closing of the Sale

### A. **The Closing Agreement**

The closing of the sale of Surv-Tek's business to S-Tek took place on December 28, 2018. On that date, the parties executed a Closing Agreement (*see* Exhibit 21) and various closing documents (*see* Exhibit 21). Although called a Closing Agreement, the Closing Agreement actually was a comprehensive purchase and sale agreement prepared by Surv-Tek's counsel that superseded and replaced the Original Purchase Agreement prepared by Mr. Smigiel. S-Tek was represented by counsel in connection with the Closing Agreement. Under the Closing Agreement, Surv-Tek agreed to sell and S-Tek agreed to purchase all assets and properties of Surv-Tek except for accounts receivable for work completed prior to closing. Neither Robbie Hugg nor Russ Hugg agreed to sell, or did sell, any of their stock in Surv-Tek. Neither S-Tek, Randy Asselin or Christopher Castillo have owned any stock or other equity interest in Surv-Tek.

The Closing Agreement provided for a purchase price of $1,800,000 with $250,000 down and the balance paid over a period of time under a promissory note.

The closing documents executed in connection with the closing are listed in paragraph 2 of the Closing Agreement and were attached as exhibits to the Closing Agreement. The listed closing documents include, among other things, a Promissory Note for $1,550,000 (the "Note"), a Security Agreement (the "Security Agreement"), an Assignment of Contracts, a Commercial

---

[21] Part of the deal included a lease between STIF (owned by the Huggs) and S-Tek under which STIF would lease to S-Tek the premises from which Surv-Tek had operated.

Guaranty under which Mr. Asselin and Mr. Castillo and Mr. Castillo's spouse personally guaranteed the Note, a Non-Compete Agreement ("Non-Compete Agreement"), a commercial lease between STIF and S-Tek for the lease of Surv-Tek's office space (with personal guaranties) (the "Lease"),[22] an Escrow Agreement, an Allocation of the Purchase Price for purposes of income tax reporting, and a Bill of Sale, and assignments. Any negotiations with respect to the contents of the Closing Agreement, or the closing documents attached as exhibits to the Closing Agreement, are not in evidence. The closing documents do not include a subordination agreement, and no subordination agreement between any of the parties has been executed in connection with the sale or otherwise.

1. *Transferred and Retained Assets*

The Closing Agreement specified the assets transferred to S-Tek, the liabilities S-Tek assumed, and the assets Surv-Tek retained. Surv-Tek retained its cash and accounts receivable for work completed prior closing. ¶ 3.A.(a). All of Surv-Tek's other assets and property were transferred to S-Tek, including but not limited to Surv-Tek's name, business, and goodwill; the hard assets listed on an exhibit attached to the Closing Agreement; and accounts receivable related to work-in-progress to be completed after closing. ¶ 3.A.(b).

2. *The Huggs to assist S-Tek during a post-closing transition period*.

The Closing Agreement required the Huggs to provide three types of post-closing services for S-Tek during a transition period:

Training. One or both of the Huggs will train S-Tek in the administration of S-Tek's business for 90 days after closing at no charge.

Paid Survey and Survey-Related Work. For a period of one year after closing, the Huggs will work for S-Tek as licensed surveyors on an independent contractor basis, as needed by S-Tek, to "provide survey and related work for [S-Tek], in furtherance of [S-Tek's] business and for work in process for [S-Tek] customers" for $40.00 per hour. As

---

[22] Surv-Tek's office space was 9384 Valley View Dr. NW, Albuquerque, NM 87114.

S-Tek employed a licensed surveyor, the survey and survey-related work for a fee would be reduced to nothing. In the event of a payment default by S-Tek under the Note or a default under the Security Agreement, the Huggs were permitted to suspend performance of the survey and related work. The independent contractor survey work relationship was designated "at will." If a dispute arose between S-Tek and the Huggs, which could not be amicably resolved within two weeks, either party/side may terminate the relationship.

Stamping Surveys. The Huggs will stamp surveys for S-Tek for a period of 90 days following closing, "during which time [S-Tek] will be proceeding in good faith to interview candidates for employment by the Business as its licensed qualifying surveyor." In addition, the Huggs will stamp surveys up to 180 days following closing, if needed, "[p]rovided that [S-Tek] is at all times proceeding diligently and in good faith to hire a qualifying surveyor." S-Tek's "failure to hire a licensed surveyor as the qualifying party for the Business, shall not form the basis of, or be grounds for, [S-Tek] not performing its duties under the terms of the Note, Security Agreement, and Lease."

Closing Agreement, ¶ 6.

The Court infers that under the Closing Agreement the parties intended that the Huggs would not be compensated for stamping surveys, because stamping surveys was addressed separately from the paid work.

3. *Surv-Tek's customers; goodwill; employee transition to S-Tek*

The Closing Agreement provided that Surv-Tek's business largely consisted of "one-off" survey jobs ordered by its customers or as a result of the goodwill of the company with third parties, including realtors, developers, home builders, and title agents, and Surv-Tek does not warrant that its customers will continue to be customers of S-Tek, that Surv-Tek's goodwill will transfer to S-Tek, or that S-Tek will receive any survey work as a result of the goodwill. ¶ 4.O.

The Closing Agreement contained no provisions for introductions of Surv-Tek customers to S-Tek nor handling the announcement to employees that S-Tek had acquired the business.

4. *S-Tek hiring a licensed surveyor.*

The Closing Agreement contained no representation or warranty that S-Tek would be able to hire a full-time licensed surveyor.

5. *Entire Agreement Clause*

The Closing Agreement contained specific representations and warranties by Surv-Tek and its shareholders. ¶¶ 4 and 5. The Closing Agreement also contained an "entire agreement" provision, which states:

> This Agreement constitutes the entire agreement, and supersedes all other agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.
> Closing Agreement, ¶ 12.C.a.

*Cross Indemnities that Include an attorneys Fee Provision.*

Surv-Tek and its shareholders, and S-Tek and its principals, indemnified each other from, among other things, any damages, including reasonable attorneys' fees and consultants' fees, incurred as a result of the other party's breach of the Closing Agreement.

**B. <u>The Note</u>**

Surv-Tek provided seller-financing for the $1.8 million purchase price less the $250,000 down payment. This took the form of a promissory note, in an original principal amount of $1.55 million, made by S-Tek in favor of Surv-Tek.[23] The interest rate on the unpaid principal balance owing under the Note was 5% per annum prior to the maturity date while the Note was not in default, and 12% per annum after the maturity date or a default under the Note or the other Loan Documents (defined below). ¶¶ 1 & 6(b). The Note provided for equal monthly payments in the amount of $16,440.15, with the first payment due April 1, 2019, and subsequent payments due on the first day of each month. ¶ 2. The Note had a 10-year term, with a maturity date of April 1, 2029. ¶ 3. There was a late charge for any payment made more than 10 days after the payment was due, in the amount of 10% of the late payment. ¶ 4. The late charge provision did not limit Surv-Tek's right to compel prompt payment. ¶ 4.

---

[23] Ex. K a p. 141.

Further, the Note would be in default if any payment was not made by the date the payment was due. ¶ 6(a). The Note would also be in default if an "Event of Default" occurred under the Security Agreement or the Guarantees or under related documents executed by S-Tek in favor of Surv-Tek (defined as the "Loan Documents") . ¶ 6(a). Upon any default that "is not cured beyond any applicable notice and cure period," the entire amount owed under the Note would be become due and payable, including the outstanding principal balance, accrued interest, and Surv-Tek's attorney's fees and costs related to collection under the Note, without notice or demand. ¶ 6(a). The Note contained no grace period and no cure period in the event of a default.

The Note further provided that S-Tek would pay Surv-Tek's reasonable attorney's fees and other costs in connection with collection or enforcement of the Note or the other Loan Documents. ¶ 9.3. The Note also provided that if a lawsuit was commenced arising out of or relating to the Note or the other Loan Documents, the prevailing party is entitled to recover as part of its judgment its reasonable attorney's fees incurred with respect to such lawsuit. ¶ 9.9.

### C.  __The Security Agreement__

To secure the indebtedness under the Note and Related Documents (as defined in the Security Agreement), S-Tek granted Surv-Tek a security interest in all of its personal property as of closing and any proceeds thereof.[24] The "Collateral" is more specifically defined as "the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located

> All Goods, Furniture Equipment, Inventory, Accounts, Account Receivables [*sic*], General Intangibles, Contract Rights, and other personal property owned by S-Tek as of the Effective Date of this Agreement, and all proceeds and products of the foregoing including replacements thereof acquired with proceeds or by trade or exchange of property of S-Tek owned as of the Effective Date hereof.

---

[24] Ex. M at p. 150.

Security Agreement at p. 1. Additionally, the Collateral "also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All products and proceeds of any of the Collateral described in this Collateral section.
(B) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the Collateral described in this Collateral section.
(C) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.
(D) All records and data relating to any of the Collateral described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of S-Tek's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

Security Agreement at p. 1. The Security Agreement required, except in the ordinary course of business or with Surv-Tek's consent, that S-Tek keep the Collateral at S-Tek's address: 9384 Valley View Drive NW, Albuquerque, NM 87114. Security Agreement at p. 2.

The Security Agreement required that S-Tek provide a "certified statement of accounts" each quarter. By the 15th day of each calendar quarter, starting in April 2019, S-Tek was required to provide "a certified roll of all of S-Tek's accounts and work in progress" for which S-Tek has not yet received payment. Security Agreement at p. 5.

Among other things, it would be an "Event of Default" under the Security Agreement if S-Tek failed to make a payment when due under the Note or failed to comply with any other obligation in the Security Agreement or the other Loan Documents. Security Agreement at p. 6. Upon an Event of Default, Surv-Tek had the right, among other rights and remedies, to "enter upon the Collateral of S-Tek to take possession of and remove the Collateral." Security Agreement at p. 8.

Surv-Tek filed with the office of the New Mexico Secretary of State a UCC-1 financing statement on January 2, 2019, as Document No. 20190072065I. The financing statement served to perfect Surv-Tek's security interest in all assets that for which a security interest could be perfected by a UCC-1 financing statement.

The Security Agreement contained no grace or cure period in the event of a payment not made on time or a default.

### D.  The Non-Compete Agreement

Surv-Tek, Russ Hugg, and Robbie Hugg, as the seller parties, and S-Tek, Christopher Castillo and Randy Asselin, as the buyer parties, executed and delivered a Non-Compete Agreement pursuant to the Closing Agreement . In general terms, the Non-Compete Agreement prohibits the seller parties for a period of five years after closing from engaging in the survey business in New Mexico, soliciting any of S-Tek's customers or clients to obtain their work, or soliciting any of S-Tek's employees for employment.[25]

The Non-Compete Agreement contained a cure period. It provided that if S-Tek or the guarantors default under the Note, Security Agreement, or Commercial Guaranty, and the default is not cured within 10 days after notice of default is given under the applicable agreement, the non-compete provisions would flip. Not only would the non-compete obligations of Surv-Tek and the Huggs terminate, but S-Tek and its principals could not compete with Surv-Tek in the survey industry in New Mexico for a period of 3 years after the default.[26]

S-Tek defaulted under the Note and did not cure the default within 10 days after a notice of default was given on March 23, 2020 (or thereafter). The last payment S-Tek made under the Note was for the payment due in January 2020.

---

[25] Ex. J at p. 135-36, ¶ 1,2.
[26] Ex. J at p. 136, ¶ 3.

-35-

### E.  The Escrow Agreement

An Escrow Agreement among Surv-Tek, S-Tek, and Weststar Escrow, Inc., as escrow agent (the "Escrow Agent"), executed at closing, provides, among other things, that S-Tek would make its payments under the Note to the Escrow Agent, and the Escrow Agent would disburse the payments to Surv-Tek. ¶ 3. A copy of an executed Escrow Agreement is not in evidence.[27] "Escrow Documents," as defined in the Escrow Agreement, include the original Note, original Security Agreement, and original Guaranty. ¶ 1. The form of Escrow Agreement attached to the Closing Agreement does not itself contain a grace period or cure period in the event of a default, but does require "an affidavit of uncured default by Lender under the Note, the Security Agreement, or the Guaranty Agreement" to trigger the Escrow Agent's obligation to release and deliver the Escrow Documents to the Lender or its agent. ¶ 4. The escrow documents consist of the original Note, original Security Agreement, original Commercial Guaranty, and original UCC-1s.

### F.  The Lease

At closing S-Tek signed a 28-page single spaced lease (the "Lease") under which STIF, another entity wholly owned by the Huggs, was the landlord, and S-Tek was the tenant. S-Tek leased the commercial premises (the "Leased Premises") where Surv-Tek had operated: 9384 Valley View Drive NW, Albuquerque, NM 87114. The effective date of the Lease was January 1, 2019; however, no rent was charged for January and February 2019. The term of the Lease was 5 years, with an option to renew for an additional 5-year term.

The base rent under the Lease was $5,800 per month for the five years of the lease term. ¶ 4.1. S-Tek also owed "Tenant's Cost Allocation," which was S-Tek's proportionate share of

---

[27] The copy of the Escrow Agreement in evidence is not signed by the Escrow Agent. Ex. 21 at p. 58.

operating costs for the property. ¶¶ 2.33 & 4.2. The Lease required S-Tek to pay an estimated amount each month for Tenant's Cost Allocation, in the amount of $1,386 per month. ¶ 4.2.1. Then, within a reasonable time but no later than 120 days after the end of each calendar year, STIF was required to deliver to S-Tek a reconciliation statement, setting forth the actual Tenant's Cost Allocation for the year in reasonable detail. ¶ 4.2.2.

Among other things, it would be a default under the Lease if Tenant failed to pay any rent when due, and "where such failure shall continue for a period of ten (10) days after notice thereof from Landlord to Tenant a 5% late fee will be charged to tenant." ¶ 19.1.1. In the event that STIF served S-Tek with a Notice to Pay Rent or Quit, it shall constitute such notice. ¶ 19.1.1. The Lease also provided for interest on unpaid amounts of prime plus 4%.[28]

In the event of a default under the Lease, STIF's remedies included "the right, without notice to Tenant, to change or re-key all locks to entrances to the Premises." ¶ 20.1.7. In addition, in the event of a default STIF may, among other things, (a) terminate the Lease or (b) continue the Lease in effect but terminate the tenant's right of possession, reenter and take possession of the premises, with the same constituting acceptance of surrender. ¶¶ 20.1.1 and 20.1.3.

The Lease provided that upon termination of the Lease or S-Tek's right of possession, STIF is entitled to the following damages: (1) past rent (all unpaid rent that had accrued at the time of the termination), (2) unpaid rent from the date of termination until the time of award, (3) unpaid rent for the balance of the term, minus any rental loss that S-Tek proves could have been reasonably avoided, and (4) proximately caused damages, including costs or expenses for retaking possession of the Leased Premises. ¶ 20.2.

---

[28] Lease at ¶¶2.17 & 4.5.

Under the Lease, S-Tek granted STIF a security interest under the Uniform Commercial Code ("UCC") in all property that S-Tek "now or hereafter placed in or upon the Premises." Art. 22. STIF had the right to file a financing statement to perfect the lien.[29] The UCC lien is in addition to STIF's liens and rights provided by law as landlord.[30] The section of the Lease governing Surrender of Premises, provides that upon the "expiration or earlier termination of the Lease," . . . "Tenant's Property shall be and shall remain the property of Tenant and may be removed by Tenant at any time during the Term . . . ."[31]

STIF attempted to perfect its security interest by filing a UCC-1 financing statement on January 2, 2019 at 11:14 a.m. as Document 20190072066F. The financing statement mistakenly states that Surv-Tek is the secured party and nowhere refers to STIF. There is no evidence that STIF perfected a lien on titled vehicles by registering its lien with the New Mexico Motor Vehicle Department so the lien would be noted in the certificates of title for the vehicles. There is no evidence that any of the property that was located in the Leased Premises at the time that STIF regained possession of the Leased Premises still is in STIF's possession. Among the other property once located in the Leased Premises, neither Surv-Tek nor STIF is in possession or control of the OCE scanner, microfiche, client files or archived surveys.

S-Tek defaulted under the Lease by failing to pay rent. The last payment S-Tek made under the Lease was for the payment due in January 2020.

### G. Personal Guarantees

In connection with S-Tek's purchase of Surv-Tek's business, Randy Asselin, Christopher Castillo, and Mr. Castillo's spouse, Kymberlee Castillo, executed a Commercial Guaranty under

---

[29] Lease at Art. 22.
[30] Lease at Art. 22.
[31] Lease at Art. 24.

which they personally guaranteed, jointly and severally, the payment of all amounts owed under the Note. The S-Tek Parties in good faith believed that S-Tek would fulfill its obligations under the Note and Lease and that it would be unnecessary for Surv-Tek to call upon the guarantees.

In addition, Mr. Asselin and Mr. Castillo executed a Personal Guaranty under which they personally guaranteed the payment of all rent and other amounts owed under the Lease and the performance of S-Tek's obligations under the Lease. The Personal Guaranty was prepared to be signed also by Mr. Castillo's spouse, but she did not sign it.

## VII.    S-Tek's First Day of Business

S-Tek's first business day under the new ownership was Monday, January 2, 2019. Prior to the closing, Mr. Asselin and Mr. Castillo asked one or both of the Huggs about the transition plan to tell the employees that the business had been sold and to introduce them to the new owners. Mr. Asselin and Mr. Castillo were assured that the Huggs would take care of it. Accounts of how the employees were told about the sale and introduced to the new owners differed but is it fair to conclude it was handled quite badly. When the employees learned for the first time in the morning of January 2, 2019 when they came to work that Surv-Tek's business was under new ownership and had been acquired by non-surveyors, many employees were shocked and fearful for the security of their jobs.

As various employees clocked in that morning, Robbie Hugg would say something to the effect of, "You don't work for me anymore—you work for these guys," pointing to Mr. Asselin and Mr. Castillo. (Russ Hugg was out of the office on a previously scheduled vacation). Although Robbie Hugg denied that account of events, the Court finds Messrs. Asselin's and Mr. Castillo's testimony to be credible at least with respect to some of the employees that clocked in.

Mr. Asselin decided to call a meeting of the employees. He pulled Mr. Castillo aside and told him that they were going to lose half the staff by noon if they did not get them all together.

A meeting of the employees, Robbie Hugg, Mr. Asselin, and Mr. Castillo did take place that morning. Robbie Hugg introduced the employees to the new owners and explained that he and his brother would continue to work at the business during a transition period, for as long as a year if not longer.

After the meeting in the conference room, Mr. Asselin and Mr. Castillo began meeting with employees one-on-one. In the individual meetings, Mr. Asselin and Mr. Castillo learned that the employees were unsettled about the sale and worried that about the new owners' ability to run the business as non-surveyors. They also learned about the duties and responsibilities of various employees and the nature of the survey work that the Huggs performed for Surv-Tek. Mr. Asselin and Mr. Castillo concluded based on those interviews that they did not have the skillsets as non-surveyors necessary to operate the business nearly at the level of Surv-Tek's profitability.

Joe Orloski told Mr. Asselin and Mr. Castillo during his interview that he still went to Russ Hugg for finishing work on construction surveys, that the Huggs ran the show in operating the business, and that "if you start today, in 15 years you won't have surveyor skills that are half as good as the Huggs."

After the morning interviews, Mr. Asselin and Mr. Castillo had lunch together and identified major concerns with the business they had just taken over. They were rattled by the employees' apprehension about the business being run by non-surveyors. They determined that they had been misled about the structure of the business, and that rather than the employees being the core of the business, the Huggs were the core of the business. At that lunch, Mr.

-40-

Asselin told Mr. Castillo, referring to the Huggs, they did not know whether they had "an enemy from within." Mr. Asselin and Mr. Castillo decided they had problems and that they needed to promote from within. They also discussed that although they had a long-term contract with the Huggs at $40 per hour, they were not sure how long they would want to keep them on. At that point, Mr. Asselin had a "real distrust for the Huggs."

Mr. Asselin and Mr. Castillo did not wait to make any major changes to the business during the transition period in which the Huggs would train them about how to run the business and would continue to perform survey and survey-related work at least until the company hired a full-time licensed surveyor. Instead, without waiting to give the employees a period to adjust to the new ownership, and without to be trained by the Huggs or waiting to see how the transition period worked out, Mr. Asselin and Mr. Castillo decided that they needed to immediately promote experienced employees to management-level positions.[32]

Also on the first day, Robbie Hugg "fired" one of the employees, Manny Herrera. Mr. Herrera was one of the construction stakers on the field crew, and Robbie Hugg told him that they did not have any work for him that day. That was how the Huggs told a field crew member he was fired. Robbie Hugg told Mr. Asselin and Mr. Castillo that he was doing them a favor by firing Mr. Herrera because Mr. Herrera was unreliable. A year and a half later S-Tek hired Mr. Herrera back, and Mr. Asselin believes that Mr. Herrera is an excellent employee.

There is conflicting testimony regarding whether Robbie Hugg told Mr. Asselin and Mr. Castillo on the first day that they were going to have difficulty with other employees and recommended firing them as well. The Court makes no findings in that regard.

---

[32] Mr. Smigiel normally advises buyers of small businesses to keep everything the same for about 6 months while the seller is there to train them. He advises that "if then you want to test the market on great ideas, test it on a small scale." Mr. Smigiel did not recall whether he gave that advice to Mr. Asselin and Mr. Asselin and Mr. Castillo.

## VIII.  The First Few Months of S-Tek's Business

### A.  <u>The transition period did not work as intended.</u>

Mr. Asselin and Mr. Castillo concluded that management decisions to run a survey business were infused with technical knowledge of surveying, which they did not have. The principal examples they gave were preparing proposals to obtain new work and supervising technical staff in the performance of their work. In addition, they concluded that Robbie Hugg's virtuosity as a surveyor was critical to the company's level of profitability and could not be replicated by another surveyor (discussed further below). As a result, they concluded that they could not manage the business to achieve profitability nearly to the level that the Huggs achieved. They felt they had been lied to and cheated and regarded the Huggs as enemies that could not be trusted.

In this frame of mind, Mr. Asselin and Mr. Castillo did not (1) allow the Huggs to take the lead in running the business for a reasonable period of time during the transition period, (2) allow the Huggs to continue doing survey and survey-related work for S-Tek for up to a year as needed for an orderly transition, and at least, if possible, until they hired an experienced licensed surveyor to take over survey and the survey-related work that the Huggs performed, or (3) give the employees a level of assurance during the transition period that would enable S-Tek to retain the workforce that S-Tek acquired. Instead, Mr. Asselin and Mr. Castillo managed the business in crisis mode.

Within the first or second week after closing, Mr. Asselin and Mr. Castillo implemented the promotions they discussed on the first day. They promoted John Montoya to general manager and Eric Mercado to assistant manager. Prior to making the promotions, Mr. Asselin and Mr. Castillo consulted the older employees (Joe Orloski, Dick Smith, and Bob Sprenger) and asked

their opinion about the promotions; the older employees agreed that Mr. Montoya and Mr. Mercado were good candidates for promotion. Notably, Mr. Asselin and Mr. Castillo did not consult either Robbie Hugg or Russ the Hugg before making the promotions; in fact, they made the promotions before Russ Hugg had even returned from his vacation.

Because Mr. Asselin and Mr. Castillo determined that managing the business was so "infused with technical knowledge" they would be unable to learn, when Mr. Asselin and Mr. Castillo met with Robbie Hugg to inform him about the promotions, Mr. Asselin testified that he told Robbie Hugg that he, Robbie Hugg, would be training Mr. Montoya and Mr. Mercado instead of Mr. Asselin and Mr. Castillo. Mr. Asselin testified that he would have run the other way if he thought they wanted him to go out and pound stakes (his way of saying, become a surveyor). The training of Mr. Asselin and Mr. Castillo was intended to teach them how to manage the business, not to become expert surveyors or perform survey work themselves.

Other than Mr. Castillo's acknowledgement that Russ Hugg showed him and Mr. Asselin how to do the billing, there is no evidence regarding whether the Huggs trained Mr. Asselin and Mr. Castillo about the administrative aspects of running the business. Mr. Mercado, the only Surv-Tek employee who is still working for S-Tek, testified that he did not receive any training from the Huggs.

S-Tek has alleged that the Huggs did not perform the tasks they had agreed to perform during the transition period, including by walking out on work and current projects, controlling all revenue and profitability, resulting in cash flow losses and S-Tek's inability to make the Note payment due April 1, 2019. The evidence does not establish that this occurred. Further, the evidence does not establish that the Huggs failed to bid jobs for S-Tek during the transition period.

S-Tek alleges that Surv-Tek failed to obtain the required consent of Pulte Homes of New Mexico, Inc. ("Pulte Homes") to its assignment of Surv-Tek's interest in a Master Agreement to S-Tek. The Closing Agreement provides that Surv-Tek has not sought and has no obligation to obtain such consent but will diligently prosecute a request for such consent. The evidence does not establish that Surv-Tek failed to diligently prosecute a request for such consent.

### B. **The new owners were not trained to manage the business.**

Mr. Asselin also rejected training by one of the longtime employees, Bob Sprenger, on the basics of surveying and the survey work S-Tek performed. Mr. Sprenger envisioned training Mr. Asselin for approximately 15 minutes per day for a period of one month, with some visits to the field to give him guided tours of the different types of survey work that S-Tek performed and to see the field employees in action. Mr. Sprenger told Mr. Asselin that this information was important for Mr. Asselin to learn and asked Mr. Asselin to give him 15 minutes per day for the training. Mr. Asselin attended three or four training sessions and then decided that he did not have time for the training anymore because he "had bigger fish to fry," referring to managing what he considered to be a crisis within the company.

Mr. Asselin did not understand the importance of his learning the basics of surveying and the types of survey work that S-Tek performed to effectively manage a surveying business, including observing the field crews at work for each type of survey. Such an understanding was necessary or important for Mr. Asselin and Mr. Castillo to prepare job proposals (discussed further below), to help him to manage the employees, to make better business decisions. In addition, such knowledge would have enabled Mr. Asselin to speak the language of surveyors familiar to real estate developers, home builders, and civil engineers, before trying to build

-44-

relationships with those important clients and referral sources. A few examples illustrate this point:

First, at one point the Huggs were consulting with Scooter Hanes, one of Surv-Tek's historical customers, and attempting to secure work for S-Tek. Mr. Asselin and Mr. Castillo took the initiative to introduce themselves to Mr. Hanes when he walked into the office to meet with Robbie Hugg, before Robbie Hugg felt they were ready for client introductions. Robbie Hugg testified: "There was no need for that . . . when you don't understand what you're talking about. You come across as an idiot."

Second, Russ Hugg testified regarding the new owners' attendance at a pre-construction conference. Russ Hugg said that it was fine for them to attend "but . . . [d]on't run your mouth off if you have no idea what you're talking about. Stay in the back for a little while, observe."

Third, S-Tek was in desperate need of hiring a full-time, quality licensed surveyor. The Huggs had a personal connection with a particular licensed surveyor, Bob Green, who managed a Trimble dealership selling survey equipment. Mr. Green is a guru in the world of GPS equipment for surveying and has trained people all over the world. Mr. Green was in the market for a new job, and Robbie Hugg had been in conversations with him about coming to work for S-Tek. One day Mr. Green came to S-Tek's office to meet with Robbie Hugg, but Robbie Hugg unexpectedly had to leave for an emergency back surgery. Mr. Asselin and Mr. Castillo intercepted Mr. Green and invited him to lunch. After the lunch, Mr. Green sent a text message to Robbie Hugg that said, "Who the hell are these guys?" According to Robbie Hugg, Mr. Asselin and Mr. Castillo scared Mr. Green off.

Fourth, a retired prominent developer named John Black came to S-Tek's office one day. He is a personal friend of the Huggs. Robbie Hugg thought it was not a good idea for Mr. Black

to meet with Mr. Asselin and Mr. Castillo "when you don't understand what you're talking about."

## C.  **Introductions to customers.**

Prior to execution of the Original Closing Agreement, the Huggs represented to Mr. Asselin and Mr. Castillo that they would introduce Mr. Asselin or Mr. Castillo to Surv-Tek's major customers. Mr. Asselin and Mr. Castillo assert that the Huggs failed to do so. The Huggs did not make the representation about customer introductions with intent to deceive or otherwise in bad faith.

The Huggs did introduce Mr. Asselin or Mr. Castillo to several existing major customers. These included Jeanine Dodson of Stewart Title of Albuquerque, LLC; Titan Development; and Pulte Homes. Mr. Orloski introduced them to Salls Brothers, another major customer. The Huggs also introduced Mr. Asselin or Mr. Castillo to Ted Loe and Fred Arfman, civil engineers that Surv-Tek worked with on a regular basis. Customers, especially those in construction, would stop by S-Tek's office early in the morning, between 6:00 and 7:00 a.m., to meet with the Huggs. But Mr. Asselin and Mr. Castillo were not in the office that early.

The evidence does not establish that S-Tek lost any business as a result of Mr. Asselin and Mr. Castillo not being introduced to historical Sur-Tek customers.

## D. **Preparation of job proposals.**

The parties dispute whether Mr. Asselin and Mr. Castillo, as non-surveyors, could learn to prepare proposals instead of incurring the additional cost of delegating that work to employees with technical knowledge. Logically, adequate preparation of a proposal, particularly on a larger job, is important because bidding too low could result in loss of money and bidding too high could result in loss of work.

Preparing a proposal involves researching the project, knowing the type of surveying being done, and then preparing the proposal. For Surv-Tek, and then S-Tek, preparing proposals often could be done with the aid of canned proposals from prior jobs, including prior proposals included in the Archived Survey Database.

Russ Hugg testified that preparing proposals did not require technical survey knowledge as evidenced by the fact that he had trained Renee Levis to prepare proposals, although Mr. Hugg assisted with the more difficult proposals she prepared. The evidence does not show what type of proposals Ms. Levis prepared. Russ Hugg trained John Montoya to prepare proposals after Mr. Asselin and Mr. Castillo told the Huggs to train John Montoya and Eric Mercado instead of themselves. Although Mr. Montoya is a highly skilled surveyor, he would come to Russ Hugg for advice about some of the difficult proposals. Russ Hugg and Joe Orloski would also collaborate on some of the construction surveying proposals.

Russ Hugg credibly testified that knowledge of what was on the ground that could be obtained from the Archived Survey Database could provide an advantage in preparing a proposal, sometimes allowing the proposal to be prepared in a day while it would take competitors several days.

Kent Holland testified that preparing proposals does not require a lot of technical knowledge, but you have to understand what you are looking at when doing proposals.

The evidence does not show exactly what is involved in preparing a job proposal, whether the complexity of preparing a job proposal differs depending on the type of project that is being bid, what technical knowledge, if any, is required to prepare a job proposal and whether it differs depending on the type of proposal, or whether there are types of repetitive work where job proposals differ little from proposal to proposal.

-47-

Based on this testimony and other evidence, the Court finds that Mr. Asselin and Mr. Castillo could be trained to prepare job proposals, although the Court cannot determine from the evidence how long the training would take and whether they could prepare job proposals on complicated jobs either on their own or with the assistance of others in the company.

### E. **Hiring a licensed surveyor.**

During the early months after S-Tek began operating the Surv-Tek business, Mr. Asselin and Mr. Castillo attempted to hire a licensed surveyor, as anticipated, but they had great difficulty hiring one. In fact, to date they still have not hired a full-time licensed surveyor and instead utilize a part-time independent contractor. Mr. Asselin and Mr. Castillo interviewed 10 to 12 licensed surveyors for the position; all were currently employed at other places, such as the Bureau of Land Management. Bob Sprenger participated in some of the interviews and testified that he was surprised there was not more discussion of surveying during the interviews. The Huggs were not involved in the interviews; the Court cannot make a finding regarding whether the Huggs were invited to participate in the interviews in light of the conflicting testimony.

Mr. Asselin and Mr. Castillo were not alone in having difficulty hiring a licensed surveyor. The owner of another survey company, Larry Medrano, testified that he had difficulty hiring a licensed surveyor for his company. He ultimately had to hire a headhunter company at cost of approximately $15,000, but the headhunter was successful in finding a licensed surveyor for Mr. Medrano to hire. S-Tek did not hire a headhunter company to assist it in its search.

Because the Huggs were both licensed surveyors, Surv-Tek did not need to hire a licensed surveyor to stamp surveys or perform survey work. There is no evidence that Robbie Hugg or Russ Hugg were aware, prior to closing, of how difficult it would be for S-Tek to hire a full-time licensed surveyor.

## F. __Undercapitalization exacerbated.__

Despite S-Tek's business being undercapitalized, within a month of S-Tek acquiring the business, Mr. Asselin borrowed money from the business. Mr. Asselin had defaulted on his home mortgage loan in October 2017, and subsequently the lender filed a foreclosure action. Mr. Asselin borrowed money from S-Tek to pay the arrears on his home mortgage. The foreclosure action was later dismissed in February 2019. Mr. Asselin borrowed the funds even though he and Mr. Castillo knew from the outset that the business was undercapitalized by approximately $50,000, and neither Mr. Asselin nor Mr. Castillo had the financial ability to support the operation of the company. Indeed, shortly down the road, and prior to the time Mr. Asselin fired Robbie Hugg from performing hourly work for S-Tek (see below), Mr. Asselin and Mr. Castillo requested that the Huggs agree to postpone a couple Note payments or accept partial Note payments and add the unpaid amounts to the end of the Note. The Huggs refused that request. S-Tek took out high interest loans to meet payroll.

## G. __Prebilling__

There was conflicting evidence whether S-Tek had to perform work for which Surv-Tek had billed customers before the work was performed. Originally, S-Tek believed considerable work fell in this category but later concluded that amount was not material. Further, no invoices were provided for work that was allegedly pre-billed.

## IX. __The Firing of Robbie Hugg__

With the relationship continuing to deteriorate between the Huggs, on one hand, and Mr. Asselin and Mr. Castillo, on the other, on April 19, 2019, Mr. Asselin fired Robbie Hugg from performing survey and survey-related work for S-Tek on an hourly basis (at $40.00 per hour). Mr. Asselin and Mr. Castillo told Russ Hugg that he was welcome to continue working, but since

-49-

his brother had been fired, he quit. The Huggs did continue to stamp surveys for S-Tek, however. The firing of Robbie Hugg shortened the period in which the Huggs would perform survey and survey-related work for S-Tek by as much as 70% of the contractual commitment period.

Mr. Asselin testified that he fired Robbie Hugg because: (1) S-Tek's reliance on the Huggs at $40 per hour was distasteful, (2) S-Tek was not "cash flowing," (3) the Huggs had misrepresented the business, and (4) the Huggs refused to modify the Note and add the first few payments to the back end of the Note. Mr. Castillo testified that they fired Robbie Hugg because: (1) he yelled at and berated employees in the office in front of other employees, which created a toxic environment, and (2) he and Mr. Asselin had concerns about initial capitalization during negotiations, and the Huggs said they would work with them but then did not. The Court does not find that Robbie Hugg yelled at and berated employees in the office in front of other employees. Several witnesses who were then employees testified to the contrary. Mr. Asselin testified that when he confronted Robbie Hugg about misrepresenting the business, Robbie Hugg responded by saying, "Well, you shouldn't have believed us." The Court finds this testimony is not credible.

The evidence does not establish the extent to which S-Tek experienced cash flow problems by April 2019, or why, other than the fact that the parties considered S-Tek as undercapitalized by $50,000 from the outset and Mr. Asselin borrowed money from S-Tek to cure his home mortgage arrears. There is no evidence of S-Tek's monthly cash flow or profitability between January 2, 2019, when S-Tek began business operations, and April 19, 2019, when Robbie Hugg was fired. There is no evidence regarding whether the Huggs performed the same survey and survey-related work for S-Tek during that period that they had previously performed for Surv-Tek. While some evidence was presented about the work the

-50-

Huggs performed after the sale, the evidence presented did not include an estimate of the amount of time Russ Hugg and Robbie Hugg each spent on the different types of work performed, nor did the evidence establish whether Russ Hugg or Robbie Hugg exclusively performed such work. For example, there is no evidence regarding how many hours they worked performing survey and survey-related work at $40 per hour, in training S-Tek's owners and employees, and in stamping surveys. There is no evidence regarding whether Russ Hugg continued his draftsman work and continued to supervise other draftsmen. There is no evidence whether Robbie Hugg continued to set up and stack the jobs and supervise field crews. There is also no evidence that S-Tek lost customers during that period that provided a flow of work and cash for S-Tek or that any of the jobs that S-Tek performed were less profitable. There is no evidence that any employee left S-Tek's employ during this period except for Mr. Herrera, who was fired on the first day.

**X.     The Aftermath of the Firing of Robbie Hugg**

**A.  <u>The April 22, 2019 Default Letter</u>**

The Security Agreement required S-Tek to provide Surv-Tek by the 15th day of each calendar quarter starting in April 2019, a report that contained a roll of all of S-Tek's accounts and work in progress with the name of the customer and account balance for which S-Tek had not yet received payment, prepared in accordance with generally accepted accounting principles and certified by S-Tek to be true and correct.

After Robbie Hugg was fired on Friday, April 19, 2019 the relationship between Mr. Asselin and Mr. Castillo, on the one hand, and the Huggs, on the other, was hostile. The following Monday, April 22, 2022, Surv-Tek by counsel sent a letter to S-Tek containing a notice of default under the Note and Security Agreement, and to Messrs. Asselin and Castillo

and to Kymberlee Castillo under the Commercial Guarantee, on the basis that S-Tek had failed to provide the quarterly certified statement of accounts as required by the Security Agreement.[33] Mr. Asselin and Mr. Castillo defended S-Tek not having provided a quarterly certified statement of accounts by stating that the Huggs had full access to S-Tek's books through a shared bookkeeper, Renee Levis, and that Robbie Hugg had recently printed a full set of S-Tek's books. Renee Levis and the Huggs denied that the Huggs had access to S-Tek's books. Surv-Tek gave no advance notice to S-Tek of its failure to provide the quarterly certified statement of accounts before declaring the default. After receiving the April 22nd default letter, S-Tek provided certified financial documents to Surv-Tek.[34] Surv-Tek thereafter took no action to enforce its remedies for this default.

### B. **Stamping Surveys Across the Parking Lot**

After Robbie Hugg was fired from performing survey and survey-related work at $40 per hour, and Russ Hugg quit performing that work as well, The Huggs continued to "stamp" surveys to fulfill the commitment to stamp surveys for 180 days. As discussed above, "stamping" surveys means to sign the certification that a licensed surveyor must place on a survey before it can be provided to a customer, certifying that the survey meets certain requirements imposed by law. The certification carries lifetime potential liability. Although the Huggs continued to stamp surveys for S-Tek, after Mr. Asselin fired Robbie Hugg from performing hourly work for S-Tek, the Huggs moved their desks from S-Tek's offices to a separate location across the parking lot, in the basement of another building the Huggs owned. John Montoya, Eric Mercado, or Renee Levis would go to the basement location to get surveys stamped.

---

[33] Ex. 23 at p. 2.
[34] *See* Ex. 25.

Mr. Asselin and Mr. Castillo testified that the Huggs refused to stamp, or delayed stamping, completed surveys on multiple occasions for reasons unrelated to the quality of the surveys. The Huggs denied that they did so. The Court makes no determination on this issue as a result of the inconclusive evidence. Either way, no damages were shown from any gaps in stamping.

### C. The May 7, 2019 Second Default Letter and Offer

On May 7, 2019, Surv-Tek by counsel sent a second letter to S-Tek and the guarantors declaring a default under the Note for S-Tek's failure to make the May 2019 payment under the Note by the May 1 due date.[35] The second notice of default, among other things, again accelerated the entire balance of the Note, and it also stated that, due to the default under the Note, Surv-Tek would publish an announcement of a public sale of its collateral pursuant to the UCC; and the Huggs would no longer stamp surveys for S-Tek.

The May 7, 2019 email from counsel for the Surv-Tek parties to counsel for S-Tek, to which the default letter was attached, included the following:[36]

> If you would consider surrendering the business/its assets to Surv-Tek, Inc. care of Messieurs Russ and Robbie Hugg by 2 pm today, in lieu of the debt that is owed on the Note made by S-Tek, LLC to the order of Surv-Tek, Inc., Surv-Tek, Inc. may consider accepting such in lieu of the debt.

(typographical errors corrected).

Mr. Castillo understood the offer to mean "leave the keys and we'll keep your $250,000 down payment and call it even." He considered the offer to be a predatory response to S-Tek's offer to add the missed payment to the back end of the Note, after he had emptied his personal retirement account to make the down payment. S-Tek

---

[35] Ex. 26.
[36] Ex. 26.

-53-

responded to the offer by stating it would make the payment under the Note by May 10, 2019.

Mr. Asselin and Mr. Castillo also believed that when Surv-Tek sent the default letter and made the offer, the May 1, 2019 payment was not even past due. They understood there was a 10-day grace period to make payments under the Note. However, neither the Closing Agreement, Note, Security Agreement, nor the Escrow Agreement granted a grace period or cure period for late payments under the Note. Mr. Asselin and Mr. Castillo testified that there was a grace period of 10 days with the escrow company. However, the Escrow Agreement does not mention such grace period.

Mr. Asselin had a theory that the Huggs' plan from the outset was to keep the down payment and take the business back. He was unaware that Surv-Tek spent most of the down payment to cover Mr. Smigiel's broker commission and for attorneys' fees for preparation of the Closing Agreement and closing documents. Surv-Tek's offer to consider taking the business back in fact was a good faith gesture to attempt to resolve a situation that was not good for anyone.

S-Tek responded to Surv-Tek's offer to consider taking the business back in lieu of the debt by making the May 1, 2019 Note payment on May 8, 2019. Surv-Tek accepted the payment and did not pursue any enforcement action for failure to make the May 2019 payment under the Note or failure to provide a certified statement of accounts by April 15, 2019. An announcement of a UCC sale was published but Surv-Tek did not proceed with the sale. Surv-Tek's attorney had called the newspaper to cancel the publication of the announcement, but the newspaper mistakenly published it anyway. S-Tek has not presented any evidence of any specific monetary damage it suffered as a result of the publication of the announcement of a UCC sale.

-54-

Surv-Tek continued accepting payments under the Note after May 8, 2019. The Huggs continued stamping surveys for S-Tek.

### D.  Departure of Workforce

Eventually, one by one the entire workforce that S-Tek acquired from Surv-Tek quit working for S-Tek, with one exception: the assistant manager, Eric Mercado. However, although Mr. Herrera was fired the first day, S-Tek later hired him back. The general manager, John Montoya, testified that he quit because of the tension of being caught in the middle between Mr. Asselin and Mr. Castillo on one side and the Huggs on the other, after Mr. Asselin fired Robbie Hugg. John Montoya worked for S-Tek as its general manger for about six months, meaning he left S-Tek's employ in approximately late June 2019. Renee Levis, the bookkeeper, left S-Tek's employ on Feb 17, 2020. Although the evidence does not show when or exactly why the other employees left, they apparently became demoralized to continue to work for S-Tek after Mr. Asselin fired Robbie Hugg from performing any further hourly work for S-Tek and Russ Hugg quit performing such work after his brother was fired.

After Mr. Asselin fired Robbie Hugg from performing work for S-Tek on an hourly basis, and during the time the Huggs were stamping surveys in the basement across the parking lot, Robbie Hugg mentioned to Eric Mercado that when the Huggs ever got the business back Eric Mercado could go work for them. Eric Mercado did not quit working for S-Tek as a result of that conversation because there was no timeline when the Huggs would get the business back; it could be years. The evidence does not show whether that conversation occurred before or after Surv-Tek gave S-Tek a notice of default under the Note.

Mr. Mercado testified that he heard Robbie Hugg tell Renee Levis the same thing. Ms. Levis testified that Robbie Hugg never encouraged her to quit working for S-Tek. Robbie Hugg did not encourage Mr. Montoya to quit working for S-Tek.

## XI. Larry Medrano and Then David Vigil Replace the Huggs to Stamp Surveys

At the end of the 180-day period after closing of the sale of the business to S-Tek, during which the Huggs agreed to stamp surveys for S-Tek, the Huggs stopped stamping S-Tek's surveys. S-Tek had been unable to hire a licensed surveyor during those six months. Since S-Tek was unsuccessful in hiring a full-time licensed surveyor, instead S-Tek arranged for Larry Medrano, a licensed surveyor who owns his own survey business, to stamp surveys for S-Tek as a part-time independent contractor on a temporary basis. Larry Medrano testified that he had difficulty hiring a licensed surveyor for his company in or around 2020. He ultimately engaged a headhunter, and with its help was able to hire a licensed surveyor. S-Tek did not similarly use a headhunter.

Eventually S-Tek was able to find another licensed surveyor, David Vigil, to stamp surveys as a part-time independent contractor on a long-term basis. S-Tek pays David Vigil significantly less than it would pay a licensed surveyor that was a full-time employee. David Vigil does not perform other survey or survey-related work for S-Tek. David Vigil continues to stamp surveys for S-Tek.

## XII. Could the business, operated by non-surveyors, achieve a Surv-Tek level of profitability?

Neither S-Tek nor the guarantors have shown that, without the Huggs, Mr. Asselin and Mr. Castillo as non-surveyors would be unable to operate the business to achieve levels of profit comparable to what Surv-Tek achieved, less an estimate annual cost of $80,000 to hire a full-time licensed surveyor and taking into account the Note payments. Mr. Asselin and Mr. Castillo

-56-

on day one of S-Tek's operations regarded the Huggs as potential enemies because the business they purchased was not what they expected. They did not allow the transition period to take place as contemplated by the Closing Agreement. S-Tek never hired a full-time licensed surveyor to perform the survey and survey-related work that the Huggs performed. Mr. Asselin did not make the required effort during the transition to learn S-Tek's survey business. After Mr. Asselin fired Robbie Hugg, the relationship between Mr. Asselin and Mr. Castillo and the Huggs became quite adversarial and eventually almost all of Surv-Tek's highly skilled, experienced workforce who went to work for S-Tek left S-Tek's employ. If all had gone as the parties contemplated prior to closing, S-Tek very well may have achieved the expected level of profitability while being managed by non-surveyors.

Neither Robbie or Russ Hugg, nor Mr. Smigiel, represented to Mr. Asselin or Mr. Castillo that no particular skills were required to operate the Surv-Tek business profitably. The Huggs believed that Mr. Asselin and Mr. Castillo had the business acumen, experience, and skills necessary to operate the Surv-Tek business profitably based, in large part, on their impressive resumes.

In addition, the evidence does not establish that a survey business in New Mexico cannot legally be owned and operated by non-surveyors. S-Tek is still in operation and is owned and operated by non-surveyors.

## XIII.   S-Tek Sues Surv-Tek and the Huggs.

On July 9, 2019, S-Tek brought the State Court Action against Surv-Tek and the Huggs. S-Tek's original complaint includes claims for fraud, negligent misrepresentation, breach of contract, restitution and unjust enrichment, and violation of the UCC. The adversary proceeding pending before this Court resulted from removal of the State Court Action to bankruptcy court.

**XIV.  S-Tek's Failure to Make Payments under the Note and the Lease; STIF Retakes Possession of the Leased Premises**

In February 2020, S-Tek failed to make its payments under the Note and the Lease. S-Tek has made no further payments on the Note or the Lease since that time.

In a letter dated March 16, 2020, Surv-Tek made demand on S-Tek for all amount owed under the Note and Lease.[37] As of that time, S-Tek had not paid rent due under the Lease on February 1, 2020 and March 1, 2020 in the amount of $5,800 per month plus common area maintained charges and was past due in those payments Monthly rent under the Lease consists of base rent plus payment of a common area maintenance charge, which can fluctuate in amount month to month. The base rent is fixed at $5,800 per month for the five years of the lease term.

In addition, as of March 16, 2020, S-Tek had not made the payments due under the Note on February 1, 2020 and March 1, 2020 in the amount of $16,440.15 per month and was past due in the amount of 32,880.30.

On March 16, 2020, Surv-Tek demanded payment in full of the amount S-Tek owed under the Note. The parties attempted to reach an agreed resolution regarding S-Tek's nonpayment under the Note and Lease. S-Tek responded to the March 16, 2020 demand on March 26, 2020. STIF and Surv-Tek countered on March 31, 2020 and in connection with that counteroffer STIF agreed not to change the locks at the Leased Premises until April 6, 2020 (Exhibit 29). In follow up email correspondence dated April 2, 2020, the Surv-Tek Parties' counsel wrote: "To move the negotiations along, as a further demonstration of good faith, my clients have decided not to proceed with changing the locks on the leasehold premises on April

---

[37] Facts Established for Trial, ¶ 45. Doc. 99. The demand letter itself is not in evidence.

6. Hopefully, your clients will respond in kind with their own show of good faith and we can reach an accommodation concerning their default."[38]

In late March 2020, the Governor of the State of New Mexico issued mandates shutting down non-essential businesses due to Covid-19. When Ms. Stansberry returned to work in early April after being out on sick leave, she learned that Mr. Asselin and Mr. Castillo decided the employees should work from home because it was safer. Mr. Castillo made that decision prior to April 3, 2020. On Friday, April 3, 2020, S-Tek employees moved out of the company's offices to set up home offices. They removed items from the Leased Premises necessary to set up their home offices. They also removed all of the vehicles from the parking lot at the Leased Premises.

On or before April 3, 2020, STIF posted an eviction notice on the building located in the Leased Premises. On April 3, 2020, the Huggs noticed that all the vehicles owned by S-Tek were missing from the Leased Premises, including four trucks, a delivery vehicle, and all-terrain vehicles, or ATVs. They knew that the vehicles could not all reasonably be engaged on jobs because the removed ATVs were seldom needed. As a result, the Huggs believed that Surv-Tek and STIF's collateral was being improperly taken from the Leased Premises and therefore decided that the locks on S-Tek's office building at the Leased Premises should be changed immediately to prevent further removal of STIF's collateral.

The Huggs entered S-Tek's office building and notified the receptionist, Cate Stansberry, that they would be changing the locks. Ms. Stanberry did not leave and felt intimated by the situation. The Huggs left the building and drove to a parking lot across the street where they could see the building entrance. Ms. Stanberry called Mr. Asselin and Mr. Castillo, who arrived after the Huggs had parked across the street.

---

[38] Ex. 30.

That evening, Mr. Asselin and Mr. Castillo and Ms. Stansberry removed additional items from the Leased Premises. The Huggs saw Mr. Asselin and Mr. Castillo taking additional property from the Leased Premises, called the police, and reported a theft of their collateral but were told the police would not intervene in a civil matter. Mr. Castillo testified that they only removed items that evening that S-Tek employees needed to work from home due to the Covid-19 pandemic, such as printers, folders, and staplers, contending the items were removed in the ordinary course of business. S-Tek did not remove the Archived Surveys that were in hard copy or stored on microfiche or the OCE scanner. The evidence does not establish whether the door to the building was locked when Ms. Stanberry and Mr. Asselin and Mr. Castillo left the building. Although the Court has concluded that S-Tek did not remove the collateral in the ordinary course of its business because the collateral was removed after Surv-Tek and STIF had declared defaults, S-Tek and its owners in good faith believed the removal was permitted as an ordinary course of business event.

Later that night, on April 3, 2020, or in the morning of April 4, 2020, STIF's property manager, at the Huggs' direction, had a locksmith change the locks to the Leased Premises. S-Tek has not had access to the Leased Premises to operate its business since that time.

There is no evidence that STIF terminated the Lease following its having retaken possession of the Leased Premises. Likewise, there is no evidence that STIF did not terminate the Lease following its having retaken possession of the Leased Premises. The Court infers that STIF terminated the Lease prepetition because there is no evidence to the contrary and STIF has the burden of proving its breach of lease damages.[39]

---

[39] Whether the Lease was terminated prepetition may affect whether the damages cap under § 502(b)(6) applies.

-60-

Mr. Castillo denied that S-Tek was removing its property from the Leased Premises due to the eviction notice. He testified that S-Tek removed the property so employees could work from home during the Covid-19 pandemic. He testified that if S-Tek had known STIF would change the locks on April 3, 2020, S-Tek would have removed additional property from the premises.

The Security Agreement required that Surv-Tek's collateral be kept at the Leased Premises, except it may be removed in the ordinary course of business or with Surv-Tek's consent. S-Tek did not solicit Surv-Tek's consent to remove any property. Although STIF had agreed not to change the locks at the Leased Premises as a sign of good faith to facilitate negotiations, neither Surv-Tek nor STIF consented to the removal of any of the collateral from the Leased Premises.

The Lease provides that upon expiration or termination of the Lease, "Tenant's Property shall be and shall remain the property of Tenant and may be removed by Tenant at any time during the Term; provided that, if any of Tenant's Property is removed, Tenant shall promptly repair any damage to the Premise or to the building resulting from such removal. Lease, Art. 24. The Lease also provides that, in the event Landlord reenters or retakes possession of the leased premises following a default, Landlord "shall have the right, but not the obligation, to remove all or any part of Tenant's property on the Premises and to place such property in storage at a public warehouse at the expense and risk of Tenant." Lease, ¶ 20.1.4.[40]

### XV. Proofs of Claim.

Surv-Tek filed an amended proof of claim in S-Tek's bankruptcy case ("Claim 6-2") on February 11, 2021 in the amount of $1,768,941.83. The Summary of Claim attached to the proof

---

[40] Ex. 21 at p. 80.

of claim shows that the claim consists of the amount due under the Note as of the Petition Date (principal and interest) in the amount of $1,553,454.77 calculated entirely at the nondefault interest rate of 5% per annum plus attorneys' fees and costs incurred to the Petition Date in the amount of $201,487.06. A footnote to the Summary of Claim states: "It does not appear that Weststar [the escrow agent that provided the payoff information] is using the default interest rate in in its calculations, however. If it is not, Surv-Tek will amend its claim with the correct calculation." Surv-Tek has not amended its proof of claim since February 11, 2021. Surv-Tek's statement of facts that the Court deemed established for trial include that "the balance on the Petition Date [under the Note] . . . is $1,553,454.77. Also established for trial is that the per diem interest rate under the Note is $203.48. That Note balance and per diem interest rate are based on an interest rate of 5% per annum and do not include interest at the default rate of 12% per annum. Claim 6-2 states that the claim is secured by a perfected lien and that the value of the collateral securing the claim is $1,800,000. The Summary of Claim attached to Claim 6-2 further states that as of the Petition Date, S-Tek owed $14,000 in monetary sanctions as ordered in the State Court Action.

STIF filed an amended proof of claim on February 11, 2021 ("Claim 7-2") in the amount of $82,998.30, subject to a $5,800 security deposit. Claim 7-2 is asserted as a perfected secured claim. STIF did not put on evidence at trial of the amount of its damages arising from S-Tek's breach of the Lease apart from the Court having taken judicial notice of STIF's amended proof of claim filed in the bankruptcy case.

The Summary of Claim attached to Claim 7-2 states:

As of the Petition Date, the Debtor owed **$82,998.30**[2] in back lease payments for February 1 through and including December 1, 2020. A calculation of these lease payments is attached hereto as **Exhibit J**. (emphasis in the original). [footnote 2

states: "The calculation of Exhibit J, showing a total of $90,914.59, includes January 2021.

Upon Debtor's default under the Lease, Debtor was liable to STIF for the past rent owed, all unpaid rent up until a time of award of damages, and the worth at the time of award by which the unpaid rent for the balance of the term exceeds the amount of the rental loss that Debtor proves could have been reasonably avoided (see paragraph 20.2 of Exhibit I). STIF reserves the right to supplement its claim for these post-petition damages or, alternatively, for any rejection damages allowable under 11 U.S.C. § 365.

(emphasis in original). Exhibit J includes a chart setting forth a calculation of amounts owed under the Lease for rent consisting of (a) $82,998.30 owed for months prior to S-Tek's commencement of its bankruptcy case and (b) $7,916.29 for the first month following commencement of the case.[41] Exhibit J shows that the claim includes base rent and additional rent in the form of common area maintenance fees. Exhibit J includes a separate chart calculating the rent under the Lease, plus late fees, for the remainder of the Lease term, in the total amount of $375,031.86.

## XVI. Serv-Tek's Discovery Response

As president of Surv-Tek, Russ Hugg signed Surv-Tek's response to S-Tek's request for admission no. 6. (the "Response"). Request for admission no.6 stated, "Admit that Surv-Tek assumed control of the Premises prior to April 5, 2020."[42] The Response denies that it is true. Russ Hugg testified the denial was based on the fact that STIF, not Surv-Tek, assumed control of the Leased Premises, as the landlord. However, the Response explains the reason for the denial of the request for admission no. 6 is that, "*Surv-Tek* assumed control and the locks were changed on April 6, 2020, after S-Tek had abandoned the premises and left it unlocked and open." (emphasis added).[43] Russ Hugg testified that at the time he signed the response, he believed that

---

[41] These amounts appear to include late fees and interest.
[42] Ex. 20 at p. 7.
[43] Ex. 20 at p. 7

-63-

the locks were changed on April 6, 2020. Surv-Tek's Response to S-Tek's request for admission no. 6, which states the locks were changed on April 6, 2022, is untrue.

The Court finds that Surv-Tek's response request for admission no. 6 that the locks were changed on April 6, 2022 was not the result of an intentional fabrication of the truth but was the result of carelessness in not finding out the actual date the locks where changed.

## VII.    The State Court Action

On October 2, 2020. the Court in the State Court Action entered an order finding that S-Tek violated an earlier order by failing to provide proof of insurance of Surv-Tek's collateral as required by the order and failing to provide Surv-Tek with financial statements in the form, manner and detail required under the Security Agreement. The order imposed a deadline of October 7, 2020 for S-Tek to cure the noncompliance and a sanction of $250 per day for each day S-Tek fails to cure the noncompliance after the deadline.

On October 21, 2020, the Court in the State Court Action entered an order imposing a deadline of November 2, 2020 for S-Tek to pay arrearages due under the Note in the amount of $180,841.20. The order provided that if S-Tek did not pay that amount by the deadline, S-Tek and its owners Mr. Asselin and Mr. Castillo must immediately abide by all restrictions and obligations imposed on them under the Non-Compete Agreement, including immediately ceasing and desisting from engaging in any competition with Surv-Tek.

On November 12, 2020, the State Court entered a show cause order requiring S-Tek and Mr. Asselin and Mr. Castillo to appear at a hearing on December 3, 2020 to show cause why they should not be held in contempt for violating the court orders entered October 2, 2020 and October 21, 2020.  The order also provided that "Surv-Tek's legal counsel" is entitled to an

-64-

award of its attorney's fees and costs incurred in connection with Surv-Tek's motion for an order to show cause.

S-Tek commenced its chapter 11 bankruptcy case on December 2, 2020, the day before the hearing to show cause why S-Tek and Mr. Asselin and Mr. Castillo should not be held in contempt for violating the court orders entered October 2, 2020 and October 21, 2020. The S-Tek Parties removed the State Court Action to bankruptcy court in part to free themselves of a judge who was consistently ruling against them, in their view without justification, and commenced S-Tek's chapter 11 case to take advantage of the automatic stay and other bankruptcy laws to continue to operate S-Tek's business.

The evidence did not establish whether S-Tek failed to provide requested financial documentation required under the Lease. No evidence was presented regarding whether any of the State Court ordered sanctions have been paid.

## XVIII.     FICOSO

Surv-Tek and STIF alleged in their counterclaims that S-Tek breached the Note and the Security Agreement by granting an unauthorized security interest in the Collateral to First Corporate Solutions, Inc. ("FICOSO"). In the Summary Judgment Opinion, the Court ruled that whether S-Tek granted a security interest in the Collateral to FICOSO was in genuine dispute, because S-Tek disputed the fact and no security agreement was offered in evidence. No additional evidence regarding the purported FICOSO security interest was provided at trial.

## DISCUSSION

## I.     S-TEK PARTIES' CLAIMS

The S-Tek Parties commenced the State Court Action, later removed to bankruptcy court, as a defensive measure to establish that their obligations to Surv-Tek under the Note and to STIF

-65-

under the Lease are unenforceable, to eliminate or reduce the amount of those obligations through defenses and offsetting claims against Surv-Tek, and to recover damages against Surv-Tek and its principals. The S-Tek Parties blame the Surv-Tek Parties for their failure to pay— arguing that the failure to pay was due to the Surv-Tek Parties' misrepresentations prior to the sale, and the Huggs' failure adequately to perform their obligations during the transition period. The Surv-Tek Parties filed counterclaims against the S-Tek Parties asserting breaches under the Note, Security Agreement and Commercial Guarantee and other claims.

The Court will begin by analyzing S-Tek's claims.

**A.** **S-Tek's fraud claim**

S-Tek asserts that Surv-Tek and the Huggs committed fraud and fraudulently induced them to enter into the Closing Agreement, Note, and Security Agreement.

S-Tek alleges that Surv-Tek and the Huggs made various misrepresentations which constitute fraud. S-Tek argued additional misrepresentations in its closing arguments at trial. The Court will conform the pleadings to the evidence and address the additional misrepresentations. S-Tek's fraud claim alleges that Surv-Tek and the Huggs misrepresented with intent to deceive:

1. The value of the goodwill of Surv-Tek thereby inflating the purchase price;

2. That the business S-Tek purchased was turnkey operational;

3. That if S-Tek hired a licensed surveyor, non-surveyors could run the business at a level of profitability comparable to that of Surv-Tek (less the cost of hiring the licensed surveyor) whereas in reality the Huggs were the engines behind Surv-Tek's profitability, which could not be replicated without the Huggs;

4. That a single licensed surveyor could be hired to replace the survey and survey-related work that the Huggs performed at a salary of $80,000 per year; and

5. That Surv-Tek's 17 employees would become S-Tek employees, and Randy Asselin and Christopher Castillo could expect to rely on these 17 employees in their management of the company.

-66-

S-Tek's fraud claim also alleges:

> 6. The Huggs knew but failed to disclose that Surv-Tek pre-billed invoices, which reduced the amount of S-Tek's accounts receivable after it purchased the business thereby adversely affecting cash flow and profitability.

Finally, S-Tek's fraud claim alleges that the following statements by Surv-Tek's broker, Dennis Smigiel, acting as an agent, constitute fraud on the part of Surv-Tek and the Huggs:

> 7. If revenue and expenses stay the same, then profit will be the same, which impliedly was a representation that Mr. Asselin and Mr. Castillo would be able to manage S-Tek the same way as the Huggs to achieve Surv-Tek's level of profitability;

> 8. S-Tek will make $460,000 profit its first year, and profit will only increase from there; and

> 9. Mr. Asselin and Mr. Castillo could expect to make more from S-Tek than they would from a real estate investment they were contemplating as an alternative to acquiring the Surv-Tek business.

S-Tek's fraud claim is governed by New Mexico law. While the Closing Agreement contains an integration clause, stating that the Closing Agreement "constitutes the entire agreement,"[44] such a provision does not operate to bar a fraud claim. The New Mexico Supreme Court has held:

> Where one party to the contract has perpetrated a fraud upon the other, by means of which the latter was induced to enter into the contract, [one] cannot be precluded from seeking redress by a provision inserted in the contract by the party perpetrating the fraud, designed to shut the mouth of the adverse party as to such fraudulent representations which led up to the making of the contract.

*Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.,* 1991-NMSC-097, ¶ 6, 113 N.M. 9, 11-12, 820 P.2d 1323, 1325-26 (1991) (quoting *Berrendo Irrigated Farms Co. v. Jacobs,* 1917-NMSC-055, ¶ 7, 23 N.M. 290, 296, 168 P. 483, 484 (1917)).[45]

---

[44] Closing Agreement, Section 12.C.a – Exhibit 21.
[45] *See also Mountain Highlands, LLC v. Hendricks*, No. CIV 08-0239, 2009 WL 1300750, at *8–9 (D.N.M. Feb. 13, 2009) (quoting *Golden Cone* and permitting fraud claim to proceed, despite integration clause), *on reconsideratio*n, No. CIV 08-0239, 2009 WL 2432678 (D.N.M. July 2, 2009); *Summit Elec. Supply Co. v. Int'l Bus. Machines Corp.*, No. 07-0431, 2009 WL 9087259, at *18 (D.N.M. Sept. 30, 2009)

Under New Mexico law, the elements of fraud are (1) a misrepresentation of fact, (2) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation. *See Williams v. Stewart*, 2005-NMCA-061, ¶ 34, 137 N.M. 420, 429, 112 P.3d 281, 290 (citing UJI 13–1633 NMRA); *Unser v. Unser*, 1974-NMSC-063, ¶ 26, 86 N.M. 648, 653-54, 526 P.2d 790, 795-96 (1974) (defining fraud as "a misrepresentation of a fact, known to be untrue by the maker, and made with an intent to deceive and to induce the other party to act upon it with the other party relying upon it to his injury or detriment").

The elements of fraud must be proven by clear and convincing evidence. *Eckhardt v. Charter Hosp. of Albuquerque, Inc*., 1998-NMCA-017, ¶ 56, 124 N.M. 549, 562, 953 P.2d 722, 735; *Sauter v. St. Michael's Coll*., 1962-NMSC-107, ¶ 9, 70 N.M. 380, 385, 374 P.2d 134, 138; *Hilley v. Cadigan*, No. A-1-CA-36741, 2020 WL 604972, at *12 (N.M. Ct. App. Jan. 9, 2020) (unpublished opinion), *cert. denied* (Mar. 4, 2020). None of the elements can be presumed; each must be shown by clear and convincing evidence. *Sauter*, 1962-NMSC-107, ¶ 9, 70 N.M. at 385, 374 P.2d at 138 (citing *Berrendo Irrigated Farms*, 1917-NMSC- 055, ¶ 12, 3 N.M. 290, 168 P. at 485; *Frear v. Roberts*, 1947-NMSC-023, ¶ 3, 51 N.M. 137, 139, 179 P.2d 998, 999; *Equitable Life Ins. Co. v. Halsey, Stuart and Co*., 112 F.2d 302, 308 (7th Cir. 1940)*; Standard Ins. Agency, Inc. v. Ne. Rapid Transit Co.*, 40 Ariz. 408, 12 P.2d 777 (1932); *Kaye v. Cooper Grocery Co*., 1957 -NMSC- 049, 63 N.M. 36, 312 P.2d 798).

As to each alleged instance of fraud, S-Tek has not proven the elements of fraud by clear and convincing evidence (or by a preponderance of the evidence).

---

(holding that fraud claim was not barred by merger clause). An "integration clause" is also called a "merger clause." *See Integration Clause*, Black's Law Dictionary (7th ed. 1999).

1.  *Alleged misrepresentation of the value of goodwill resulting in an inflated purchase price*

In consultation with the Huggs, Dennis Smigiel set the listing price for the Surv-Tek business at $2.2 million—the price he calculated to be the fair market value of the business. Smigiel was an experienced broker for the sale of small businesses, and he used the same methodology to calculate the fair market value of Surv-Tek's business that he had used in hundreds of other transactions. He calculated the listing price based on the historical cash flow and profitability of the business. The Marketing Package disclosed that the listing price was based on an adjusted historical net profit, not asset values, and was substantially higher than asset value. Mr. Asselin and Mr. Castillo and the Huggs ultimately negotiated a purchase price that was about 18% less than the listing price.

The allegation that Surv-Tek and the Huggs misrepresented the value of Surv-Tek's good will resulting in an inflated purchase price is predicated on Mr. Asselin and Mr. Castillo's belief that Surv-Tek's level of profitability was dependent on Robbie Hugg's skill and experience, which was at such a high level that without his services S-Tek could never achieve profitability comparable to that of Surv-Tek.[46] Mr. Castillo testified that Robbie Hugg was a "virtuoso" and was the "secret sauce" to Surv-Tek's profitability. S-Tek did not prove this assertion by clear and convincing evidence or by a preponderance of evidence. In its findings of fact, the Court detailed types of work Robbie Hugg performed for Surv-Tek. That work included (1) setting up jobs by use of control points and GPS calibrations from public sources and from the Surv-Tek Archived Survey Database that S-Tek acquired, (2) assigning field crews based on their skillsets,

---

[46] S-Tek also alleged that Surv-Tek's profitability could not be replicated without the services of Russ Hugg but that was not the focus of S-Tek's evidence at trial.

(3) supervising field crews, (4) "stacking" jobs, (5) dealing with clients and the manager of the local Trimble dealership, and (6) stamping surveys.

Before S-Tek purchased the business, from August 2017 to July 2018 Robbie Hugg took a leave of absence from working for Surv-Tek following a back surgery. He trained John Montoya, who later went to work for S-Tek, to set up and stack jobs and assign and supervise field crews in Robbie Hugg's absence. S-Tek did not prove that Surv-Tek was less profitable during Robbie Hugg's absence. In fact, the evidence suggests that its profitability during the period of his absence was comparable to periods before and after the absence, although without monthly profit and loss information the Court cannot make a specific finding about Surv-Tek's profitability during Robbie Hugg's absence as compared with other periods.

2. *Alleged misrepresentation that non-surveyors could run the business if S-Tek hired a full-time licensed surveyor because the business was turnkey operational*

S-Tek alleges that Surv-Tek misrepresented that non-surveyors could run the business as profitably as Surv-Tek. Mr. Asselin and Mr. Castillo were quite concerned about whether, as non-surveyors, they could run the business. The Huggs assured Mr. Asselin and Mr. Castillo that they could run the business as non-surveyors based on their business experience and skills as reflected in their resumes. Mr. Castillo consulted his uncle, Mike Castillo, who is a licensed surveyor. Mike Castillo told him that if systems were in place and the business in fact was turnkey, they as non-surveyors could run the business. Mr. Asselin and Mr. Castillo formed an expectation that when they purchased the Surv-Tek business it would be turnkey operational based on (a) the advice they received from Mike Castillo, (b) the Huggs' assurances that they, as non-surveyors, could run the business profitably, and (c) Surv-Tek's longevity and history of profitability and its established client base and skilled workforce. Mr. Asselin and Mr. Castillo understood turnkey operational to mean that they could rely on the Surv-Tek's skilled workforce

and established business systems to manage and grow ongoing operations without Mr. Asselin and Mr. Castillo having much knowledge of surveying, the types of survey work performed, or how Surv-Tek competed in the marketplace and performed its work efficiently and profitably.

Mr. Asselin testified that on S-Tek's first day of operations he learned from the employees that it wasn't the Huggs supporting the employees, it was the employees supporting the Huggs – that the Huggs were the engines behind Surv-Tek not the other way around. He also learned that the employees were concerned about whether Mr. Asselin and Mr. Castillo, as non-surveyors, could adequately run the business.

Because Mr. Asselin and Mr. Castillo were non-surveyors, and S-Tek needed to hire a licensed surveyor, the Closing Agreement provided for a 90-day period for the Huggs to train Mr. Asselin and Mr. Castillo, and for the Huggs to provide survey and survey-related work for S-Tek for up to one year and to stamp surveys for up to six months following the sale of the business.

The misinformed expectation that Mr. Asselin and Mr. Castillo formed about what things would be like when S-Tek started operations was based on their failure to perform adequate due diligence regarding Surv-Tek's business operations. Mr. Asselin and Mr. Castillo  failed to learn in a meaningful way such things as (a) the roles the Huggs played in running the business and how hard they worked, (b) what duties Mr. Asselin and Mr. Castillo were expected to take over, including preparation of job proposals, so that they and a newly-hired licensed surveyor could perform the duties that the Huggs had performed, (c) what preparation of job proposals entailed, (d) the level of understanding of the survey business they would need to learn to effectively and efficiently manage the company, and (e) the skillsets of the employees, how they were supervised and by whom, and the degree to which various employees acted independently.

As a result of their misinformed expectations about how Surv-Tek had operated and the employees' initial apprehension about the new ownership of the company, on the first day of S-Tek's operations Mr. Asselin and Mr. Castillo formed the belief that the Huggs had defrauded them and were untrustworthy and appeared to be the enemy from within, and that they needed to take charge and make immediate changes in how the business was managed to prevent a massive exodus of employees. As a result, they did not allow the Huggs to play the role during the transition period contemplated by the Closing Agreement to ease Mr. Asselin and Mr. Castillo into managing the business by training them and helping them manage the business. Their fears on the first day of S-Tek's operations became a self-fulfilling prophecy. It created friction and hostility between the new and former owners of the business that eventually led to Mr. Asselin firing Robbie Hugg from performing survey and survey-related work for S-Tek, other than stamping surveys, even though S-Tek had not yet hired a licensed surveyor. That decision triggered a series of events in which Russ Hugg quit performing hourly survey and survey-related work for S-Tek because his brother was fired, Surv-Tek took a hardline position enforcing the Note and Security Agreement, and the entire Surv-Tek workforce except one eventually left S-Tek's employ.

S-Tek has not proven that the Huggs represented that the business was turnkey operational. Nor have they proven that the Huggs' representations that Mr. Asselin and Mr. Castillo as non-surveyors could run the business profitably if S-Tek hired a full-time licensed surveyor were untrue or that the Huggs intended to deceive them in that regard.

3. *Alleged misrepresentations by Mr. Smigiel as Surv-Tek's agent regarding (i) S-Tek's future profitability and (ii) Mr. Asselin and Mr. Castillo's comparative returns on investment by acquiring Surv-Tek's business or alternatively investing in real estate*

Mr. Smigiel's alleged misrepresentations about S-Tek's future profitability and that profitability being greater than an investment in real estate were made in an email message dated July 20, 2018 from Mr. Smigiel to Mr. Asselin and Mr. Castillo on which the Huggs were not copied. The evidence does not establish that the Huggs saw the email or were aware of its contents. The Court need not decide whether Mr. Smigiel's representations made in the email are imputed to the Huggs based on an agency relationship between Mr. Smigiel and the Huggs because the representations in the email are not fraudulent misrepresentations.

The July 20, 2018 email contained the following statement: "The amount of return on your investment is always going to be much higher when purchasing a business and much lower when buying real estate." That statement is obvious marketing hyperbole.

When the email is read as a whole, and taking into account (1) the speaker (a business broker trying to make a sale), (2) the audience (individuals holding themselves out as sophisticated businessmen), (3) the transaction (the sale of a business for a couple million dollars in which the prospective buyer conducts due diligence with the aid of professionals), and (4) the nature of a small business (future profit never is a sure thing), it is clear to the Court that the following three statements of which S-Tek complains are puffery upon which Mr. Asselin and Mr. Castillo did not justifiably or reasonably rely: (1) "you will have a return on your investment at the end of the first year after paying all expenses and monthly debt service to the sellers of approximately $460,000," (2) "And you will make this money each year if sales and operating expenses stay about the same as they are now. If you increase sales, you will earn even more"

-73-

and (3) the purchase of Surv-Tek is a better investment than a contemplated alternative real

estate investment.

In *Alpine Bank v. Hubbell*, the Tenth Circuit explained the concept of puffery as follows:

The term *puffery* is used to characterize those vague generalities that no
reasonable person would rely on as assertions of particular facts. In a classic
statement of the underlying principle (which also serves as a reminder that politics
has not changed that much in the last century), Learned Hand wrote:

There are some kinds of talk which no sensible man takes seriously,
and if he does he suffers from his credulity. If we were all
scrupulously honest, it would not be so; but, as it is, neither party
usually believes what the seller says about his own opinions, and each
knows it. Such statements, like the claims of campaign managers
before election, are rather designed to allay the suspicion which would
attend their absence than to be understood as having any relation to
objective truth. It is quite true that they induce a compliant temper in
the buyer, but it is by a much more subtle process than through the
acceptance of his claims for his wares.

*Vulcan Metals Co., Inc. v. Simmons Mfg. Co.,* 248 F. 853, 856 (2d Cir.
1918). In determining whether a statement is puffery, the context matters.
The relative expertise of the speaker and the listener can be a critical
factor. *See id.* So can the size of the audience.

555 F.3d 1097, 1106-07 (10th Cir. 2009).

In addition, the S-Tek Parties have not satisfied the intent to deceive with respect to the

statements in Mr. Smigiel's email correspondence.

4. *Alleged failure to disclose that Surv-Tek pre-billed invoices*

S-Tek alleged that Surv-Tek failed to disclose that it pre-billed invoices, which reduced

the amount of S-Tek's accounts receivable after it purchased the business thereby adversely

affecting cash flow and profitability. After an investigation, S-Tek determined that the amount in

question was only $7,000. That amount is immaterial in the context of this case. Further, no

invoices were provided to substantiate the allegation, which would be necessary under the best

evidence rule.

-74-

5. *Other Alleged Fraudulent Misrepresentations.*

Based on the Court's findings of fact, the Court concludes that with respect to the other alleged misrepresentations by Surv-Tek and/or the Huggs, S-Tek has not proven the representations were untrue or made with an intent to deceive necessary to sustain a claim for fraud or fraudulent misrepresentation.

## B.    S-Tek's Negligent Misrepresentation Claims

S-Tek asserts in the alternative that the misrepresentations it alleges were made fraudulently, summarized above, were made negligently. In addition, S-Tek alleges that the Surv-Tek Parties and Mr. Smigiel negligently failed to disclose how the business was operated.

New Mexico follows the standard set forth in Restatement (Second) of Torts § 552 with respect to what is required to establish a claim of negligent misrepresentation when the alleged misrepresentation is made in the course of a business, profession or employment, or in any other transaction in which the party making the misrepresentation has a pecuniary interest. *Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.,* 1988-NMSC-014, ¶ 16, 106 N.M. 757, 761, 750 P.2d 118, 122. Restatement (Second) of Torts § 552(1) states in relevant part:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

That standard applies here. The alleged misrepresentations were made in a transaction in which Surv-Tek, the Huggs, and Dennis Smigiel had a financial interest.[47]

---

[47] The New Mexico Court of Appeals has characterized the elements of the tort negligent misrepresentation, in general, as requiring proof by a preponderance of the evidence that (1) the defendant made a material misrepresentation of fact to the plaintiff, (2) the plaintiff relied upon that representation, (3) the defendant knew the representation was false or made it recklessly, and (4) the defendant intended to induce the plaintiff to rely on that representation. *Cobb v. Gammon,* 2017-NMCA-022, ¶ 27, 389 P.3d

-75-

The Surv-Tek Parties argue that S-Tek's claim for negligent misrepresentation is precluded by the entire agreement clause in the Closing Agreement (this type of clause is also known by other names, such as an integration clause, zipper clause, or merger clause). While it may be true that under New Mexico law an integration clause in a contract can cut off claims of misrepresentation based on representations made before the contract as made,[48] the entire agreement clause at issue does not do so. That clause states: "This Agreement constitutes the entire agreement, and supersedes all other agreements and understandings, both written oral, between the parties with respect to the subject matter hereof." Closing Agreement at ¶ 12.C.a. Notably, the entire agreement clause does not provide that the agreement supersedes prior representations, as many such clauses do.

Much of the Court's discussion relating to S-Tek's fraudulent malpresentation claim likewise applies to its negligent misrepresentation claim. Without repeating that discussion, the Court concludes:

- Surv-Tek did not inflate the purchase price for the Surv-Tek business,

- S-Tek has not proven that any of the following representations were untrue: (a) that Mr. Asselin and Mr. Castillo as non-surveyors could profitably run the business, or (b) that a single licensed surveyor could be hired to replace the survey and survey-related work that the Huggs performed at a salary of $80,000 per year.

- S-Tek has not proven that a representation was made that the business would be turnkey operational,

- Mr. Asselin and Mr. Castillo did not justifiably or reasonably rely on the representations made in Mr. Smigiel's July 20, 2018 email regarding expected business profits or achieving greater profitability than in a real estate investment,

---

1058, 1069 (citing *Saylor v. Valles*, 2003-NMCA-037, ¶ 17, 133 N.M. 432, 438, 63 P.3d 1152, 1158). Negligent misrepresentation may be established by commission or omission. *Cobb*, 2017-NMCA-022, ¶ 29.

    The New Mexico Uniform Jury Instructions on the tort of negligent misrepresentation state that "[a] negligent misrepresentation is one where the speaker has no reasonable ground for believing that the statement made was true." NMRA, Rule 13-1632.

[48] *See Summit Elec. Supply Co. v. Int'l Bus. Machines Corp.*, No. 07-CV-0431, 2009 WL 9087259, at *19 (D.N.M. Sept. 30, 2009) and cases cited therein.

-76-

- The amount of pre-billed invoices was either none or an immaterial amount ($7,000) in context of the purchase and sale transaction.
- There was no material misrepresentation that Surv-Tek's 17 employees would become S-Tek employees, and there was no misrepresentation regarding whether Mr. Asselin and Mr. Castillo could expect to rely on the workforce in their management of the company.

The Court also concludes that the Surv-Tek Parties and Mr. Smigiel did not negligently fail to disclose how the business was operated. Mr. Asselin and Mr. Castillo's misunderstanding in that regard resulted from their failure to perform adequate due diligence.

## C.    S-Tek's Fraudulent Inducement Claim

S-Tek asserts a claim against Surv-Tek and the Huggs for fraudulent inducement to enter into the Closing Agreement. The claim is based on alleged misrepresentations by Surv-Tek's business broker, Dennis Smigiel. The Court need not decide whether Smigiel's representations should be attributed to Surv-Tek or the Huggs for fraudulent inducement purposes. For the reasons stated below, the Court concludes that even if the representations should be so attributed, S-Tek has not proven its fraudulent inducement claim.

S-Tek bases its fraudulent inducement claim on the following alleged misrepresentations made to Mr. Asselin and Mr. Castillo by Surv-Tek, through its agent:

(1) That S-Tek would make several hundred thousand dollars in profit in the first year.

(2) That Mr. Asselin and Mr. Castillo should not purchase real estate as an investment, as they could make more money purchasing Surv-Tek's surveying business.

(3) That a licensed surveyor was not required to run a surveying business.

(4) That purchasing Surv-Tek's business, including continuity of employees, would be turnkey operational and profitable, *i.e.*, requiring no further adjustments after purchase in order to generate a profit.

(5) That the Huggs would remain at S-Tek for at least three months following S-Tek's purchase of Surv-Tek to train employees.

(6) That during the three months that the Huggs would remain following S-Tek's purchase of Surv-Tek, the Huggs would bid jobs for S-Tek.

-77-

(7) That the Huggs would facilitate a smooth transition of Surv-Tek's employees to S-Tek.

(8) That S-Tek could expect a profit margin similar to the 30% profit margin that Surv-Tek had historically experienced under the direction of the Huggs.

(9) That the Huggs would introduce Mr. Asselin and Mr. Castillo to all of Surv-Tek's regular customers so that S-Tek would be able to continue doing business with them.

(10) That the Huggs would obtain the consent of Pulte Homes of New Mexico, Inc. ("Pulte Homes") to assign Surv-Tek's right, title, and interest in its Master Agreement with Pulte Homes to S-Tek.

(11) That the Huggs would stamp surveys for S-Tek through June 28, 2019.

New Mexico laws applies to the fraudulent inducement claim. "Under New Mexico law, the elements of a claim for fraudulent inducement are: (i) a misrepresentation of fact or failure to disclose a material fact; (ii) where the falsity was known to the maker or where the representation or concealment was reckless; (iii) the maker acted with the intent to deceive and to induce the other party to act in reliance; and (iv) the other party actually relied on the representation or concealment." *Radian Asset Assur. Inc. v. Coll. of the Christian Bros. of New Mexico*, No. CIV 09-0885, 2011 WL 10977180, at *52 (D.N.M. Jan. 24, 2011) (citing *Woodworker's Supply Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 994 (10th Cir. 1999); *Cain v. Champion Window Co. of Albuquerque, LLC*, 2007-NMCA-085, ¶ 22, 142 N.M. 209, 216, 164 P.3d 90, 97). "New Mexico law applies a clear and convincing standard of proof to claims for . . . fraudulent inducement." *In re Otero County Hosp. Ass'n*, No. 11-13686, 2017 WL 5591399, at *5 (Bankr. D.N.M. Nov. 17, 2017). S-Tek has not established a claim of fraudulent inducement with respect to any of these alleged misrepresentations for the following reasons:

- As to the alleged misrepresentations summarized in (1), (2), and (8) above, the Court has found that Mr. Smigiel did not intend to deceive Mr. Asselin, Mr. Castillo, or S-Tek, that the statements were made subject to Mr. Asselin and Mr. Castillo performing due diligence, and that Mr. Asselin and Mr. Castillo did not reasonably or justifiably rely on the statements.

-78-

- S-Tek has not proven that the statements summarized in (3), (6), and (10) above were untrue, or, if made, were made with intent to deceive. Further, the alleged statement summarized in (10) above contradicts the terms of the subsequently executed Closing Agreement.

- Mr. Smigiel did not make the statement summarized in (4) above.

- The statements in (5) and (11) above were true.

- The statement summarized in (7) was not made with intent to deceive. Further, the Court has made detailed findings regarding problems that developed regarding Mr. Asselin and Mr. Castillo's relationship with the Surv-Tek employees who went to work for S-Tek. Those problems did not result from the Huggs' failure to facilitate a smooth transition of the employees to S-Tek.

- The statement summarized in (9) was not made with intent to deceive or otherwise in bad faith.

### D.    <u>S-Tek's Material Breach of Contract Claim</u>

S-Tek asserts a claim for material breach of contract against the Surv-Tek Parties, based on allegations that the Surv-Tek Parties: (1) inflated the goodwill of the company to inflate the purchase price, (2) failed to adhere to the post-closing employment/consulting terms, and (3) failed to support revenue-building.

The party claiming breach of contract bears the burden of proof for all elements. *Cent. Mkt., Ltd. v. Multi-Concept Hospitality, LLC*, 2022-NMCA-021, ¶ 38, 508 P.3d 924, 935 (N.M. Ct. App. Jan. 19, 2022). S-Tek as the party claiming breach has the burden of proving each element by a preponderance of the evidence. *See W. Commerce Bank v. Gillespie*, 1989-NMSC-046, ¶ 8, 108 N.M. 535, 538, 775 P.2d 737, 740 (regarding the preponderance of the evidence burden of proof). In New Mexico, the elements of a breach of contract action are: (1) existence of the contract, (2) breach of the contract, (3) causation, and (4) damages. *Anderson Living Trust v. ConocoPhillips Co.*, 952 F. Supp. 2d 979, 1030 (D.N.M. 2013) (citing *Abreu v. N.M. Children, Youth and Families Dep't*, 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011)). A material breach of contract "excuses the non-breaching party from further performance under the contract."

*KidsKare, P.C. v. Mann*, 2015-NMCA-064, ¶ 20, 350 P.3d 1228, 1234 (citing *Famiglietta v. Ivie–Miller Enters., Inc.*, 1998-NMCA-155, ¶ 14, 126 N.M. 69, 73, 966 P.2d 777, 781). A material breach is defined as the "failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *KidsKare*, 2015-NMCA-064, ¶ 20, 350 P.3d at 1234 (quoting *Famiglietta*, 1998-NMCA-155, ¶ 17, 126 N.M. at 74, 966 P.2d at 782). "The materiality of a breach is a specific question of fact." *KidsKare*, 2015-NMCA-064, ¶ 20, 350 P.3d at 1234 (quoting *Famiglietta*, 1998-NMCA-155, ¶ 16, 126 N.M. at 74, 966 P.2d at 782).

The Closing Agreement is the operative contract for this claim. It was an agreement among Surv-Tek, S-Tek, and the Huggs. STIF, Mr. Asselin, and Mr. Castillo were not parties to the Closing Agreement.

The Closing Agreement is a detailed, comprehensive agreement intended to be the final expression of the parties regarding their respective rights and obligations relating to the purchase and sale of the Surv-Tek business. To the extent S-Tek asserts obligations on the part of Surv-Tek that are broader than Surv-Tek's obligations under the Closing Agreement, the additional obligations are unenforceable as a result of the entire agreement provision contained in the Closing Agreement. *Cf. Rio Grande Jewelers Supply, Inc. v. Data Gen. Corp*., 1984-NMSC-094, ¶ 1, 101 N.M. 798, 799, 689 P.2d 1269, 1270 (a claim based on pre-contract negligent misrepresentation in the context of a sale of goods governed by the UCC was cut off by an integration clause in the contract); *see also* Restatement (Second) of Contracts § 209(3) (1981) ("Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final

-80-

expression."); *id.* at § 213(2) ("A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.").

The Court has found that the evidence does not establish that there was any specific commitment on the part of Robbie Hugg or Russ Hugg to help S-Tek build its revenues or what those alleged obligations would entail apart from Surv-Tek's obligations under the Closing Agreement. The evidence does not establish that Surv-Tek failed to support S-Tek's revenue-building in breach of an obligation set forth in the Closing Agreement.

The Court has found that the evidence does not establish that Surv-Tek or the Huggs inflated the purchase price of Surv-Tek's business by inflating its goodwill or that Surv-Tek or the Huggs failed to adhere to the post-closing employment or consulting terms in violation of the Closing Agreement. The Court therefore concludes that S-Tek did not prove by a preponderance of the evidence that Surv-Tek breached the Closing Agreement by (1) inflating the goodwill of the company to inflate the purchase price, (2) failing to adhere to the post-closing employment/consulting terms, or (3) failing to support S-Tek' revenue-building. Because no such breach of contract has been shown, no material breach of contract has been shown.

### E.     S-Tek's Breach of Contract Claim

S-Tek asserts a claim for breach of contract against the Surv-Tek Parties based on allegations that the Surv-Tek Parties: (1) breached the right to cure and cure period provisions and gave notice of default, all in violation of one or more provisions in the closing documents, (2) breached the requirement in the Closing Agreement that the Huggs would stamp surveys for S-Tek, and (3) breached post-closing employment and consulting requirements under the Closing Agreement. S-Tek has not established a claim for breach of contract based on any of these allegations.

S-Tek has not directed the Court to any cure rights under any of the closing documents, other than testimony from Mr. Asselin that he understood that the escrow agent's policy under the Escrow Agreement was to afford the borrower a right to cure in the event of default. The Court has found that there was no grace period or cure period in the event of default under the Closing Agreement, Note, Security Agreement, or Lease. Because the Note, Security Agreement, and Lease, grant no cure rights to S-Tek and contain no grace period, Surv-Tek did not breach those agreements by failing to afford S-Tek a grace period to make payments or opportunity to cure a default after failing to make a timely payment.

The Non-Compete Agreement does contain a cure period. The cure provision under the Non-Compete Agreement provides that if S-Tek or the guarantors default under the Note, Security Agreement, or Commercial Guaranty, and the default is not cured within 10 days after notice of default is given under the applicable agreement, Surv-Tek and the Huggs' non-compete obligations would terminate and S-Tek and its principals could not compete with Surv-Tek in the survey industry in New Mexico for a period of 3 years after the default. The State Court gave S-Tek an opportunity to cure defaults before enforcing the Non-Compete Agreement. That satisfied the cure right provision in that agreement. There is also no evidence that Surv-Tek and the Huggs began competing within 10 days after S-Tek was provided notice of default. Therefore, Surv-Tek did not breach the Non-Compete Agreement by failing to afford S-Tek a right to cure.

The form of Escrow Agreement attached to the Closing Agreement does not itself contain a grace period or a cure period in the event of a default but it does require "an affidavit of uncured default by Lender under the Note, the Security Agreement, or the Guaranty Agreement" to trigger the Escrow Agent's obligation to release and deliver the Escrow Documents to the Lender or its agent. Because no cure rights are granted under the Note or Security Agreement,

any default is an "uncured default." Therefore, Surv-Tek did not breach the Escrow Agreement by failing to afford S-Tek or the guarantors a right to cure.

The Court has found that the evidence does not establish that Surv-Tek or the Huggs breached the obligation under the Closing Agreement to stamp surveys for a period of 180 days after closing, or that Surv-Tek or the Huggs failed to adhere to the post-closing employment or consulting terms in violation of the Closing Agreement. Therefore, the Court concludes that the S-Tek Parties have not satisfied their burden to show that Surv-Tek or the Huggs breached any obligations under the Closing Agreement to stamp surveys or provide employment or consulting services to S-Tek.

The Court notes that STIF, Randy Asselin and Christopher Castillo were not parties to the Closing Agreement, and therefore there were no obligations to Randy Asselin or Christopher Castillo under the Closing Agreement that could be breached and no obligations on the part of STIF under the Closing Agreement that could be breached.

F.     **S-Tek's Claim for Breach of the Covenant of Good Faith and Fair Dealing**

S-Tek asserts a claim for breach of the covenant of good faith and fair dealing implied in every contract in New Mexico based on allegations that the Surv-Tek Parties: (1) acted in bad faith in performing their contractual obligations, (2) disclosed false information, and (3) sent notices of default when the alleged default was curable or the time to cure had not expired.

"Whether express or not, [in New Mexico] every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement." *Bourgeous v. Horizon Healthcare Corp.*, 1994-NMSC-038, ¶ 15, 117 N.M. 434, 438, 872 P.2d 852, 856 (quoting *Watson Truck & Supply Co. v. Males*, 1990-NMSC-105, ¶ 12, 111 N.M. 57, 60, 801 P.2d 639, 642). "The concept of the implied covenant of good faith and fair dealing requires that neither

party do anything that will injure the rights of the other to receive the benefit of their agreement."

*Ruegsegger v. W. N.M. Univ. Bd. of Regents*, 2007-NMCA-030, ¶ 39 (quoting

*Bourgeous,* 1994-NMSC-038, ¶ 16, 117 N.M. at 438, 872 P.2d at 856). "The breach of this

covenant requires a showing of bad faith or that one party wrongfully and intentionally used the

contract to the detriment of the other party." *Sanders v. FedEx Ground Package Sys., Inc.,*

2008-NMSC-040, ¶ 7, 144 N.M. 449, 452, 188 P.3d 1200, 1203 (quoting *Cont'l Potash, Inc. v.*

*Freeport-McMoran, Inc.,* 1993-NMSC-039, ¶ 64, 115 N.M. 690, 706, 858 P.2d 66, 82).

"Importantly, the implied covenant of good faith and fair dealing cannot be used to overcome or

negate an express term contained within a contract." *Sanders*, 2008-NMSC-040, ¶ 8, 144 N.M. at

452, 188 P.3d at 1203. The plaintiff bears the burden of proof to show that there was a breach of

the covenant of good faith and fair dealing by a preponderance of the evidence. *Huntingford v.*

*Pharmacy Corp. of Am.*, No. 17-CV-1210, 2019 WL 2504107, at *14 (D.N.M. June 14, 2019)

(applying Delaware law); *see also Barlovento, LLC v. AUI, Inc*., No. CV 18-1112, 2021 WL

3879072, at *20 (D.N.M. Aug. 31, 2021) ("In civil actions, the presumed burden of proof is a

preponderance of the evidence.").

The Court will address the allegations in reverse order. The Court has found that

Surv-Tek did not breach any rights to cure on the part of S-Tek under any of the agreements.

Cure rights not contained in a contract are not inferred under the implied covenant of good faith

and fair dealing because the implied covenant of good faith and fair dealing cannot be used to

overcome or negate express contract terms.[49]

---

[49] There is no allegation that Surv-Tek waived the right to enforce contract terms strictly or is collaterally estopped from doing so, apart from S-Tek's laundry list of affirmative defenses pled in response to all claims against it. In any event, S-Tek did not prove those defenses with respect to Surv-Tek not affording S-Tek cure rights.

-84-

The Court already addressed Surv-Tek and the Huggs' alleged disclosure of false information in its discussion of S-Tek's fraud and negligent misrepresentation claims. S-Tek failed to establish that Surv-Tek or the Huggs disclosed false information in breach of the implied covenant of good faith and fair dealing. S-Tek did not allege that STIF disclosed false information.

Finally, the Court has found that the evidence does not establish that Surv-Tek or the Huggs acted in bad faith, and there were no allegations that STIF acted in bad faith. S-Tek asked the Court to conform the pleadings to the evidence by allowing S-Tek to claim that Surv-Tek and the Huggs acted in bad faith by failing to introduce S-Tek to Surv-Tek's historical customers. The Court grants that request. However, the Court has found that (1) the Huggs made introductions to various of Surv-Tek's historical customers, and (2) the Huggs did not introduce Mr. Asselin or Mr. Castillo to customers who stopped by S-Tek's office early in the morning because Mr. Asselin and Mr. Castillo did not come to work that early. The Huggs' lack of any additional customer introductions does not establish that the Huggs were acting in bad faith in breach of the implied covenant of good faith and fair dealing.

The Court concludes that neither Surv-Tek nor the Huggs breached the implied covenant of good faith and fair dealing.

**G.**     **S-Tek's Claim for Equitable Recovery (Restitution and Unjust Enrichment**

S-Tek asserts a claim for restitution and unjust enrichment, alleging that as a direct and proximate result of the Surv-Tek Parties' actions, the Surv-Tek Parties have been unjustly enriched.

The goal of restitution is to prevent unjust enrichment by making the defendant "give up what he wrongfully obtained from the plaintiff." *Martin v. Comcast Cablevision Corp. of*

*California, LLC*, 2014-NMCA-114, ¶ 11, 338 P.3d 107, 110 (quoting Dan B. Dobbs, *Law of Remedies* ¶ 1.1, at 4 (2d ed. 1993)). "To prevail on such a claim, one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust." *Ontiveros Insulation Co. v. Sanchez*, 2000-NMCA-051, ¶ 11, 129 N.M. 200, 203, 3 P.3d 695, 698; *see also ABQ Uptown, LLC v. Davide Enters., LLC*, No. CV 13-0416, 2015 WL 8364799, at *31 (D.N.M. Oct. 19, 2015). "The theory has evolved largely to provide relief where, in the absence of privity, a party cannot claim relief in contract and instead must seek refuge in equity." *ABQ Uptown*, 2015 WL 8364799, at *31 (quoting *Ontiveros Insulation*, 2000-NMCA-051, ¶ 11, 3 P.3d at 698-99). Thus, "where a contractual relationship exists with applicable contractual provisions, unjust enrichment claims—which arise in equity—must be dismissed." *ABQ Uptown*, 2015 WL 8364799, at *31; *see also Steadfast Ins. Co. v. Legacy Safety & Consulting, LLC*, No. CV 15-00218, 2015 WL 12803775, at *2-5 (D.N.M. June 25, 2015) (dismissing unjust enrichment claim where plaintiff had remedy at law, to bring breach of contract claim).

Because S-Tek had an adequate remedy at law, and indeed brought breach of contract or tort claims against the Surv-Tek Parties, its claim for unjust enrichment fails. Further, S-Tek failed to identify any allegations which supported this claim, either in the complaint or at trial, and the evidence has failed to establish any unjust enrichment by the Surv-Tek Parties. Therefore, S-Tek failed to prove its claim for restitution and unjust enrichment.

## H. S-Tek's Claim for Violations of the UCC

S-Tek asserts a claim for damages against the Surv-Tek Parties for violations of the New Mexico Uniform Commercial Code ("UCC"), alleging that S-Tek was in compliance with the terms of the contracts and within the grace period of payment when the Surv-Tek Parties

published a public notice of a UCC foreclosure sale. S-Tek asserts that as a result of the Surv-Tek Parties' violations of the UCC, S-Tek suffered unnecessary attorney's fees, competitive disadvantage due to their competitors learning of their outdated equipment via the notice of the UCC sale, loss of employees, and lost profits.

Under the UCC, a secured party may dispose of collateral by public proceedings after default. NMSA 1978, § 55-9-610(a)-(b). A person who fails to comply with the UCC "is liable for damages in the amount of any loss caused by [such] failure[.]" NMSA 1978, § 55-9-625(b). The moving party bears the burden of proof to show that a violation of the UCC was committed. *See Yazzie v. Gurley Motor Co*., No. CV 14-555, 2016 WL 7494272, at *2 (D.N.M. Mar. 22, 2016) (holding that party bringing deficiency counterclaim under the UCC bears the burden of proof); *Barbour v. United States*, 562 F.2d 19, 21 (10th Cir. 1977) (holding that moving party has the burden of proof to show violation of the UCC under Kansas law).

The Court has found that S-Tek was in default under the Note before the notice of the UCC sale was published on May 10, 2019 because there was no grace period under the Note, and S-Tek failed to pay its May 2019 payment by the May 1st due date. On May 8, 2019, S-Tek made a payment of the amount due on May 1, 2019. Surv-Tek accepted S-Tek's late payment and did not pursue any further enforcement action based on the late payment. Surv-Tek thereby waived any default relating to the payment. Despite Surv-Tek's acceptance of the late payment, an announcement of a UCC sale was published. Surv-Tek did not proceed with the sale. Surv-Tek's attorney had called to cancel the publication of the announcement, but the newspaper mistakenly published it anyway. The Court need not decide whether Surv-Tek's actions in connection with the publication of a UCC sale violated the UCC because S-Tek did not present any evidence of any specific monetary damage it suffered as a result of the publication of the announcement of a

UCC sale. Therefore, S-Tek's claim for damages against the Surv-Tek Parties for violation of the UCC fails.

## I. S-Tek's Claim for Violations of the Unfair Trade Practices Act

S-Tek alleges that Surv-Tek took advantage of Mr. Asselin and Mr. Castillo's lack of knowledge, ability, and experience in the survey industry to a grossly unfair degree by misleading them that, as non-surveyors, they could operate S-Tek at a level of profitability comparable to that of Surv-Tek, less the estimated $80,000 per year cost of hiring a licensed surveyor and taking into account the Note payments.

S-Tek alleges further that the sale of Surv-Tek's business to S-Tek resulted in a gross disparity between the value received by S-Tek and the price it paid because Surv-Tek inflated the value of its goodwill. The inflated goodwill contention is based on an allegation that the business could not operate nearly as profitably without the services of the Huggs, particularly Robbie Hugg, even if the Huggs' services were replaced by another full-time licensed surveyor and work performed by two new non-surveyor owners.

The New Mexico Unfair Practices Act, NMSA 1978 § 57-12-1 *et seq.* (the "UPA"), prohibits both: (1) unfair and deceptive trade practices and (2) unconscionable trade practices. The Court ruled on summary judgment that S-Tek's claim for violation of the UPA failed to the extent it asserted that the Surv-Tek Parties committed "unfair and deceptive trade practices," because such practices must occur in the regular course of one's trade or commerce. The claim survived summary judgment to the extent it asserted that the Surv-Tek Parties committed "unconscionable trade practices."[50]

---

[50] *See* Memorandum Opinion Regarding Surv-Tek Parties' Motion for Summary Judgment and Partial Summary Judgment (Doc. 99), p. 12.

As a threshold matter, the Court will consider whether the integration clause in the Closing Agreement bars a claim under the UPA. The Court concludes that it does not.

> New Mexico courts recognize that UPA claims are . . . more akin to fraud claims . . . . Given th[e] heightened requirements for pleading and proving UPA claims, which make them more akin to claims of fraud, it is unlikely that the New Mexico Legislature intended to allow parties to bargain away their rights under the UPA through a merger clause . . . .

*Summit Elec. Supply Co. v. Int'l Bus. Machines Corp.*, No. 07-CV-0431 MCA/DJS, 2009 WL 9087259, at *18 (D.N.M. Sept. 30, 2009). In *Summit*, the district court held that the UPA claim could proceed despite an integration clause in the parties' contract. This Court agrees with the reasoning of *Summit*. S-Tek's UPA claim is not barred by the integration clause.

> The UPA defines an unconscionable trade practice as:

> an act or practice in connection with the sale, lease, rental or loan, or in connection with the offering for sale, lease, rental or loan, of any goods or services, including services provided by licensed professionals, or in the extension of credit or in the collection of debts that to a person's detriment:

>> (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or

>> (2) results in a gross disparity between the value received by a person and the price paid.

NMSA 1978, § 57-12-2(E).

The Court has found that the evidence fails to establish that Surv-Tek took grossly unfair advantage of Mr. Asselin and Mr. Castillo's lack of knowledge, ability, experience or capacity, or that Surv-Tek inflated the purchase price for the sale of its business by inflating the value of its goodwill. Therefore, the Court concludes that S-Tek has not proven its claim that Surv-Tek violated the UPA.

-89-

### J.  S-Tek's Claim for Conversion

S-Tek asserts a claim for conversion of assets and seeks compensatory and punitive damages against Surv-Tek and the Huggs. S-Tek alleges that the Huggs locked S-Tek out of the Leased Premises on April 3, 2020, after the Surv-Tek Parties promised that they would not change the locks until at least April 6, 2020, and then further reassured S-Tek that they would not proceed with changing the locks on April 6th. S-Tek alleges that certain assets remained on the Leased Premises after Surv-Tek assumed control of the Leased Premises, including an OCE scanner, microfiche, physical archived surveys, a microfiche reader, and several client files for completed work or work in progress. S-Tek asserts that Surv-Tek and the Huggs had a duty to relinquish control of the assets when Surv-Tek assumed control of the Leased Premises.

S-Tek alleges it was damaged as a result of the conversion because it incurred the cost of using a third party to scan and print large survey plats that could have been done with the OCE scanner, performed extra work to recreate client files, and lost a competitive advantage by losing access to the archived surveys.

In New Mexico, conversion is "the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made." *Muncey v. Eyeglass World, LLC*, 2012-NMCA-120, ¶ 22, 289 P.3d 1255, 1262 (quoting *Nosker v. Trinity Land Co.*, 1998-NMCA-035, ¶ 15, 107 N.M. 333, 337-38, 757 P.2d 813, 803, 807). "Punitive damages may be awarded only when the wrongdoer's conduct may be said to be 'maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard of the plaintiffs' rights.'" *Green Tree Acceptance, Inc. v.*

*Layton*, 1989-NMSC-006, ¶ 9, 108 N.M. 171, 174, 769 P.2d 84, 87 (quoting *Hood v. Fulkerson*, 1985-NMSC-048, ¶ 16, 102 N.M. 677, 680, 699 P.2d 608, 611).

STIF, not Surv-Tek or the Huggs, is the party that assumed control of the Leased Premises by changing the locks on April 3 or 4, 2020. S-Tek did not name STIF as a defendant in this claim. However, even if STIF were properly named as the defendant for this claim, the claim would fail.

STIF notified S-Tek that it would not change the locks at the Leased Premises as a gesture of good faith to facilitate a settlement among the parties following Surv-Tek's acceleration of the Note and STIF's demand for payment of past due rent on March 16, 2020. The parties were negotiating a resolution of their disputes at that time. STIF posted an eviction notice on the building situated on the Leased Premises on or before April 3, 2020. On April 2-3, 2020, S-Tek removed of substantially all of STIF's collateral subject to its possessory landlord's lien that attached to all of S-Tek's property located at the Leased Premises. Later that same day, the Huggs noticed that all the vehicles owned by S-Tek were missing from the Leased Premises, including four trucks, a delivery vehicle, and the all-terrain vehicles. The Huggs knew that the all-terrain vehicles were seldom used, so it was quite unlikely those vehicles were being used on jobs. Neither STIF nor Surv-Tek had agreed to the removal of their collateral from the Leased Premises.

S-Tek's removal of substantially all of the collateral from the Lease Premises on April 2-3, 2020 excused STIF's obligation to defer changing the locks while the parties were negotiating. STIF acted to protect its possessory landlord's lien rights under NMSA 1978, § 48-3-5. Further, once STIF determined that S-Tek was removing collateral in violation of STIF

-91-

and Surv-Tek's lien rights, it could reasonably interpret that to mean that S-Tek was rejecting STIF's attempts to negotiate a resolution of the disputes among the parties.

S-Tek argues that its removal of the collateral did not violate STIF or Surv-Tek's lien rights because S-Tek removed the collateral in the ordinary course of its business so its employees could work at home during the Covid-19 pandemic. The Court rejects this argument. Once STIF and Surv-Tek gave S-Tek notices of default under the Lease and Note, actions to remove STIF and Surv-Tek's collateral from the Leased Premises, without the consent of the landlord and secured lender, no longer were actions in the ordinary course of business.

In addition, S-Tek did not prove any damages caused by the alleged conversion. S-Tek did not present evidence of the value of the OCE scanner on or about April 2020 or the amount S-Tek paid a third party to scan and print survey plats that could have been done with the OCE scanner. Nor did S-Tek put on evidence of the time it spent or expense it incurred to recreate client files or the amount of monetary damages it suffered from loss of the competitive advantage due to its inability to use the archived surveys. Further, S-Tek has not shown how it was damaged by not having access to the hard copies of the archived surveys located on the Leased Premises. S-Tek had a digital archived survey database that contained scanned copies of the archived surveys located at the Leased Premises, with an index or directory allowing for its use. The physical archived surveys located on the Leased Premises were backup copies.

For these reasons, the Court will deny S-Tek's conversion claim.

### K.     S-Tek's Prima Facie Tort Claim

S-Tek asserts a claim for prima facie tort against Surv-Tek and the Huggs, alleging the same factual allegations that were raised with respect to its other claims.

Prima facie tort was developed on the theory that "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances . . . . [even if such] conduct does not come within a traditional category of tort liability." *Schmitz v. Smentowski*, 1990-NMSC-002, ¶ 39, 109 N.M. 386, 394, 785 P.2d 726, 734 (quoting Restatement (Second) of Torts § 870 (1977)). A party is permitted to plead prima facie tort in the alternative. *Schmitz*, 1990-NMSC-002, ¶ 48, 109 N.M. at 396, 785 P.2d at 736 ("We also accept the view . . . that prima facie tort may be pleaded in the alternative[.]"). However, prima facie tort can "not be used to circumvent required elements of more traditional torts." *In re Borges*, 485 B.R. 743, 789 (Bankr. D.N.M. 2012), *aff'd*, 510 B.R. 306 (10th Cir. BAP 2014); *see also Bogle v. Summit Inv. Co*., 2005-NMCA-024, ¶ 22, 137 N.M. 80, 107 P.3d 520, 529 ("Prima facie tort should be used to address wrongs that otherwise 'escaped categorization,' but 'should not be used to evade stringent requirements of other established doctrines of law.'" (quoting *Schmitz*, 1990-NMSC-002, ¶¶ 49, 63, 109 N.M. at 396, 398, 785 P.2d at 736, 738).

"The elements of a prima facie tort are (1) an intentional, lawful act, (2) committed with the intent to injure the plaintiff, (3) causing injury to the plaintiff, and (4) the absence of justification for the injurious act." *Vigil v. Pub. Serv. Co. of New Mexico*, 2004-NMCA-085, ¶ 10, 136 N.M. 70, 72, 94 P.3d 813, 815 (quoting *Padwa v. Hadley,* 1999-NMCA-067, ¶ 24, 127 N.M. 416, 424, 981 P.2d 1234, 1242). The party claiming prima facie tort must prove the elements by a preponderance of the evidence. *See Schmitz*, 1990-NMSC-002, ¶ 64 (holding that the burden of proof for a prima facie tort claim is preponderance of the evidence); *Simon v. Taylor*, 252 F. Supp. 3d 1196, 1201 (D.N.M. 2017) (holding that plaintiff needs to prove prima facie tort claim by a preponderance of the evidence).

-93-

S-Tek has asserted claims for fraud, negligent misrepresentation, breach of contract, breach of the covenant of good faith and fair dealing, restitution and unjust enrichment, violations of the Unfair Trade Practices Act, tortious interference with contractual relations, intentional violation of the automatic bankruptcy stay, fraudulent inducement, subordination, and malicious abuse of process. S-Tek's claims have not escaped categorization under traditional tort liability. In addition, S-Tek has not proven that Surv-Tek or the Huggs acted with intent to injure S-Tek in the absence of justification for any injurious acts (such as exercising remedies under the Note, Security Agreement, and Non-Compete Agreement). Therefore, S-Tek's claim for prima facie tort fails.

**L.     S-Tek's Objection to Surv-Tek's Proof of Claim (Claim 6-2)**

S-Tek objects to Surv-Tek's proof of claim, Claim 6-2, and asserts that Claim 6-2 should be disallowed in its entirety on the grounds that: (1) S-Tek was fraudulently induced to enter into the Closing Agreement, (2) S-Tek is entitled to offset amounts awarded on S-Tek's claims against any amount due under the Note, and (3) the amount that S-Tek has already paid under the Closing Agreement and Note exceeds the value of the assets it purchased from Surv-Tek, and S-Tek would not have paid more than the asset value but for Surv-Tek's misrepresentations.[51] S-Tek further asks that to the extent any portion of Surv-Tek's claim is allowed, that no more than $350,000 of Surv-Tek's claim be allowed as a secured claim.

"A properly filed proof of claim is prima facie evidence of the validity and amount of the claim." *In re Harrison*, 987 F.2d 677, 680 (10th Cir. 1993). *See also* Fed. R. Bankr. P. 3001(f). A claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). "If objection is

---

[51] Although not labeled as objections to Surv-Tek's proof of claim, S-Tek has objected to the claim on other grounds in this adversary proceeding by, for example, alleging breach of contract. The Court has separately addressed the other objections to the claim that are at issue in this adversary proceeding.

-94-

made to the proof of claim, the creditor has the ultimate burden of persuasion as to the validity and amount of the claim." *Harrison*, 987 F.2d at 680. Except for objections on purely legal grounds, the objector must come forward with sufficient evidence to rebut the presumption of validly of the claim. This requires the objector to come forward with evidence "of probative force equal to that of the allegations contained in the proof of claim." *In re Geneva Steel Co.*, 260 B.R. 517, 524 (10th Cir. BAP 2001), *aff'd*, 281 F.3d 1173 (10th Cir. 2002). Expressed slightly differently, it requires the objector to come forward with evidence "equal in force to the *prima facie* case." *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). In practice, that means that "the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *Id*. at 173-74.

The Court disagrees with S-Tek's objections that Claim 6-2 should be disallowed in its entirety. First, with respect to the objection on fraudulent inducement grounds, the Court held above that no fraudulent inducement occurred. Second, the Court has found that the evidence does not establish that S-Tek overpaid for Surv-Tek's business. Surv-Tek did not inflate the purchase price the sale of its business by inflating the value of its goodwill, as S-Tek has alleged.

In addition, Surv-Tek's claim should not be reduced as a result of the claims S-Tek has asserted against Surv-Tek. The Court has not awarded any damages to S-Tek on its claims against Surv-Tek. S-Tek, therefore, is not entitled to a setoff against the amount of Surv-Tek's allowed claim against the bankruptcy estate in reduction of that claim.[52]

---

[52] Courts are split as to whether a setoff is an affirmative defense. *Burke v. Regalado*, 935 F.3d 960, 1040 (10th Cir. 2019). This Court need not decide that issue because S-Tek has not prevailed on any of its claims for damages against Surv-Tek.

S-Tek's objection that Surv-Tek's claim, if allowed, should be allowed as a secured claim for no more than $350,000 depends on the value of S-Tek's property that serves as collateral for the claim. *See* § 506(a)(1). The Court will address that issue separately, for the purposes of determining the amount of Surv-Tek's allowed secured claim, in its ruling on S-Tek's *Motion to Value Collateral of Surv-Tek, Inc. Pursuant to 11 U.S.C. § 506(a)* (Doc. 259). The Court held a separate evidentiary hearing on that motion.

### M.  S-Tek's Objection to Surv-Tek's Claim 7-1

Claim 7-1 asserts a claim for S-Tek's breach of the Lease between STIF and S-Tek, but inadvertently names Surv-Tek instead of STIF as the claimant. S-Tek objects to "Surv-Tek's" second proof of claim (Claim 7-1) on the ground that S-Tek never entered into a lease with Surv-Tek. The Court denied S-Tek's motion to strike Claim 7-1 and has permitted STIF to file an amended Claim 7-2 that amends and supersedes Claim 7-1 (by changing the name of the claimant on the proof of claim to STIF) and has deemed Claim 7-2 as timely filed. *See* Memorandum Opinion and Order Denying Motion to Strike Amended Claim 7-2 (Doc. 310). Therefore, S-Tek's objection to Claim 7-1 is moot.

### N.  S-Tek's Claim for Malicious Abuse of Process

At the close of trial, S-Tek asked for the pleadings to be conformed to the evidence to add a claim for malicious abuse of process by S-Tek against the Huggs. The Court grants that request. S-Tek claims that the Huggs committed the tort of malicious abuse of process based on four allegedly false statements the Huggs made under oath in connection with Surv-Tek's filing and prosecution of a motion for summary judgment (Doc. 72):

(1) Surv-Tek denied Request for Admission No. 8, which requested an admission that "when Surv-Tek assumed control of the Premises, the OCE Scanner was still located on the Premises." <u>Ex. 20</u> at p. 7. The explanation stated, "It was not on the premises. There was a microfiche reader, not an OCE Scanner." *Id.*

(2) Surv-Tek denied Request for Admission No. 6, which requested an admission that "Surv-Tek assumed control of the Premises prior to April 5, 2020." Ex. 20 at p. 4. The explanation stated, "Surv-Tek assumed control and the locks were changed on April 6, 2020, after S-Tek had abandoned the premises and left it unlocked and open." *Id.*

(3) The Huggs represented that they did not call Mollie Encee to tell her about S-Tek filing bankruptcy, in contradiction to Ms. Encee's testimony that she received a call from one of the Huggs during the first week of December 2020, telling her that S-Tek filed bankruptcy.

(4) The Huggs each signed an affidavit stating, "S-Tek asserts that we agreed not to change the locks on the leased property until April 6, 2021. We were unaware that our attorney ever made any such agreement, if such agreement was made." Doc. 84-1 at pp. 3 & 7.

In New Mexico, the elements of a claim for malicious abuse of process are: "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages." *Durham v. Guest*, 2009-NMSC-007, ¶ 29, 145 N.M. 694, 701, 204 P.3d 19, 26. An improper use of process "may be shown by (1) filing a complaint without probable cause, or (2) 'an irregularity or impropriety suggesting extortion, delay, or harassment[,]' or other conduct formerly actionable under the tort of abuse of process." *Id.* (quoting *Fleetwood Retail Corp. of N.M. v. LeDoux*, 2007-NMSC-047, ¶ 12, 142 N.M. 150, 154, 164 P.3d 31, 35). Further, a "use of process is deemed to be irregular or improper if it (1) involves a procedural irregularity or a misuse of procedural devices such as discovery, subpoenas, and attachments, or (2) indicates the wrongful use of proceedings, such as an extortion attempt." *Id.* Finally, a claim for malicious abuse of process "should be construed narrowly in order to protect the right of access to the courts." *Id.*

S-Tek asserts that the Huggs committed the tort of malicious abuse of process by the Surv-Tek Parties' filing and prosecution of their motion for summary judgment based on the four

-97-

allegedly false statements the Huggs made under oath, as identified above. By the motion for summary judgment, the Surv-Tek Parties sought to (a) establish their claims for (i) breach of the Note, Security Agreement, and Lease and (ii) breaches of the Commercial Guaranty and Personal Guaranty; and (b) defeat claims by S-Tek and/or Mr. Asselin and Mr. Castillo for (i) violation of the Unfair Practices Act, (ii) tortious interference with business relationships, (iii) conversion, (iv) intentional violation of the automatic stay, (v) prima facie tort, and (vi) subordination. The Surv-Tek Parties' motion for summary judgment included 63 paragraphs of facts that they asserted were not in genuine dispute. Only paragraph 56 of the 63 paragraphs related to any of the four allegedly false statements (*i.e.*, that the OCE Scanner was not still located on the Leased Premises when the locks were changed).

S-Tek's response to Surv-Tek's motion for summary judgment included 93 paragraphs of additional facts that S-Tek claimed were not in genuine dispute. Only paragraphs 80, 81, and 84 of the 93 paragraphs related to any of the four allegedly false statements (*i.e.*, that the OCE scanner was left behind at the leased premises, that locks were changed at the building on April 3 or early on April 4, 2020, and that the OCE scanner was later removed from the Leased Premises).

The two allegedly false statements relevant to Surv-Tek's motion for summary judgment pertain to a very small part of what was at issue in the motion. And regardless of whether the OCE scanner was in the building when the locks were changed, and whether the locks were changed before April 5, 2020 or later, the Court's ruling on S-Tek's conversion claim, to which these facts relate, would be the same. The Court has taken into account the allegedly false statements in assessing the credibility of the witnesses.

The Court has found that the OCE scanner was at the Leased Premises when the locks were changed. But that does not necessarily mean that the Huggs should be held accountable for making a false oath. The Court resolves disputed facts on a regular basis based on conflicting testimony. The evidence clearly establishes that STIF changed the locks on the building before April 5, 2020. But the request for admission asks the Surv-Tek Parties to admit that Surv-Tek (not STIF) changed the locks on the building before April 5, 2020. Surv-Tek properly denied the requested admission. The explanation accompanying the denial, that "Surv-Tek assumed control and the locks were changed on April 6, 2020" perpetuated S-Tek's mistake in the question and erroneously referred to April 6, 2020. But the Court does not find that the mistake was intentional.

The New Mexico Supreme Court cautions that a claim for malicious abuse of process should be construed narrowly to protect the right of access to the courts. The types of issues S-Tek raises in support of its claim for malicious abuse of process are discovery issues for which adequate remedies exist under the Federal Rules of Civil Procedure (made applicable to adversary proceedings in bankruptcy by the Federal Rules of Bankruptcy Procedure) and the Court's inherent authority,[53] and under the facts of this case should not be actionable in tort.

_____

[53] In addition to imposing sanctions under the Federal Rules of Civil Procedure, a federal court has inherent authority to sanction bad faith discovery misconduct. *E.g., First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 517 (6th Cir. 2002) ("A court may impose sanctions pursuant to its inherent powers only when it finds the action in question was taken in bad faith." (quoting *Lockary v. Kayfetz,* 974 F.2d 1166, 1174 (9th Cir.1992)); *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (holding that a court may impose sanctions for misconduct in discovery). One permissible sanction a court may impose under its inherent authority to sanction bad faith discovery misconduct is to require the party that has acted in bad faith to reimburse legal fees and costs incurred by the other party as a result of the misconduct. *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186, 197 L. Ed. 2d 585 (2017); *see also King v. Fleming*, 899 F.3d 1140, 1150 (10th Cir. 2018) (referring to a court's inherent power as an additional authority for a court to impose sanctions for discovery violations).

The Court concludes that S-Tek has not established the required elements to prevail under the tort of malicious abuse of process. S-Tek has not shown either (1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; or (2) a primary motive in the use of process to accomplish an illegitimate end. Nor has S-Tek proven any damages resulting from the alleged malicious abuse of process.

### O.    S-Tek's Motion to Subordinate Surv-Tek's Claims Pursuant to § 510(c)

S-Tek filed a *Motion to Subordinate Claims of Surv-Tek Pursuant to § 510(c)* (Doc. 258) seeking to subordinate the claims of Surv-Tek under 11 U.S.C. § 510(c)(1) and an order transferring to the bankruptcy estate any lien of Surv-Tek in property of the estate.[54] Some of the more material of the many allegations relating to S-Tek's request to subordinate Surv-Tek's claims are that:

(1) Surv-Tek intentionally misrepresented the degree to which its value was wholly dependent upon its former owners, the Huggs,

(2) Surv-Tek intentionally misrepresented the feasibility of a non-surveyor's assumption of its business,

(3) Surv-Tek intentionally misrepresented the likely profit that S-Tek would earn upon its assumption of Surv-Tek's business,

(4) Surv-Tek declared a default and advertised a UCC Article 9 sale of S-Tek's assets based on S-Tek's failure certify its financial statements to Surv-Tek, without ever having issued a reminder of such certification requirement,

(5) Surv-Tek deliberately demoralized S-Tek's workforce, making it harder and more unlikely for S-Tek to pay the Note,

(6) Surv-Tek failed to introduce S-Tek to even one substantive historical Surv-Tek customer, and

(7) Surv-Tek reclaimed the Leased Premises on April 4, 2020 after having provided two written assurances that it would not do so prior to April 6, 2020 to enable the parties to pursue a resolution to their dispute.

---

[54] The Motion to Subordinate was filed in S-Tek's bankruptcy case, but since the Court held a combined trial in the Adversary Proceeding and final hearing on the Motion to Subordinate, the Court will address the Motion to Subordinate in this combined opinion. A separate order on the Motion to Subordinate will be entered in the bankruptcy case.

S-Tek argues that such inequitable conduct has injured other creditors giving Surv-Tek and its owners an unfair advantage in S-Tek's bankruptcy case. S-Tek further argues that if Surv-Tek's claim is not subordinated, and is allowed in the amount stated in in its proof of claim (approximately $1.8M), then Surv-Tek will control the unsecured creditor class in the voting on S-Tek's plan of reorganization, and, even if Surv-Tek voted for the plan, its claim would take the vast majority of plan payments to unsecured creditors, which would harm other unsecured creditors.

Pursuant to 11 U.S.C. § 510(c), under principles of equitable subordination, all or part of a claim may be subordinated to other claims. Section 510(c) provides:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

"The objecting party bears the initial burden of showing that grounds exist for equitable subordination of a creditor's claim." *Farr v. Phase-1 Molecular Toxicology, Inc. (In re Phase-I Molecular Toxicology, Inc.)*, 287 B.R. 571, 578–79 (Bankr. D.N.M. 2002). The Tenth Circuit Court of Appeals applies a three-prong test in analyzing equitable subordination. *Id.* (citing *In re Castletons, Inc.,* 990 F.2d 551, 559 (10th Cir. 1993)). Equitable subordination is permitted if:

(1) The claimant has engaged in inequitable conduct;
(2) The conduct has injured creditors or given unfair advantage to the claimant; and
(3) Subordination of the claim is not inconsistent with the Bankruptcy Code.

*Molecular Toxicology*, 287 B.R. at 579 (citing *Castletons*, 990 F.2d at 559). However, even if all three factors are present, equitable subordination is not required, merely allowable. *Molecular Toxicology*, 287 B.R. at 579. "Equitable subordination under § 510(c) 'is an extraordinary remedy' that must be employed 'sparingly.'" *In re The Vaughan Co., Realtors*, 543 B.R. 325, 343 n.28 (Bankr. D.N.M. 2015) (quoting *In re Alternate Fuels, Inc.,* 789 F.3d 1139, 1154 (10th Cir. 2015)); *see also Molecular Toxicology, Inc*., 287 B.R. at 581 (citing *Autostyle Plastics, Inc.*, 269 F.3d 726, 745 (6th Cir. 2001)).

A "majority of courts have described the degree of inequitable conduct warranting subordination as gross and egregious, tantamount to fraud, misrepresentation, overreaching or spoilation, or involving moral turpitude." *Vaughan*, 543 B.R. at 343 n.28 (quoting *Alternate Fuels,* 789 F.3d at 1155)); *cf. Molecular Toxicology*, 287 B.R. at 579 ("What suffices as inequitable conduct sufficient to justify equitable subordination of a claim generally requires a showing of '(1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, [or] (3) control or use of the debtor as an alter ego for the benefit of a claimant.'" (quoting *In re Eufaula Indus. Authority*, 266 B.R. 483, 489 (10th Cir. BAP 2001))).

In the case of Surv-Tek, the Court begins by addressing the first prong of the three-prong test, whether the claimant (here, Surv-Tek) engaged in inequitable conduct. The Court concludes that Surv-Tek did not engage in inequitable conduct that warrants subordination under § 510(c).

The Court has found that the evidence does not establish that Surv-Tek intentionally misrepresented the role of the Huggs in the business (allegation #1), the feasibility of a non-surveyor managing the business (allegation #2), or the likely profit that S-Tek would earn after purchasing the business (allegation #3).

-102-

Further, while Surv-Tek published notice of the UCC sale without giving S-Tek a reminder of its obligation to submit a certified statement of accounts by April 15, 2019 (allegation #4), the UCC sale notice was not published based on that default.

On April 22, 2022, Surv-Tek by counsel sent a letter to S-Tek containing a notice of default by S-Tek under the Note and Security Agreement on the basis that S-Tek had failed to provide the quarterly certified statement of accounts due on April 15, 2019 as required by the Security Agreement. However, Surv-Tek took no further action to enforce remedies based on S-Tek's failure to provide the certified statement of accounts.

Subsequently, on May 7, 2010, Surv-Tek gave S-Tek a second notice of default for failure to make the payment under the Note due May 1, 2019. Mr. Asselin had mistakenly understood there was a 10-day grace period to make the payment. S-Tek made the payment on May 8, 2019. Surv-Tek waived the default by accepting the late payment and took no further enforcement action based on the late payment. Surv-Tek's attorney called the newspaper to cancel the publication of the announcement, but the newspaper mistakenly published it anyway. This series of events regarding the declared default and advertisement of a UCC Article 9 asset sale does not justify a finding that Surv-Tek engaged in inequitable conduct sufficient to satisfy the first requirement for subordination under § 510(c).

The Court has also found that the evidence does not establish that Surv-Tek deliberately demoralized S-Tek's workforce (allegation #5). The workforce eventually became demoralized after Mr. Asselin fired Robbie Hugg from performing any further hourly work for S-Tek and Russ Hugg resigned from performed such work after his brother was fired.

The evidence did not show that the Huggs completely failed to introduce S-Tek to any of Surv-Tek's historical customers (allegation #6). The Huggs introduced Mr. Asselin and Mr.

-103-

Castillo to several existing customers, in person and via email. These included Jeanine Dodson of Stewart Title of Albuquerque, LLC; Titan Development; and Pulte Homes. Mr. Orloski (a former Surv-Tek employee who continued to work for S-Tek) introduced them to Salls Brothers Construction, Inc., another major customer. Customers, especially those in construction, would stop by S-Tek's office early in the morning, between 6:00 and 7:00 a.m., to meet with the Huggs. But Mr. Asselin and Mr. Castillo were not in the office that early.

Surv-Tek did not retake possession of the Leased Premises between April 3 and 4, 2020 (allegation #7)—that was STIF. The Court has found and concluded that STIF was justified in its action to retake possession of the Leased Premises, which it did because S-Tek was removing STIF's collateral from the premises without STIF's consent, thereby negating STIF's statutory possessory landlord's lien against the property.

Finally, the Court has also reviewed the other allegations in the Motion to Subordinate. Based on the Court's findings, the Court concludes that with respect to those other allegations S-Tek has not satisfied the first requirement to establish equitable subordination under § 510(c).

With respect to the second requirement to establish equitable subordination under § 510(c), the Court also holds that Surv-Tek's conduct did not inappropriately injure other creditors or given Surv-Tek an unfair advantage.

Therefore, S-Tek's motion for equitable subordination pursuant to § 510(c) fails.

**P.** **Mr. Asselin and Mr. Castillo's Claim of Fraud**

Mr. Asselin and Mr. Castillo assert a claim of fraud against Surv-Tek and STIF, alleging that the following misrepresentations and others caused them to personally guarantee S-Tek's debts to Surv-Tek and STIF:

(1) The survey business could be run by businessmen, and no particular skills or licenses were required to operate the business.

(2) The survey business was turnkey operational.

(3) The survey business had the ability to continue generating the same amount of accounts receivable, as long as Mr. Asselin and Mr. Castillo hired a licensed surveyor within two to three months of purchasing the business.

(4) The survey business would only need to be run the same as it was being run by the Huggs in order for S-Tek to achieve the same profitability as Surv-Tek.

(5) The Huggs while working for Surv-Tek performed only "administration tasks, job estimating, scheduling, and business planning."

(6) The survey business could be legally owned and operated by owners not licensed as surveyors.

The standard for fraud claims is set forth above in Section A., above. The Court has found that the evidence has failed to establish that any of the alleged representations are fraudulent misrepresentations. For example, the evidence did not establish that businessmen would be unable to manage the survey business profitably (allegation #1) or that the survey business could not legally be owned and operated by non-surveyors (allegation #6). The evidence also failed to establish that the Huggs represented that the survey business was turnkey operational (allegation #2) or that they performed *only* administration tasks, job estimating, scheduling, and business planning (allegation #5). Finally, the evidence failed to establish that the Huggs made any guarantees of future performance or profitability (allegations #3 and # 4) or that Mr. Asselin and Mr. Castillo justifiably relied on the profitability representation (puffery) that Mr. Smigiel made (allegation # 4). The Court has also reviewed the other allegations made in support of the fraud claim and concludes that Mr. Asselin and Mr. Castillo have not satisfied the required elements to establish a claim of fraud.

### Q. Mr. Asselin and Mr. Castillo's Claim of Violation of the Unfair Trade Practices Act

Mr. Asselin and Mr. Castillo assert a claim for a violation of New Mexico's Unfair Trade Practices Act, NMSA 1978 § 57-12-1 *et seq*, against Surv Tek and STIF. The UPA prohibits

-105-

both (1) unfair and deceptive trade practices and (2) unconscionable trade practices. Mr. Asselin and Mr. Castillo's claim is based largely on the alleged false representations and omissions that Mr. Asselin and Mr. Castillo alleged in support of their fraud claim.

Based on the Court's discussion of the UPA in the section of this opinion addressing S-Tek's claim under the UPA (Section I., above) and the Court's findings of fact, the Court concludes that Mr. Asselin and Mr. Castillo have not established a valid claim under the UPA.

## II.     SURV-TEK PARTIES' CLAIMS

In a summary judgment opinion entered in this case on December 10, 2021 (Doc. 99), the Court deemed as established for trial that S-Tek has not made any payments under the Note or the Lease since January 2020, but the Court made no determination regarding S-Tek's liability because it had asserted defenses to liability that were not determined on summary judgment. Litigation of S-Tek's defenses was a matter for trial. The Court will address the Surv-Tek Parties' claims against S-Tek but will reserve for a later decision the claims against the guarantors.

### A.   <u>Surv-Tek's Claims for Breach of Promissory Note and Security Agreement</u>

1. *Claim for Breach of the Note*

The amount of Surv-Tek's claim, as set forth in its proof of claim, is $1,768,941, consisting of $1,553,454.77 owed under the Note (excluding attorneys' fees), $201,487.06 in attorneys' fees, and $14,000 owed for State Court ordered monetary sanctions.

The documents attached to proof of claim relating to Surv-Tek's claim[55] include copies of the Closing Agreement, the Note, an Escrow Agreement, Westar Payoff Calculations, the Security Agreement, a UCC financing statement, and a State Court order imposing a sanction of

---

[55] Claim 6-2 also includes copies of documents relating to STIF's claim.

$250.00 per day and attorney's fees and a second order relating to enforcement of the Non-Compete Agreement.

In New Mexico, the elements of a breach of contract action are: (1) existence of the contract, (2) breach of the contract, (3) causation, and (4) damages. *Anderson Living Tr. v. ConocoPhillips Co.,* 952 F. Supp. 2d 979, 1030 (D.N.M. 2013) (quoting *Abreu v. N.M. Children, Youth and Families Dep't*, 797 F. Supp. 2d 1199, 1247 (D.N.M. 2011)). The party claiming breach of contract bears the burden of proof for all elements. *Cent. Mkt., Ltd. v. Multi-Concept Hosp., LLC*, 2022-NMCA-021, ¶ 38, 508 P.3d 924, 935. Breach of a promissory note is shown by proof of the note and the maker's failure to pay amounts when due without valid defenses. *See, e.g., RMM Recs. & Video Corp. v. Universal Music & Video Distrib. Co. (In re RMM Recs. & Video Corp.*), 372 B.R. 603, 609 (Bankr. S.D.N.Y. 2007) ("To make out a prima facie case for recovery for breach of obligation to pay under a promissory note, the plaintiff simply must show proof of the note and the defendant's failure to pay by its maturity date.").

Surv-Tek proved breach of the Note. The last payment S-Tek made under the Note was applied to the payment due on January 1, 2020. S-Tek has made no payments under the Note since February 2020. The unpaid balance under the Note on the Petition Date with interest accruing at the 5% per annum nondefault rate, exclusive of attorney's fees and costs, was $1,553,454.77, subject to any valid defenses asserted by S-Tek. The Note provides that in the event of default, Surv-Tek is entitled to attorney's fees incurred in collecting and/or enforcing payment under the Note.

Surv-Tek is not entitled to any interest accruing under the Note post-petition. *See* §§ 502(b)(2) and 506(b) (an unsecured or under-secured creditor is not entitled to allowance of a

claim for post-petition interest).[56] Surv-Tek is not entitled to any interest accruing under the Note at the default rate of 12% per annum. Facts deemed established for trial as a result of a ruling on Surv-Tek's motion for summary judgment include that "the balance on the Petition Date [under the Note] . . . is $1,553,454.77," and that the per diem interest rate under the Note is $203.48.[57] That per diem interest rate is based on an interest rate of 5% per annum and does not include interest at the default rate of 12% per annum. Further, Surv-Tek did not amend its proof of claim to include interest at the default rate.

As discussed below, S-Tek has not proved any of its affirmative defenses to its liability under the Note.[58] Therefore, Surv-Tek is entitled to judgment against S-Tek under the Note in the amount of $1,553,454.77 (consisting of the unpaid principal balance and prepetition interest at the nondefault rate),[59] plus attorney's fees and costs. The Court ruled at trial that if it found S-Tek liable under the Note, the Court would set a separate hearing to determine the amount of attorney's fees and costs to which Surv-Tek is entitled under the Note and applicable bankruptcy law. In accordance with that ruling, the Court will set that hearing.

2. *Claim for Breach of the Security Agreement*

Surv-Tek claims that S-Tek breached the Security Agreement by failing to keep the collateral securing the Note at the Leased Premises, as required by the Security Agreement and

---

[56] In a separate opinion on S-Tek's motion to value Surv-Tek's collateral to be entered in the S-Tek chapter 11 case, the Court will hold that the amount of Surv-Tek's allowed claim exceeds the value of the collateral securing the claim.

[57] Doc. 99, Exhibit A, ¶ 19.

[58] S-Tek asserted numerous affirmative defenses. The affirmative defenses are presented as defenses to all of Surv-Tek's claims, without specifying the claims to which an affirmative defense may apply. The Court will address all of S-Tek's affirmative defenses to all of Surv-Tek's claims separately below.

[59] In a separate opinion, the Court will find that S-Tek's claim is undersecured–the allowed amount of its claim exceeds the value the collateral securing the claim. Surv-Tek is not, therefore, entitled to any interest on its claim accruing post-petition. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372-73 (1988) ("[T]the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest.").

by granting a junior lien to First Corporate Solutions, Inc. ("FICOSO") in violation of the Security Agreement.

Surv-Tek breached the Security Agreement by removing the collateral from the Leased Premises outside the ordinary course of its business and without Surv-Tek's consent. For the reasons explained below in the Court's discussion of Surv-Tek's conversion claim, the Court concludes that S-Tek's removal of the collateral from the Leased Premises was not in the ordinary course of S-Tek's business. However, Surv-Tek has not proved any damages caused by that breach.

Surv-Tek also claims that S-Tek breached its obligations under the Security Agreement by further encumbering all or part of the collateral by granting a security interest to FICOSO in or about August 2019. Surv-Tek (and STIF to the extent applicable) failed to meet their burden of proof for this claim. No security agreement, loan documents, or other evidence of an unauthorized loan and security interest in favor of FICOSO were proffered or admitted in evidence other than a UCC-1 financing statement, which the Court in a summary judgment opinion already deemed insufficient by itself to prove the grant of a security interest. *See* Doc. 99 at pp. 26-27.

In addition, Surv-Tek has not proved that it suffered any damages even if Surv-Tek granted a security interest in the collateral to FICOSO in violation of the Security Agreement. *See Jemez Properties, Inc. v. Lucero*, 1979-NMCA-162, ¶ 20, 94 N.M. 181, 186, 608 P.2d 167, 162 (party asserting claim for breach of contract must establish damages by a preponderance of the evidence). In a separate opinion, the Court is finding that the value of the collateral securing Surv-Tek's allowed claim is less than the amount of Surv-Tek's allowed claim. As a result, even if S-Tek had granted FICOSO a junior security interest in the collateral in violation of the prior

-109-

Security Agreement S-Tek executed in favor of Surv-Tek, FICOSO's security interest in the collateral would not affect the amount of Surv-Tek's secured claim.

**B.  STIF's Claim for Breach of Lease Claim**

1. *STIF's Lien Rights*

Under the Lease, S-Tek granted STIF a UCC security interest in all of S-Tek's property now or hereafter placed in or upon the Leased Premises, including but not limited to all fixtures, machinery, equipment, furnishings, and other articles of personal property. Notably, the security interest does not cover accounts receivable since it is not tangible property located at the Leased Premises. STIF attempted to perfect the security interest by filing a UCC-1 financing statement in the office of the New Mexico Secretary of State on January 2, 2019 at 11:14 a.m. as Document No. 20190072058F. However, the filed financing statement inadvertently names Surv-Tek as the secured party, not STIF. As a result, STIF has an unperfected security interest. On the other hand, Surv-Tek perfected its security interest by filing a UCC-1 financing statement on January 2, 2019 at 11:09 a.m. as Document 20190072065. STIF's UCC security interest, therefore, is junior to Surv-Tek's security interest both because STIF's financing statement was filed after Surv-Tek filed its financing statement and because it identified the wrong secured party.

Under § 506(a), a creditor's claim is a secured claim to the extent of the value of the creditor's interest in the estate's interest in property. In a separate ruling on S-Tek's motion to value collateral to bifurcate Surv-Tek's secured claim, the Court will rule that Surv-Tek's claim is under-secured. Because STIF's UCC unperfected security interest is junior to Surv-Tek's security interest, STIF's interest (its UCC security interest) in the estate's interest in property has

no value. The Court therefore concludes that STIF does not have an allowed secured claim on account of its UCC lien.

STIF also has a possessory landlord's lien to secure unpaid rent under the Lease. *See* NMSA 1978, § 48-3-5. That statute provides, with an exception not applicable here:

> Landlords have a lien on the property of their tenants that remains in or about the premises rented, for the rent due by the terms of any lease or other agreement in writing, and the property shall not be removed from the premises without the consent of the landlord until the rent is paid or secured.

NMSA 1978, § 48-3-5(A).

Under NMSA 1978, § 48-3-6, if the tenant becomes insolvent or commences a bankruptcy case, the landlord's lien is limited to six months' rent, which under the Lease is $45,271.80 (base rent plus common area maintenance fees). However, there is no evidence that STIF has possession of any of S-Tek's property once located at the Leased Premises. The Court therefore concludes the STIF does not have a valid landlord's lien against any property for any amounts owing under the Lease.

Because STIF does not have a valid secured claim in this bankruptcy case on account of either its UCC security interest or statutory landlord's lien, the Court will disallow its claim as a secured claim. STIF's allowed claim is unsecured.

2. *S-Tek breached the Lease*

STIF claims that S-Tek breached the Lease by failing to pay rent when due and by removing STIF's collateral from the Leased Premises without STIF's consent.

The Lease has a 5-year term beginning January 1, 2019. S-Tek has not paid any rent under the Lease since February 2020. Rent under the Lease consists of base rent plus payment of a common area maintenance charge. The base rent is fixed at $5,800 per month for the five years of the Lease term. By failing to pay rent, S-Tek breached the Lease.

-111-

In defense of its breach, S-Tek asserts that STIF breached the Lease by changing the locks to the Leased Premises on April 3, 2020 in violation of its agreement not to effectuate a lockout until at least April 6, 2020 and its subsequent statement that it would not change the locks on April 6 as gesture of good faith in an effort to negotiate a resolution to S-Tek's defaults under the Lease and Note. S-Tek has also asserted failure to mitigate damages as an affirmative defense.

After S-Tek had defaulted under the Lease and Note, STIF and Surv-Tek notified S-Tek on March 16, 2020 that they intended to exercise remedies. Subsequently, the parties traded offers and counteroffers. STIF agreed not to change the locks until April 6, 2020 (and then subsequently offered not to change the locks even on April 6) as a gesture of good faith to facilitate a settlement among the parties. However, on or before April 3, 2020, STIF posted an eviction notice on the Leased Premises stating something to the effect that the tenant shall immediately surrender the premises and, if not, the landlord may reenter and take possession of the Leased Premises. Later that day, STIF locked S-Tek out of the premises by changing the locks and took possession of the premises. S-Tek has not thereafter been in possession of the Leased Premises.

S-Tek removed collateral from the Leased Premises on April 2 and 3, 2020. Neither STIF nor Surv-Tek had agreed to the removal of their collateral from the Leased Premises.

The Court holds that STIF did not breach the Lease by changing the locks prior to April 6, 2020. S-Tek's removal of collateral excused STIF's obligation to defer changing the locks while the parties were negotiating. STIF acted to protect its possessory landlord's lien rights. *See* NMSA 1978, § 48–3–5. Further, once STIF determined that S-Tek was removing

-112-

collateral in violation of STIF and Surv-Tek's lien rights, STIF could reasonably interpret that as a sign that S-Tek was rejecting STIF's attempts to negotiate a resolution.

S-Tek also argues that its removal of collateral did not violate STIF or Surv-Tek's lien rights because S-Tek removed the collateral in the ordinary course of its business. For the reasons explained below in the Court's discussion of Surv-Tek's conversion claim, the Court concludes that S-Tek's removal of the collateral from the Leased Premises was not in the ordinary course of S-Tek's business.

Based on the foregoing, the Court concludes that S-Tek breached the Lease by failing to pay rent when due and by removing STIF's collateral from the Leased Premises without STIF's consent. STIF is entitled to a judgment as a result of S-Tek's breach of the Lease.

### 3. *Breach of Lease Damages*

STIF did not put on evidence at trial of the amount of its damages arising from S-Tek's breach of the Lease apart from the Court having taken judicial notice of STIF's proof of claim filed in the bankruptcy case. The amount of STIF's claim, set forth in its proof of claim, is $82,998.30, subject to a $5,800 security deposit setoff.

STIF's breach of lease claim is a prepetition claim. The Tenth Circuit has adopted the conduct theory under which classification of a claim as a pre- or post-petition claim depends on when the conduct giving rise to the claim occurred. *In re Parker,* 313 F.3d 1267, 1269 (10th Cir. 2002).[60] A prepetition claim arising from conduct that occurred prepetition is a prepetition claim even if the amount of the claim is contingent and unliquidated and must be estimated for

---

[60] The Tenth Circuit has not decided whether to adopt the "narrow conduct theory" under which a claim arises at the time of conduct only if the claimant had a specific relationship with the debtor at the time the conduct occurred. *Parker,* 313 F.3d at 1270 n.1.

purposes of allowance, if necessary, pursuant to § 502(c). For example, a claim for breach of contract, where the breach occurred prepetition, is a prepetition claim even if the amount of the claim may include post-petition attorney's fees.[61]

Here, S-Tek's breach of the Lease occurred prepetition. Because the breach occurred prepetition, even if the damages amount might be affected by whether Surv-Tek relets the Leased Premises post-petition, the entire claim is a prepetition claim.

Because STIF's breach of lease claim is a prepetition claim, STIF was required to include the entire amount of its claim in its proof of claim.[62] A proof of claim is prima facie evidence of the validity and amount of the creditor's claim. *See* Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."). S-Tek did not rebut the presumption of validity of STIF's claim asserted in the amount of $82,998.30 subject to a setoff for a $5,800 security deposit.

The Lease provides for $5,800 monthly base rent and an estimated monthly amount of $1,386.00 for common areas fees. Even if the Lease term extended past the petition date, STIF did not preserve a claim for more than $82,998.30 because the conduct giving rise to the claim, the breaches of the Lease, occurred prepetition, and Surv-Tek limited the amount of its proof of claim to $82,998.30.[63]

### C. <u>Surv-Tek and STIF's Claim for a Post-Judgment Writ of Replevin</u>

Surv-Tek and STIF ask the Court to issue a post-judgment writ of replevin. In this claim, Surv-Tek and STIF seek immediate possession of the collateral securing their claims against S-

---

[61] *In re MOY*, No. BR 12-B-81963, 2016 WL 7745143, at *4 (Bankr. N.D. Ill. Jan. 13, 2016); *In re Pioneer Carriers, LLC,* 581 B.R. 809, 819 (Bankr. S.D. Tex. 2018).
[62] The claims bar date in the S-Tek case was February 1, 2021. *See* Docs. 36 & 37.
[63] The Court notes that if the Lease was not terminated prepetition, the statutory cap on STIF's breach of lease claim is $107,790, consisting of three months of rent due and unpaid when STIF regained possession of the Leased Premises plus one year of rent under the Lease.

-114-

Tek. Such collateral is property of the estate in S-Tek's bankruptcy case. Section 362(a)(3) provides that the automatic stay imposed by § 362 operates as a stay, applicable to all entities, of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Surv-Tek and STIF's claim for a writ of replevin is stayed by the automatic stay imposed by § 362(a). Therefore, the Court will deny the claim without prejudice to renewing the claim if the automatic stay or a discharge injunction does not bar the replevin either as a result of the Court having granted relief for the stay or having dismissed this bankruptcy case.

### D. __Surv-Tek and the Huggs' Claim for Breach of Non-Compete Agreement__

Surv-Tek and the Huggs assert a claim for breach of the Non-Compete Agreement. They assert that S-Tek and its owners continue to operate S-Tek's business in breach of their obligations under the Non-Compete Agreement. As a remedy, they seek damages "to be proved at trial" and injunctive relief as may be necessary to prevent any and all irreparable harm to Surv-Tek.

Under the Non-Compete Agreement, if S-Tek or the guarantors default under the Note, Security Agreement, or Commercial Guaranty, and the default is not cured within 10 days after notice of default is given under the applicable agreement, the non-compete provisions, which prevent Surv-Tek and the Huggs from competing against S-Tek, would flip. Not only would the non-compete obligations of Surv-Tek and the Huggs terminate, but S-Tek and its principals could not compete with Surv-Tek in the survey industry in New Mexico for a period of 3 years after the default.

The Court has found that S-Tek defaulted under the Note and did not cure the default within 10 days after a notice of default was given on March 23, 2020 (or thereafter). The Court

therefore concludes that S-Tek, Randy Asselin and Christopher Castillo violated the Non-Compete Agreement by continuing to operate after the 10-day period expired.[64]

However, the Court concludes that upon the filing of S-Tek's chapter 11 case, the request for injunctive relief (*i.e.*, to enforce the non-compete provisions against S-Tek by ordering S-Tek to cease operations) was stayed by the automatic stay. No relief from the automatic stay has been sought or granted.

Section 362(a)(1) and (3) provide, respectively, that the automatic stay imposed by § 362 operates as a stay, applicable to all entities, of

> (1) the commencement or continuation . . . [of any] action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title . . . [and]

> (3) any act . . . to exercise control over property of the estate[.]

Although the Court is adjudicating the Surv-Tek Parties' claims against S-Tek, the stay remains in place with respect to any enforcement remedies, including injunctive relief.

The Court also concludes that neither Surv-Tek nor the Huggs are entitled to any damages for S-Tek's violation of the Non-Compete Agreement. Neither Surv-Tek nor the Huggs have put on any evidence of damages caused by S-Tek's breach of the Non-Compete Agreement.[65] The claim is denied with prejudice with respect to damages, but the Court will deny the claim without prejudice with respect to the request for injunctive relief. Surv-Tek and the Huggs may renew the request for injunctive relief in the future if it is not barred by the automatic stay or a discharge injunction.

---

[64] *See* Exhibit 29 referencing an earlier letter dated March 23, 2020 (not in evidence) and describing generally what that letter said.

[65] Because Surv-Tek and STIF did not prove damages caused by S-Tek's breach of the Non-Compete Agreement, the Court need decide whether injunctive relief is the exclusive remedy for violation of the agreement.

-116-

**E. The Surv-Tek Parties' Claim for Declaratory Relief**

The Surv-Tek Parties seek declaratory relief, consisting of: (1) a declaration that Surv-Tek and STIF hold valid security interests and liens in the collateral pledged by S-Tek that were acquired in good faith; (2) a declaration that Surv-Tek and STIF are entitled to immediate possession of the collateral free and clear of any adverse liens, encumbrances, or other claims that may be asserted by S-Tek and its owners; (3) a declaration that the non-compete obligations under the Non-Compete Agreement are no longer binding on Surv-Tek but are binding on the S-Tek Parties, and that Surv-Tek is entitled to a permanent injunction preventing the S-Tek Parties from violating its obligations under the Non-Compete Agreement for the remainder of the applicable 3-year period; (4) a declaration that S-Tek must produce certain financial information and proof of insurance; and (5) a grant of ancillary relief in the form of an order for turnover, or in the alternative, a declaration that the Surv-Tek Parties are entitled to a writ of replevin to exercise their rights as secured parties.

1. *Surv-Tek and STIF's Lien Rights*

The Court addresses here whether and to what extent Surv-Tek and STIF hold valid security interests and liens in the collateral pledged by S-Tek and whether the liens were acquired in good faith.

Based on the Court's other findings of fact, the Court finds and concludes that Surv-Tek and STIF acquired their security interests and liens in good faith. The Court also concludes that STIF does not presently hold a valid lien against any of S-Tek's property for the reasons explained above in the discussion of STIF's lien rights relating to STIF's breach of Lease claim.

The Court will next address the extent of Surv-Tek's lien rights. In connection with its purchase of Surv-Tek's business, S-Tek executed and delivered a Security Agreement under

-117-

which it granted Surv-Tek a security interest in substantially all of its property, then owned or thereafter acquired, to secure payment of the Note and certain other indebtedness. Under the Security Agreement, and the financing statement filed of record to perfect the security interest, Surv-Tek has a valid security interest in all goods, furniture, equipment, inventory, accounts, accounts receivable, general intangibles, and contract rights, including after-acquired property and all proceeds and products of the foregoing.

The Court has ruled that the prepetition security interest by its terms extends to after-acquired accounts receivable but does not extend to the $30,000 that S-Tek received from its settlement with Mr. Smiegel. Docs. 299 and 300.

Further, under Bankruptcy Code §§ 552(a) and (b), the security interest does not extend to any property that S-Tek acquired after it commenced its bankruptcy unless the property is proceeds, products offspring, or profits of the prepetition property in which Surv-Tek had a security interest. *See In re Hastie*, 2 F.3d 1042, 1044 (10th Cir. 1993) ("Property acquired after the commencement of a bankruptcy proceeding is not subject to the lien of any security agreement entered prior to the bankruptcy petition . . . except that a security agreement covering proceeds of property acquired before commencement covers proceeds acquired after commencement."). However, the bankruptcy court may grant a secured creditor a security interest in property acquired after commencement of the bankruptcy case as adequate protection for use of cash collateral under § 363 and for other reasons. Here, the Court has granted Surv-Tek a security interest in accounts receivable and cash that S-Tek acquires post-petition as adequate protection for use of cash collateral limited to the "Cash Collateral Base Amount" as defined in cash collateral orders entered by the Court, which as of March 29, 2022 was $181,764.54. *See* Cash Collateral Order, Doc. 345.

-118-

Except for the limitations as explained above, Surv-Tek has a valid security interest in all goods, furniture, equipment, inventory, accounts, accounts receivable, general intangibles, and contract rights as set forth in the Security Agreement.[66]

The security interest was perfected under the UCC on January 2, 2019 at 11:09 a.m. by the filing of a UCC-1 in the office of the New Mexico Secretary of State as Document No. 201900720651. Such perfection perfected the security interest in all property to which the security interest attached except motor vehicles.

Although the security interest in goods extends to motor vehicles,[67] the filing of the financing statement did not perfect that security interest. There are special provisions under New Mexico law for the perfection of liens in motor vehicles. A landlord's lien in a motor vehicle is perfected by possession. NMSA 1978, § 48-3-5(A), § 66-3-201(A), and § 66-3-202(B). A UCC security interest in motor vehicles is perfected by registering the lien with the New Mexico Department of Motor Vehicles ("MVD"), which will result in MVD issuing a new certificate of title for the vehicle showing all liens against the vehicle. NMSA 1978, § 66-3-201.

Surv-Tek did not specifically ask the Court to determine whether its liens are perfected and presented no evidence that its security interest in S-Tek's motor vehicles is shown on the certificates of title for those vehicles. The Court therefore makes no determination of whether Surv-Tek's security interest in S-Tek's motor vehicles is perfected.

---

[66] In addition to goods, furniture, equipment, inventory, accounts, accounts receivable, general intangibles, and contract rights, the Security Agreement purports to create a security interest in "other personal property." Such a collateral description does not reasonably identify the collateral and therefore does not create a security interest in "other personal property." *See* NMSA 1978, § 55-9-108(c).

[67] *E.g. Dean v. Carr (In re Dean)*, No. 1:11-AP-00481MDF, 2012 WL 4634291, at *3 (Bankr. M.D. Pa. Oct. 1, 2012); *Boyd v. Direct Cap. Corp. (In re Pizzano)*, 439 B.R. 445, 451 (Bankr. W.D. Mich. 2010); *In re Bray*, 365 B.R. 850, 855 (Bankr. W.D. Tenn. 2007); *In re Curtis*, 345 B.R. 756, 763 (Bankr. D. Utah 2006).

-119-

2. *Other requested declaratory relief.*

In addition, Surv-Tek asks for a declaration that it is entitled to immediate possession of its collateral. The Court has addressed this issue in the discussion of Surv-Tek's claim for writ of replevin. Surv-Tek also asks the Court to declare that its collateral is free and clear of any adverse liens, encumbrances, or other claims that may be asserted by S-Tek and its owners. Surv-Tek's interest in its collateral is not free and clear of the rights and interests of S-Tek in the property. S-Tek owns and has a possessory interest in the property.

For the reasons explained above in the discussion of Surv-Tek's claim for breach of the Non-Compete Agreement, the non-compete obligations under the Non-Compete Agreement are no longer binding on Surv-Tek but are binding on the S-Tek Parties for the remainder of the applicable 3-year period. However, even though the S-Tek Parties are bound by the Non-Compete Agreement, the automatic stay under the Bankruptcy Code prevents enforcement of those obligations. Unless and until Surv-Tek obtains relief from the automatic stay that permits Surv-Tek to enforce the obligations of the S-Tek Parties under the Non-Compete Agreement, Surv-Tek is not entitled to a permanent injunction preventing S-Tek from violating its obligations under the Non-Compete Agreement.

Finally, the request for a declaration that S-Tek must produce certain financial information and proof of insurance is moot now that S-Tek is a chapter 11 debtor. S-Tek's financial information is available to Surv-Tek, and S-Tek is required to maintain insurance under cash collateral orders. Surv-Tek can obtain proof of S-Tek's compliance with that requirement in the bankruptcy case.

3. *Declaratory relief granted*

For the reasons explained above, the Court will grant Surv-Tek's request for declaratory judgment to the following extent:

1. Surv-Tek holds a valid perfected security interest in the collateral described in the Security Agreement that Surv-Tek acquired in good faith, except (a) Surv-Tek does not have a security interest in the $30,000 of settlement proceeds S-Tek received from Mr. Smigiel, (b) the Court makes no determination whether Surv-Tek has a perfected security interest in the motor vehicles, (c) Surv-Tek's security interest in cash and accounts receivable is limited as set forth in cash collateral orders entered by the Court, and (d) the generic grant of a security interest in "other personal property" is not a sufficient collateral description to create a security interest in any particular personal property owned by S-Tek.

2. Surv-Tek would be entitled to possession of the collateral if the automatic stay did not prevent Surv-Tek from taking possession of the collateral.

3. Surv-Tek's non-compete obligations under the Non-Compete Agreement are no longer binding on Surv-Tek. *See* Doc. 17. By the terms of the Non-Compete Agreement, S-Tek is required to honor its non-compete obligations under the agreement. However, Surv-Tek's enforcement of that requirement is stayed by the automatic bankruptcy stay imposed under § 362(a).

4. Surv-Tek would be entitled to a turnover order or in the alternative a writ of replevin to enable it to exercise its rights as a secured party if the automatic stay did not prevent it from doing so. Such action, however, is stayed at this time.

**F. Surv-Tek's Claim of Conversion**

Surv-Tek seeks damages, including punitive damages, for S-Tek's alleged wrongful exercise of dominion and control of its collateral by purposely concealing or hiding the collateral in an effort to hinder and delay Surv-Tek's exercise of rights and remedies under the Security Agreement, Lease, and applicable law.

In New Mexico, "[c]onversion is 'the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made.'" *Muncey v. Eyeglass World, LLC*, 2012-NMCA-120, ¶ 22, 289

-121-

P.3d 1255, 1262 (quoting *Nosker v. Trinity Land Co*., 1998-NMCA-035, ¶ 15, 107 N.M. 333,

337-38, 757 P.2d 803, 807). A secured party's interest in collateral is a sufficient interest in

property for purposes of stating a claim for conversion. *See Van Daele Bros., Inc. v. Thoms (In re*

*Thoms)*, 461 B.R. 50, 55 (Bankr. N.D. Iowa), *aff'd*, 460 B.R. 749 (8th Cir. BAP 2011), *aff'd*, 505

F. App'x 603 (8th Cir. 2013) (discussing a claim for conversion of collateral by a landlord in

derogation of the rights of a secured party); *Leban Store Fixture Co., v. Aug. Props.,* 117 A.D.2d

782, 782-84, 499 N.Y.S.2d 109, 110 (1986) (same). In New Mexico. "[p]unitive damages may

be awarded only when the wrongdoer's conduct may be said to be 'maliciously intentional,

fraudulent, oppressive, or committed recklessly or with a wanton disregard of the plaintiffs'

rights.'" *Green Tree Acceptance, Inc. v. Layton*, 1989-NMSC-006, ¶ 9, 108 N.M. 171, 174, 769

P.2d 84, 87 (quoting *Hood v. Fulkerson,* 1985-NMSC-048, ¶ 16, 102 N.M. 677, 680, 699 P.2d

608, 611).

     Surv-Tek argues that S-Tek's removal of collateral from the Leased Premises in

April 2020 constituted conversion, because S-Tek, Mr. Castillo, and Mr. Asselin were taking the

property to hide it from Surv-Tek so that Surv-Tek could not repossess it.

     S-Tek, Mr. Castillo, and Mr. Asselin removed Surv-Tek collateral from the Leased

Premises after Surv-Tek made demand on S-Tek on March 16, 2020 for all amounts owed under

the Note. The demand letter is not in evidence. S-Tek removed the collateral from the Leased

Premises after STIF threatened to change the locks for nonpayment of rent.

     The removal of the collateral from the Leased Premises violated S-Tek's obligations to

Surv-Tek under the Security Agreement. The Security Agreement required that Surv-Tek's

collateral be kept at the Leased Premises, except in the ordinary course of business or with

Surv-Tek's consent. Surv-Tek did not consent to the removal of the collateral, nor was the

removal in the ordinary course of S-Tek's business. S-Tek argues that its removal of the collateral was in its ordinary course of business because it removed the collateral to facilitate its employees working at home due to the Covid-19 pandemic. However, the removal of the collateral occurred after S-Tek stopped making payments under the Note and after Surv-Tek accelerated and demanded full payment of the Note, and occurred while the parties were negotiating a resolution of their disputes. Even if the removal of the collateral otherwise would have been in the ordinary course of business to facilitate employees working at home, the other circumstances in which S-Tek removed the collateral took it out of an ordinary course transaction.

S-Tek's intentional removal of the collateral in violation of the Security Agreement constituted conversion. It constituted the unlawful exercise of dominion and control over personal property in derogation of Surv-Tek's rights in the collateral under the Security Agreement.

Only Surv-Tek, and not STIF, asked for relief on the conversion claim. Therefore, the Court will grant no relief to STIF on the claim. Surv-Tek presented no evidence that Kymberlee Castillo participated in the removal of the collateral from the Leased Premises. Therefore, the Court will grant no relief to Surv-Tek against Kymberlee Castillo on the claim.

Finally, Surv-Tek presented no evidence of damages caused by conversion of collateral. Therefore, the Court will grant no compensatory damages against S-Tek, Mr. Asselin, or Mr. Castillo on the conversion claim. Finally, the Court exercises its discretion not to award any punitive damages against S-Tek, Mr. Asselin, or Mr. Castillo on the claim.

### G. Surv-Tek Parties' Claim for Injunctive Relief

The Surv-Tek Parties seek an injunction ordering S-Tek to surrender possession of the collateral to Surv-Tek and STIF, and produce all quarterly financial statements and satisfactory proof of insurance covering the collateral. For the reasons stated above, this claim is stayed by the automatic stay or is moot. No stay relief has been sought or granted.

### H. Surv-Tek Parties' Claim for Appointment of Receiver

The Surv-Tek Parties seek the appointment of a receiver to take possession of the collateral. This claim was filed in the State Court Action prior to the bankruptcy filing. This claim is stayed by the automatic stay. No stay relief has been sought or granted.

### I. Surv-Tek Parties' Claim for Malicious Abuse of Process

Surv-Tek claims that S-Tek is liable under the tort of malicious abuse of process for filing their supplemental claims on February 16, 2021 (Doc. 29). In the supplemental claims, S-Tek asserts claims for tortious interference with business relationships, fraudulent inducement, and prima facie tort.

The Court has set forth the elements of a claim for malicious abuse of process under New Mexico law in its discussion of S-Tek's claim for malicious abuse of process. Surv-Tek asserts that S-Tek either failed to conduct a reasonable investigation of the facts in support of its supplemental claims or filed the supplemental claims despite knowing that the underlying allegations were false.

The Court disagrees. While the Court has concluded that S-Tek has failed to meet its burden of proof to prevail on any of its supplemental claims, the Court finds and concludes that the S-Tek Parties had a good faith basis to assert their supplemental claims and did not file those

claims in bad faith or with a motive of using the judicial process to accomplish an illegitimate end.

**J.** **Surv-Tek Parties' Claim for Fraud**

Surv-Tek and STIF allege that S-Tek, Mr. Asselin, Mr. Castillo, and Kymberlee Castillo committed fraud.

Surv-Tek and STIF's fraud claim is governed by New Mexico law. As set forth in the discussion of S-Tek's claim of fraud, under New Mexico law the elements of the tort of fraud are (1) a misrepresentation of fact, (2) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation. An element of fraud relating to a party obtaining property by fraud, is that the property was acquired unlawfully, by deception, based on words or conduct that misrepresented a fact.

Surv-Tek and STIF allege that the S-Tek Parties "wantonly misrepresented" that they would fulfill their obligations under the Note, Lease, and the guarantees. The Court has found that the S-Tek Parties in good faith believed that S-Tek would fulfill its obligations under the Note and Lease and that it would be unnecessary for Surv-Tek to call upon the guarantees. There is no evidence to support the conclusion that the S-Tek Parties misrepresented that they would fulfill their obligations under the Note and Lease.

In addition, Surv-Tek and STIF claim that S-Tek, Mr. Asselin and Mr. Castillo defrauded them by:

- removing collateral from the Leased Premises in violation of the Security Agreement.

- failing and refusing to make monthly payments when due under the Note and the Lease.

- failing and refusing to provide requested financial documentation as required under the Security Agreement and the Lease.

- granting a security interest to FICOSO in Surv-Tek and STIF's collateral without their consent and failing and refusing to provide documents related to S-Tek's unauthorized loan with FICOSO.

- failing and refusing to comply with State Court orders in this case, prior to its removal to bankruptcy court − including failing to pay sanctions, bring the Note current, and cease business operations.

Although Mr. Asselin and Mr. Castillo removed collateral from the Leased Premises in violation of the Security Agreement, they acted in the belief that they had the right to do so because they believed S-Tek was acting in the ordinary course of business so employees could work from home during the Covid-19 pandemic. S-Tek's failure to make Note and Lease payments and to bring the Note current occurred as a result of S-Tek's financial difficulties, not fraud. Surv-Tek and STIF did not put on evidence about S-Tek's alleged failure to provide financial documentation or its alleged grant of a security interest to FICOSO. Finally, S-Tek's failure to pay $14,000 in sanctions and its failure to cease business operations as the State Court ordered does not constitute fraud. The S-Tek Parties removed the State Court Action to bankruptcy court in part to free themselves of a judge who was consistently ruling against them, in their view without justification, and to take advantage of the automatic stay and other bankruptcy laws so it could continue to operate S-Tek's business.

Surv-Tek and STIF did not prove the elements of fraud to prevail on their fraud claim against any of the S-Tek Parties.

## III.    HEARSAY OBJECTION

The Court sustains the hearsay objection to the testimony of Cate Stansberry regarding what Mr. Montoya said.

The Court will enter separate orders consistent with this Memorandum Opinion.

-126-

ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: June 13, 2022

COPY TO:

Nephi Hardman
Attorney for S-Tek Parties
Nephi D. Hardman Attorney at Law, LLC
9400 Holly Ave NE Bldg 4
Albuquerque, NM 87122

Christopher M Gatton
Attorney for Surv-Tek Parties
Giddens & Gatton Law, P.C.
10400 Academy NE, Suite 350
Albuquerque, NM 87111

-127-